EXHIBIT 1 TO  DECLARATION OF            *Execution Version*
DAVID DUCLOS DATED 09/01/2016

## DEFAULT PREVENTION AND COLLECTION SERVICES AGREEMENT

This Default Prevention and Collection Services Agreement (hereinafter "Agreement") is entered into by and between First Marblehead Education Resources, Inc. ("FMER"), a Delaware corporation with a principal place of business at 800 Boylston St., 34th Floor, Boston, MA 02199 (together with its successors and assigns, the "Special Servicer") and NCO Financial Systems, Inc., a corporation organized under the laws of the Commonwealth of Pennsylvania having a place of business at 507 Prudential Road, Horsham, PA 19044 (together with its successors and assigns, "NCO").  This Agreement is executed as of March 1, 2009.

**WHEREAS,** FMER as the initial Special Servicer currently provides administration services to certain Delaware statutory trusts (the "Trusts") consisting of alternative student loans ("ASLs"), including the provision of default prevention and collection management services pursuant to that certain Special Servicing Agreement entered into by and among FMER as Special Servicer, U.S. Bank National Association ("U.S. Bank"), as the Back-Up Special Servicer (in such capacity, the "Back-Up Special Servicer") and the Trusts party thereto and dated as of March 1, 2009 (the "Special Servicing Agreement");

**WHEREAS,** NCO provides default prevention and collections services (the "Services") to financial institutions;

**WHEREAS,** the initial Special Servicer desires to arrange for the outsourcing of certain default prevention and collections activities to NCO as hereinafter provided in the event that the Back-Up Special Servicer becomes the Special Servicer under the Special Servicing Agreement pursuant to Section 8 of the Special Servicing Agreement; and

WHEREAS, NCO is willing to provide certain default prevention and collection activities as herein provided in the event that the Back-Up Special Servicer becomes the Special Servicer.

**NOW THEREFORE,** in consideration of these presents and the covenants contained herein the parties hereto hereby agree as follows:

## ARTICLE 1 - DEFINITIONS

1.1     Definitions

"ASL" means an education-purpose loan made by a lender pursuant to the Program Guidelines and now or formerly guaranteed by The Education Resources Institute, Inc. ("TERI"), and such other education loans as the parties may agree to in writing in the future.

"ASL Lender" means the party that originally funded an ASL purchased by a Trust.

"Attempt" means a left message for the borrower or, if applicable, and cosigner of ASL.

"Borrower Data" has the meaning set forth in Section 7.1.

"Claims Package" has the meaning set forth in Section 2.3.

"Confidential Information" has the meaning set forth in Section 7.1.

"Contact" means a telephonic discussion with the borrower and/or cosigner(s) of an ASL.

{F0023045.1 }

"Dedicated Staff" has the meaning set forth in Section 2.10(b).

"Default Collection Reports" means the reports set forth on Exhibit E attached hereto.

"Default Collection Services" means NCO performed default collection services as set forth on Exhibit D attached hereto, and oversight of Default Collectors under Default Collection Agreement(s).

"Default Prevention Reports" means the reports set forth on Exhibit C attached hereto.

"Default Prevention Services" means the services described in Section 2.2 and Exhibit B attached hereto.

"Early Awareness Services" means the services described in Section 2.9 and Exhibit G attached hereto.

"Governmental Authority" means the federal government of the United States, any state government, or any political subdivision of either, or any agency, court or body of the federal government of the United States, of any state, or of any other political subdivision of either, exercising executive, legislative, judicial, regulatory or administrative functions.

"Guaranty Agreement" means the document by that name between each ASL Lender and TERI.

"Program Guidelines" means the document by that name included as a part of the Guaranty Agreement.

"Requirements of Law" means, with respect to any person, any certificate of incorporation, articles of association and, as applicable, by-laws or other organizational or governing documents of such person, and any law, ordinance, statute, rule, regulation, judgment, order, decree, injunction, permit, issuance or other determination, finding, guidance or recommendation of any Governmental Authority or final and binding determination of any arbitrator applicable to or binding upon such person or to which such person is subject, whether federal, state, county or local (including, if applicable, usury laws, the federal Truth-In-Lending Act, the federal Fair Debt Collection Practices Act, the federal Equal Credit Opportunity Act, the federal Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, regulations of the Board of Governors of the Federal Reserve System, and regulations of the Office of Foreign Assets Control, each as amended from time to time).

"Servicers" means the Pennsylvania Higher Education Association Agency, d/b/a American Education Services; Nelnet, Inc., Edfinancial Services, LLC; ACS Education Services, Inc., Chase Student Loan Servicing LLC (f/k/a CFS SunTech Servicing LLC); and Great Lakes Higher Education Servicing Corporation.

"Services" means Default Collection Services, Default Prevention Services, Early Awareness Services and Fraud Claims Review.

"Servicing Guidelines" means the document by that name included as part of the Guaranty Agreement.

"Subservicers" means Special Servicer approved subservicers retained by NCO in conformity with the requirements of Section 2.12 of this Agreement to perform part of the Services.

## ARTICLE II - SERVICES

2.1     Services Generally.   Special Servicer hereby retains NCO to perform the Services set forth herein in the event that, and only in the event that, Special Servicer (including for the avoidance of doubt, U.S. Bank in its capacity as successor Special Servicer) notifies NCO in writing that the Back-Up Special Servicer has assumed the duties of the Special Servicer pursuant to Section 8 of the Special Servicing Agreement. The parties acknowledge and agree that the foregoing reference to the Special Servicing Agreement is intended only as a reference to the conditions under which performance of the Services under this Agreement will begin; it is does not and shall not create duties or obligations for NCO under the Special Servicing Agreement. The parties further agree that upon U.S. Bank assuming the duties of Special Servicer under the Servicing Agreement, all references to "Special Servicer" in this Agreement shall, unless otherwise provided or the context otherwise requires, be deemed to refer to U.S. Bank acting in such capacity. The date of the beginning of the performance of services by NCO referenced in the foregoing sentence shall be the "Effective Date" for purposes of this Agreement (it being acknowledged that NCO shall commence performance of the Services set forth herein immediately upon being notified of the assumption by the Back-Up Special Servicer of the duties of the Special Servicer under the Special Servicing Agreement or such later date (if any) as shall be specified in such written notice). In order for NCO to carry out its duties under this Agreement with respect to the Services, as of the Effective Date, the initial Special Servicer shall cause the Servicers to provide to NCO (a) consumer file data in the manner and form described in Exhibit A (as amended from time to time by Special Servicer), and (b) view-only access to borrower ASL accounts on the Servicers' systems. NCO shall use such data for the purposes of performing the Services, risk modeling, providing reports as set forth in this Agreement, forecasting and billing.

2.2     Default Prevention Services.   NCO shall perform Default Prevention Services in conformity with those Default Prevention Services set forth in Exhibit B attached hereto. NCO shall provide Dedicated Staff to make outbound calls related to accounts thirty (30) days or greater past due referred by Special Servicer and receive inbound calls resulting from NCO's efforts. NCO will also draft and mail letters and conduct other activities reasonably calculated to perform the Services.

(a)     NCO shall provide reports to Special Servicer with respect to the results of Default Prevention Services performed by NCO with the frequency and having the content described in Exhibit C ("Default Prevention Reports").

(b)     NCO shall perform Default Prevention Services in order to maximize "cures" of delinquent loans. "Cures" include: (i) incenting ASL borrowers who are thirty (30) days past due but less than one hundred and eighty (180) days past due to become less than thirty (30) days past due, and (ii) incenting borrowers who are one hundred and eighty (180) days past due with respect to whom the appropriate Servicer has not yet submitted a Claims Package to become less than thirty (30) days past due.

2.3     Default Collection Services.   NCO shall perform Default Collection Services in conformity with those Default Collection Services set forth herein and in Exhibit D attached hereto. NCO shall use Dedicated Staff to perform Default Collection Services. Special Servicer shall cause the Servicers to provide to NCO all documents and information specified in the

Servicing Guidelines to make a claim under the Guaranty to TERI, other than: (i) original notes and (ii) a loan assignment to TERI (the "Claims Package").

    (a)    <u>Generally.</u>

    (i)    Special Servicer shall review the Claims Package for conformity to the Servicing Guidelines and Program Guidelines. Special Servicer shall return the Claims Package to the Servicers for further collection efforts and/or cure by the Servicers as provided in the Servicing Guidelines and Special Servicer's servicing agreement if it detects Servicer error as prescribed in the Servicing Guidelines.

    (ii)    NCO shall reconcile all cash collections with its reported results of operations and transmit all cash receipts (net of the fees set forth on Exhibit H) weekly to Special Servicer. NCO shall provide the Default Collection Reports set forth in Exhibit E. NCO shall assign defaulted ASLs as needed to optimize collection.

    (iii)    From time to time Special Servicer may instruct NCO with respect to collection costs, default interest rates and other adjustments to be made to account balances submitted pursuant to Special Servicer's direction by Servicers to NCO with a Claims Package ("Default Charges"). Special Servicer represents and warrants that all such Default Charges shall conform to all Requirements of Law. Any breach of the foregoing representation shall be subject of indemnification by Special Servicer under Section 8. NCO shall have no responsibility to attempt to collect any Default Charges, whether or not authorized by the ASL documents, except as instructed by Special Servicer.

    (b)    <u>Collection and Credit Reporting Services.</u>

    (i)    NCO will use all reasonable and lawful efforts to collect the full amount due on all accounts placed with it by Special Servicer for collection. Special Servicer may place with NCO various First, Second and Third Placements, as defined in Exhibit D attached hereto and incorporated herein. The full amount due on each account will consist of principal; accrued interest; late fees, if any; and any collection costs and attorneys' fees awarded by a court of competent jurisdiction pursuant to a final judgment and recoverable under the terms of the loan agreement, as well as extrajudicial collection costs recoverable under applicable law. NCO will keep full and accurate records of all borrower Contacts and other collection activity. NCO may negotiate and revise any borrower's repayment schedule in any manner approved in writing by an authorized representative or agent of Special Servicer. NCO may not reduce the amount due on any account, or otherwise decrease the borrower's aggregate obligation on the account, without specific prior written consent of an authorized representative or agent of Special Servicer, except as expressly set forth in this Agreement.

    (ii)    NCO will report the status of each post-default account whenever placed to the three national credit reporting agencies currently known as Equifax, TransUnion and Experian (f/k/a TRW), subject to the provisions of Article V. Reporting the status of an account shall include reporting the status with respect to all co-debtors.

    (iii)    Special Servicer reserves the right to restrict or otherwise limit at any time, from time to time, the manner or means to be used by NCO in collecting any account, which restrictions may be communicated to NCO by Special Servicer orally or in writing, at Special Servicer's sole discretion.

(c)   Source and Timing of Fee Payments. Notwithstanding the fee provisions set forth in Article III, fees due NCO for Default Collection Services, including costs and expenses related to litigation, will be paid on a loan-by-loan basis out of funds held in the Account (as defined in Section 2.6). Fees will be billed weekly and NCO may withdraw billed fees from the Account at such time (i.e., weekly) as it forwards the Account balances to Special Servicer.

2.4   Litigation Management. As part of the Default Collection Services, NCO shall administer collection litigation as described in this section and in Exhibit D attached hereto. Special Servicer may also from time to time designate loans as to which assessment and recovery of collection costs from the borrower in an extrajudicial context are allowed by applicable law, by way of contract or otherwise. NCO will use all reasonable and lawful efforts to collect such collection costs as directed by Special Servicer.

NCO may, with Special Servicer's prior written approval, forward accounts for litigation to an attorney licensed to practice law in the applicable jurisdiction and acceptable to Special Servicer. NCO will handle all routine communication with the attorney on Special Servicer's behalf and will be responsible for monitoring the attorney's performance in litigating the case, collecting on the accounts pre-judgment and collecting on any judgment or settlement. Except in the case where there is no media availability, any decision regarding settlement, dismissal of the action, or the removal of an attorney will require Special Servicer's written consent. Special Servicer recognizes that back up media, sworn statements of account, affidavits and other documentation may be required to pursue legal treatment on accounts placed with NCO. In the event that documentation is required, Special Servicer will comply with NCO's request for media and follow request procedures as agreed upon in work standards. If Special Servicer can not comply with media or documentation requests within a fourteen (14) day period, NCO reserves the right to dismiss any legal action, with our without prejudice and close and return the account back to Special Servicer. In the event that lack of media or documentation results in liability for NCO or Special Servicer, Special Servicer bears the burden of indemnification. At all times, Special Servicer and not NCO will be the client of the collection attorney. Special Servicer agrees promptly to provide all available documentation, written testimony, witnesses and other reasonably necessary materials and assistance requested by NCO in support of such litigation.

(a)   NCO shall be responsible for selecting and directly supervising collection attorneys. NCO will submit lists of collection attorneys used by NCO to Special Servicer, and Special Servicer may, at any time, prohibit the submission of new litigation files to an attorney on its behalf.

(b)   All collection attorneys shall be paid by NCO and Special Servicer shall have no obligation to pay such attorneys.

(c)   NCO will provide evidentiary support for collection attorneys, including basic factual orientation, copies of documents, records of account balances, affidavits and testimony, as reasonably required. Special Servicer will instruct Servicers to provide original documents to NCO upon request from NCO. For this purpose, Special Servicer on behalf of the Trusts hereby appoints NCO as keeper of the applicable Trust's records of all ASLs that are the subject of NCO administration.

(d)     NCO shall supervise the progress of collection litigation and review the progress of their assigned litigation quarterly. Such review shall include the establishment and prosecution of appropriate post-judgment enforcement, to the extent lawful.

(e)     NCO may compromise ASL claims in exchange for immediate payment of not less than ninety percent (90%) of all outstanding principal, interest and other amounts due to Special Servicer. Additional settlement authority given to NCO, if any, is described in Exhibit F, attached hereto. Special Servicer agrees to designate a business contact with authority to review and approve collection settlement proposals with NCO.

(f)     NCO shall promptly transmit to Special Servicer any pleadings or other documents it receives relating to counterclaims naming Special Servicer or any Trust in collection litigation. Upon request, NCO shall assist Special Servicer with respect to management of counterclaims naming Special Servicer or any Trust as a party, including management of local counsel in consultation with Special Servicer.

(g)     All court costs and related expenses, including hourly billing charges, incurred in connection with a legal proceeding shall be paid as set forth in Section 2.3(c). For audit and reconciliation purposes, NCO shall itemize costs for each borrower and the amount and purpose of each expense. Special Servicer will not advance the pre-payment of such costs, and will only reimburse costs that have actually been incurred. The attorney must receive Special Servicer's or NCO's prior written approval before incurring any expense (other than a filing fee, process server fee, or other court cost) in excess of $500.

2.5     Special Accounts.

(a)     In the event any debtor with respect to any ASL that is the subject of Services becomes a debtor under the U.S. Bankruptcy Code, NCO shall immediately cease all Services and submit the file to Special Servicer unless Special Servicer otherwise directs in writing.

Special Servicer undertakes that it will not send to NCO accounts for collection on any indebtedness that it has reason to believe are subject to any bankruptcy proceeding and that it will indemnify and hold harmless NCO from any and all claims and legal actions asserted against NCO, and all money damages and legal costs incurred by NCO, to the extent that the same result solely from Special Servicer's failure to observe such requirement.

(b)     In the event any debtor with respect to any ASL that is the subject of Services is deceased, NCO may accept from the Servicers the documentation specified under "Death Claim" under the Servicing Guidelines and may collect the ASL.

2.6     Special Servicer Funds Account. NCO will credit all funds received from debtors into an FDIC-insured trust fund account (the "Account") for Special Servicer in trust for the benefit of each Trust, which will segregate said funds from NCO's own funds and from the funds of all other NCO clients. Any interest earned on the Account will be forwarded to Special Servicer twice annually at a time Special Servicer directs, or upon reasonable notice by Special Servicer. For purposes of this Agreement and except as set forth in this Agreement, the funds in the Account will be the sole property of Special Servicer in trust for each Trust, and NCO will have no right to pay such funds to any person other than Special Servicer except as specifically authorized in this Agreement. NCO will remit to Special Servicer on a weekly basis on a specified day of every week (or at different periodic intervals chosen by Special Servicer), by

wire transfer to a Special Servicer-designated account, all funds in the Account representing payments received by NCO for the previous week (or alternative periodic interval chosen by Special Servicer), except fees owed to NCO for Default Collection Services (which shall be payable to NCO as set forth in Section 2.3(c)). NCO will submit a report with such wire, described more fully in Exhibit E attached hereto. Special Servicer will promptly notify NCO of any payment that Special Servicer receives directly from a debtor whose account has been assigned to NCO, and will promptly remit to NCO the fee due to NCO with respect to such payment.

2.7     Tax Reporting. NCO shall provide on Special Servicer's behalf all tax reporting required under the federal Internal Revenue Code on defaulted ASLs serviced hereunder, including but not limited to reporting required under sections 1098 and 1099 thereof.

2.8     Early Awareness Services.

(a)     NCO shall perform Early Awareness Services in conformity with those Early Awareness Services set forth herein and in Exhibit G attached hereto. NCO shall use Dedicated Staff to develop and carry out a "Borrower Repayment Education And Counseling" program for borrowers about to enter repayment. The specific objective of this program is to educate borrowers of upcoming payment requirements and advise borrowers, if authorized under the circumstances, of the existence of deferment, forbearance and modified graduated repayments ("MGRS") alternatives under applicable Program Guidelines, to reduce the number and percentage of borrowers becoming subsequently delinquent in the repayment process.

(b)     The purpose of each borrower Contact will be to:

(i)     Remind borrowers of upcoming payment requirements.

(ii)     Get "commitment/promise" from borrowers that they are prepared and intend to meet their payment requirements (for example, by signing up for ACH repayment).

(iii)     Identify borrowers who may have concerns about ability to meet payment requirements.

(iv)     Advise borrowers, only if authorized under the circumstances, of the existence of deferment, forbearance and modified graduated repayments MGRS alternatives under existing Program Guidelines.

(c)     NCO hereby acknowledges that (i) the Servicing Guidelines articulate the specific circumstances under which NCO may advise borrowers of each of the deferment, forbearance and MGRS alternatives; (ii) it is Special Servicer's objective to maximize the number and percentage of borrowers entering repayment as scheduled, (iii) borrowers will be advised of the deferment, forbearance and MGRS alternatives only in accordance with the Servicing Guidelines, and (iii) nothing in this Agreement shall be construed to authorize NCO to offer, provide or enroll borrowers in deferment, forbearance or MGRS alternatives except as set forth in the Servicing Guidelines.

2.10     Staffing. NCO represents and warrants the following with regard to all staff providing the Services to Special Servicer:

(a)     NCO's employees and/or agents are adequately trained to perform the Services with reasonable diligence, in a professional manner, and in compliance with any and all applicable laws and regulations and that NCO's Services will be in compliance with Federal,

state, and local laws, rules and regulations as now in effect and as amended from time-to-time to the extent they are applicable to the subject matter of this Agreement.

(b)     NCO shall provide staffing through its employees and other personnel to Special Servicer (the "Dedicated Staff"). The Dedicated Staff shall only work on Special Servicer ASLs and will perform the Services as directed by the Special Servicer.

(c)     Except as provided Section 2.11 ("NCO Personnel") hereof, NCO shall be responsible for all aspects of providing the Dedicated Staff to perform the Services, including staffing selection, hiring, firing, supervision, and disciplinary procedures, and NCO shall be responsible for all wages, salaries, benefits, workers compensation, unemployment compensation and other amounts due to the Dedicated Staff as well as the withholding of applicable taxes, FICA, and FUTA, provided, however, that nothing contained herein shall be deemed to limit Special Servicer overall management and supervision of the Dedicated Staff and other NCO personnel as more particularly described herein below.

(d)     NCO shall provide the Dedicated Staff at levels mutually agreed upon by Special Servicer and NCO.

(e)     NCO is solely responsible for all aspects of training the Dedicated Staff to perform the Services as required under this Agreement, including training in connection with the Special Servicer's policies and procedures.

(f)     NCO shall be responsible for providing all office and clerical supplies and equipment (fax machines, headsets, copiers, copy paper, pens, forms, etc.) as well as workstation computers, telecommunications all other equipment, materials and furniture necessary to perform the Services.

(g)     NCO will provide management personnel to support the Dedicated Staff required under this Agreement.

2.11   NCO Personnel.

(a)     NCO's employees are not eligible to participate in any of the employee benefit or similar programs of Special Servicer. NCO shall inform all of its employees providing Services pursuant to this Agreement that they will not be considered employees of Special Servicer for any purpose, and that Special Servicer shall not be liable to any of them as an employer for any claims or causes of action arising out of or relating to their assignment.

(b)     Upon the request of Special Servicer for reasonable cause, NCO shall immediately remove any of NCO's employees or Subservicers performing Services under this Agreement at Special Servicer's premises and replace such employee or Subservicer as soon as practicable. Upon the request of Special Servicer, NCO shall promptly, and after consultation with Special Servicer, address any concerns or issues raised by Special Servicer regarding any of NCO's employees or Subservicers performing Services under this Agreement at premises other than Special Servicer premises, which may include, as appropriate, removing such employee or Subservicer from the Special Servicer account.

(c)     NCO shall comply and shall cause its employees and any Subservicers to comply with all personnel, facility, safety and security rules and regulations and other instructions of Special Servicer provided to NCO, its employees or Subservicers, as applicable, in writing, when performing work at a Special Servicer facility, and shall conduct its work at

Special Servicer facilities in such a manner as to avoid endangering the safety, or interfering with the responsibilities of, Special Servicer employees or customers. NCO understands that Special Servicer operates under various laws and regulations that are unique to the security-sensitive financial services industry. As such, persons engaged by NCO to provide Services under this Agreement are held to a higher standard of conduct and scrutiny than in other industries or business enterprises. NCO agrees that its employees and Subservicers providing Services hereunder shall possess appropriate character, disposition and honesty.

(d)     NCO shall not knowingly permit any of its employees or any Subservicer to have access to the Confidential Information, premises, records or data of Special Servicer or any Trust when such employee or Subservicer: (i) has been convicted of a crime or has agreed to or entered into a pretrial diversion or similar program in connection with: (A) a dishonest act or a breach of trust, as set forth in Section 19 of the Federal Deposit Insurance Act, 12 U.S.C. 1829(a); or (B) a felony; or (ii) uses illegal drugs. Notwithstanding anything in this Agreement to the contrary, NCO shall conduct background checks on its employees and those of its Subservicers who will have access (whether physical, remote, or otherwise and whether on or off Special Servicer premises) to Confidential Information or Special Servicer facilities, equipment, systems or data. Such background checks must include, at a minimum the following: (i) the search of such person's social security number to verify the individual's identity and current and previous addresses; (ii) a criminal background search of all court records in each venue of such person's current and previous address over the past five (5) years; (iii) a minimum of one (1) confirmed work reference prior to assignment at NCO; and (iv) the validation of United States citizenship or certification to work in the United States. Additional requirements may be specified by Special Servicer from time to time. NCO shall report to Special Servicer the results of all background checks prior to such employee or Subservicer being granted such access or performing Services hereunder.

(e)     Unless this Agreement specifically provides otherwise, all Services must be performed in the United States (or, with respect to borrowers who are residents of Canada, in Canada) and all Confidential Information must be stored, maintained, accessed from, and utilized only in the United States (or, with respect to borrower who are residents of Canada, in Canada). In the event that NCO employs non-U.S. citizens to provide services hereunder, NCO shall ensure that all such persons have and maintain appropriate visas to enable them to provide the Services.

(f)     Special Servicer shall notify NCO of any act of dishonesty or breach of trust committed against Special Servicer, which may involve an employee or Subservicer of NCO of which Special Servicer becomes aware, and NCO shall notify Special Servicer if it becomes aware of any such offense. Following such notice, at the request of Special Servicer and to the extent permitted by law, NCO shall cooperate with investigations conducted by or on behalf of Special Servicer.

(g)     All employees and Subservicers of NCO performing Services or supporting NCO activities under this Agreement, regardless of their location, shall be validated by NCO to not be on any list published and maintained by the Government of the United States of America of persons or entities with whom any U.S. person or entity is prohibited from conducting business. Currently, the lists of such persons or entities can be found on the following web sites:

i.     Denied Persons List on the Bureau of Industry and Security at http://www.bis.doc.gov/dpl/default.shtm.

ii.     The Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control – Department of Treasury at http://www.ustreas.gov/offices/enforcement/ofac/sdn/index.html.

NCO shall conduct periodic reviews, no less frequently than quarterly, of the lists mentioned above. NCO shall report to Special Servicer immediately if the name of any NCO employee or Subservicer performing the Services matches with the name of any person listed on any list published by the Government of the U.S. of persons or entities with whom any U.S. person or entity is prohibited from doing business.

(h)     Special Servicer shall provide notice to NCO of any changes in Dedicated Staff levels by the 15th of every month for changes to be effective on the 1st of the following month; provided that Special Servicer shall provide NCO with a minimum of thirty (30) days advance notice of any change involving more than ten percent (10%) of the total Dedicated Staff.

2.12     Subservicers. NCO shall not retain any Subservicer to provide Services under this Agreement without first providing advance written notice to Special Servicer; provided, however, NCO shall not permit any Subservicer to have access to Confidential Information, including Borrower Data, without first providing to Special Servicer at least ten (10) days advance written notice of the identity, qualifications, and general proposed activities of such proposed Subservicer. Special Servicer may object to the selection of such proposed Subservicer during said ten (10) day period, in which case NCO shall meet with Special Servicer to discuss Special Servicer's objections and will not retain such Subservicer without Special Servicer's written consent. If Special Servicer does not object within the then (10) day period, Special Servicer shall be deemed to have approved such proposed Subservicer for all purposes disclosed to Special Servicer in the applicable notice from NCO. Any consent by Special Servicer to the engagement of a Subservicer under this Section 2.12 shall not relieve NCO of any of its obligations under this Agreement. NCO shall be responsible for the performance or nonperformance of its Subservicers as if such performance or nonperformance were that of NCO. Notwithstanding the foregoing, the entities listed on Schedule 2.12 attached hereto shall be deemed approved Subservicers hereunder.

## ARTICLE III – FEES FOR SERVICES

3.1     Fees for Services. In consideration of the Services, Special Servicer shall pay to NCO the fees set forth in Exhibit H. NCO shall invoice Special Servicer monthly as of the last date of each month. With the exception of fees due for Default Collection Services which are set forth in Section 2.3(c) herein, invoices shall be due within thirty (30) days after invoice date. NCO may submit invoices electronically in a mutually agreed format. Any amount not subject to a bona fide dispute and unpaid more than thirty (30) days after invoice date shall be subject to a late fee of one and one-half percent (1.5%) per month until paid in full. Monthly invoices shall be accompanied by a loan level report in a format mutually acceptable to NCO and Special Servicer enabling Special Servicer to reconcile the invoice with the services provided.

3.2     Expenses. NCO will bear all its own expenses in connection with its services hereunder. No thing or service costing more than one hundred dollars ($100.00) will be purchased in regard to any account without prior written approval of an authorized representative

or agent of Special Servicer, except for required court costs which are paid by Special Servicer as set forth in Section 2.3(c) herein.

## ARTICLE IV - REPRESENTATIONS AND WARRANTIES

4.1     <u>Representations and Warranties of Special Servicer</u>.  Special Servicer hereby represents and warrants to NCO as follows:

(a)     <u>Organization</u>.  It is a national banking association organized, validly existing and in good standing under the laws of the United States and has full power and authority to conduct its business as it is presently being conducted.

(b)     <u>Authorization</u>.  It has all necessary corporate authority and has taken all necessary corporate action to enter into this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder.  This Agreement has been duly executed and delivered by Special Servicer and is a legal, valid and binding obligation of Special Servicer, enforceable against it in accordance with its terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, rearrangement, reorganization or similar debtor relief legislation affecting the rights of creditors generally from time to time in effect and by general principles of equity (regardless of whether such enforcement is sought in a proceeding at law or in equity) and the discretion of the court before which any proceeding therefor may be brought.

(c)     <u>Absence of Conflicts</u>.  Neither the execution and delivery of this Agreement by Special Servicer nor the performance by Special Servicer of its obligations hereunder will result in (i) a violation of the articles of association of Special Servicer, (ii) a breach of, or a default under, any contract, agreement, instrument, lease, commitment, franchise, license, permit or authorization to which Special Servicer is a party or by which it or its assets are bound, which breach or default would have a material adverse effect on its business or financial condition or its ability to consummate the transactions contemplated hereby, or (iii) a violation by Special Servicer of any Requirements of Law, which violation would have a material adverse effect on Special Servicer's business or financial condition or its ability to consummate the transactions contemplated hereby.

(d)     <u>Consents and Approvals</u>.  Special Servicer has obtained any and all consents, approvals or authorizations of, and made any and all declarations, filings or registrations with, any Governmental Authority, or any other Person, required to be obtained or made by Special Servicer in order to execute, deliver and perform its obligations under this Agreement or consummate the transactions contemplated hereby, except where the failure to do so would not have a material adverse effect on its business or financial condition or its ability to consummate the transactions contemplated hereby.  Special Servicer represents that it is fully authorized and empowered to refer accounts to NCO for Services. Special Servicer represents that any interest or additional charges added to any account by Special Servicer, or which Special Servicer directs NCO to add, are authorized by contract or are otherwise authorized by law.

(e)     <u>Litigation</u>.  There is no action, order, writ, injunction, judgment or decree outstanding or claim, suit, litigation, proceeding, labor dispute, arbitral action or investigation pending, or to the actual knowledge of Special Servicer threatened, against or relating to Special Servicer that would have a material adverse effect on this Agreement or on Special Servicer's ability to consummate the transactions contemplated hereby.

(f)     Accounts. With respect to Default Collection Services, Special Servicer undertakes that it will not send to NCO accounts for collection on any indebtedness that it has reason to believe are subject to any bankruptcy proceeding and that it will indemnify and hold harmless NCO from any and all claims and legal actions asserted against NCO, and all money damages and legal costs incurred by NCO, to the extent that the same result solely from Special Servicer's failure to observe such requirement.

4.2     Representations and Warranties of NCO. NCO hereby represents and warrants to Special Servicer as follows:

(a)     Organization. It is duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania, and has full corporate power and authority to conduct its business as it is presently being conducted.

(b)     Authorization. It has all necessary corporate authority and has taken all necessary corporate action to enter into this Agreement to consummate the transactions contemplated hereby and to perform its obligations hereunder. This Agreement has been duly executed and delivered by NCO and is a legal, valid and binding obligation of NCO, enforceable against it in accordance with its terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, rearrangement, reorganization or similar debtor relief legislation affecting the rights of creditors generally from time to time in effect and by general principles of equity (regardless of whether such enforcement is sought in a proceeding at law or in equity) and the discretion of the court before which any proceeding therefor may be brought.

(c)     Absence of Conflicts. Neither the execution and delivery of this Agreement by NCO nor the performance by NCO of its obligations hereunder will result in (i) a violation of the articles of incorporation or charter documents of NCO, (ii) a breach of, or a default under any contract, agreement, instrument, lease, commitment, franchise, license, permit or authorization to which NCO is a party or by which it or its assets are bound, which breach or default would have a material adverse effect on its business or financial condition or its ability to consummate the transactions contemplated hereby, or (iii) a violation by NCO of any Requirements of Law, which violation would have a material adverse effect on NCO's business or financial condition or its ability to consummate the transactions contemplated hereby.

(d)     Consents and Approvals. NCO has obtained any and all consents, approvals or authorizations of, and made any and all declarations, filings or registrations with, any Governmental Authority, or any other person, required to be obtained or made by NCO in order to execute, deliver and perform its obligations under this Agreement or consummate the transactions contemplated hereby, except where the failure to do so would not have a material adverse effect on its business or financial condition or its ability to consummate the transactions contemplated hereby.

(e)     Litigation. There is no action, order, writ, injunction, judgment or decree outstanding or claim, suit, litigation, proceeding, labor dispute, arbitral action or investigation pending, or to the actual knowledge of NCO threatened, against or relating to NCO that would likely have a material adverse effect on this Agreement or on NCO's ability to consummate the transactions contemplated hereby.

(f)     Best Efforts. NCO will utilize its best efforts and competence in rendering services and in performing its duties hereunder and shall not use any method prohibited by

federal, state or local laws, regulations or procedures, including but not limited to any applicable consumer protection or bankruptcy laws, regulations or procedures in collecting the account balances. . NCO has not, does not and will not represent, warrant, or guarantee the collections or timing of any collections of any accounts assigned to it under this Agreement. Also, NCO will not conduct its business in a manner calculated or reasonably expected to result in unfavorable public opinion or notoriety to Special Servicer, Special Servicer or any Trust or to result in litigation being threatened or instituted against Special Servicer, Special Servicer or any Trust. NCO will promptly give oral and written notice to Special Servicer of any federal, state or local administrative or court proceeding affecting NCO or any of its officers, agents, servants or employees in the collection of Special Servicer's accounts.

(g)     Legal Proceedings.  In the event of any lawsuit in which counterclaims are interposed by a debtor, or where a debtor shall make any other claim against Special Servicer or any Trusts, the same shall be immediately referred by NCO to Special Servicer and Special Servicer shall have the right to intercede and defend such action.  No criminal proceedings, real property executions, bailable attachments, commitment orders or other enforcement proceedings, except for the issuance of a subpoena to examine the debtor and restraining notices, shall be instituted by NCO without prior written approval of Special Servicer.

## ARTICLE V - GENERAL COVENANTS OF THE PARTIES

5.1     Compliance With Requirements of Law.  NCO and Special Servicer each shall comply with all applicable Requirements of Law in performing its respective obligations under this Agreement.

(a)     Collection Practices.  NCO warrants and represents that it has special knowledge and skills necessary to perform collection services properly, and has trained its employees to use such knowledge and skills in the performance of such services.  NCO further warrants and represents that its performance of its obligations hereunder, including but not limited to its collection and credit reporting practices, will fully comply with all applicable Requirements of Law, and any and all rules of conduct required by Special Servicer from time to time.  NCO shall keep itself fully informed regarding existing and pending legislation and regulatory rule-making or other action relating to collection and credit reporting practices and procedures.

(b)     Licensing.  NCO warrants that it will maintain in full force and effect all licenses required under Applicable Law for the conduct of all activities contemplated by this Agreement and comply with all Requirements of Law relative to its licenses.  NCO will furnish Special Servicer with copies of such licenses on request.

(c)     Records.  NCO warrants that it will maintain all records required of it under any Requirements of Law.  It will furnish copies of all such records to Special Servicer upon request.

5.2     Insurance, etc.  NCO warrants that it will maintain all insurance, bonds, capital reserves, and the like that may be required of it under any Requirements of Law.  NCO will provide Special Servicer with satisfactory evidence thereof upon request.

(a)     Special Servicer will notify NCO of any facts known to it concerning a

particular loan that may limit the collection activities that NCO can undertake with respect to such loan, such as, without limitation, the fact that the borrower has notified Special Servicer that he or she has retained counsel.

(b)     NCO shall, at all times and at NCO's cost and expense, keep in full force and effect the following insurance coverages with insurers that have ratings from A.M. Best of not less than "A" or a comparable rating from another nationally recognized rating agency reasonably acceptable to Special Servicer:

i.     Employee dishonesty coverage at a limit not less than $1,000,000 per occurrence, insuring against theft or misappropriation of money or Confidential Information of any affiliate or subsidiary of Special Servicer or any Trust for which NCO may be held legally liable;

ii.     Professional liability/errors and omissions liability coverage at a limit not less than $1,000,000 per occurrence, extending to Special Servicer, any affiliate or subsidiary of Special Servicer or any Trust as additional insureds, insuring against claims for loss attributable to wrongful acts of NCO, including wrongful acts of NCO's employees, in the performance of Services under this Agreement;

iii.     Commercial general liability coverage on an occurrence basis, including bodily injury liability, property damage liability, personal injury liability, and contractual liability coverages, extending to Special Servicer, any affiliate or subsidiary of Special Servicer or any Trust as additional insureds, with respect to claims arising from NCO's operations in connection with this Agreement, at a combined single limit not less than $1,000,000 per occurrence and combined annual aggregate liability limit of not less than $2,000,000;

iv.     Business automobile liability coverage for claims of bodily injury or property damage arising from the operation of vehicles owned, leased, hired or borrowed by NCO or on NCO's behalf in connection with Services performed under this Agreement, at a combined single limit not less than $1,000,000 per occurrence;

v.     Workers' compensation coverage providing statutory benefits as required in any and all jurisdictions where Services will be performed under this Agreement;

vi.     Employer's liability coverage, extending to Special Servicer, any affiliate or subsidiary of Special Servicer or any Trust as additional insureds, at limits not less than $1,000,000 per accident for injury by accident, and $1,000,000 per employee and in the aggregate for injury by disease;

vii.     Umbrella or excess liability coverage, extending to Special Servicer, any affiliate or subsidiary of Special Servicer or any Trust as additional insureds, at a limit not less than $4,000,000 per occurrence, which is to apply in excess of the commercial general liability, business automobile liability and employer's liability coverages identified in subparts (iii), (iv) and (vi) of this Paragraph 23(a).

(c)     Evidence of Insurance.  NCO shall provide Special Servicer with certificates of insurance providing evidence of all these required coverages prior to the commencement of Services under this Agreement, and thereafter upon the renewal or replacement of any of the policies.  Said certificates shall identify significant policy exclusions that would have a bearing upon the Services provided under this Agreement.

## ARTICLE VI - BOOKS AND RECORDS: AUDIT RIGHTS

6.1    Maintenance of Books and Records.  NCO will keep proper books and records reflecting all of its business affairs and transactions so that its financial statements, consolidated with its affiliates, are in accordance with GAAP.  NCO shall maintain its books and records relating to activities under this Agreement throughout the term hereof and thereafter for such periods as are required under applicable Requirements of Law or NCO's policy, whichever is longer.

6.2    Audit Rights.

(a)    Special Servicer shall have the right to review, inspect and audit, at Special Servicer's expense, once each calendar year (or more than once in a calendar year in the event that Special Servicer requires the review, inspection or audit in order to respond to a court order, civil investigation demand or other government or regulatory agency inquiry), the books and records of NCO related to: (i) NCO's activities hereunder or (ii) conformance with NCO's obligations hereunder.

(b)    No later than thirty (30) days prior to the commencement of any review, inspection or audit, Special Servicer shall provide to NCO written notice of its intent to perform a review, inspection or audit, which notice shall include in reasonable detail the scope thereof and the supporting documentation to be requested.  Within fifteen (15) days of receipt of any such notice, NCO shall notify Special Servicer, in writing of any objections to the scope of the review, inspection or audit or the supporting documentation requested, it being understood that any objections of NCO must be based upon a reasonable and documented belief that such review, inspection, audit or documentation is not reasonably related to NCO's obligations under this Agreement or would require the disclosure of proprietary information (other than information that is proprietary solely as a result of this Agreement).  Special Servicer and NCO shall cooperate in good faith to resolve objections with respect to any review, inspection or audit proposed by Special Servicer and such review, inspection or audit shall not commence until such objections are resolved.  In the event the parties are not able to resolve such objections, the matter shall be resolved in accordance with the procedures set forth in Section 11.2.

(c)    Any review, inspection or audit to be performed by Special Servicer pursuant to this Section 6.2 shall be conducted only during normal business hours and with reasonable advance notice, using reasonable care not to cause damage and not to interrupt the normal business operations of NCO.

(d)    NCO will engage, at its sole expense, an unrelated American Institute of Certified Public Accountants ("AICPA") certified public accounting firm acceptable to Special Servicer to conduct reviews of NCO's general controls and practices associated with NCO's facilities and Subservicers facilities engaged in providing Services, as well as the controls associated with the services and the programs used to provide Services.  The scope of the audit shall include all such matters as NCO's auditor deems necessary or required to meet regulatory compliance standards, including but not limited to an examination of the record keeping system and other equipment and software used by NCO.  Such reviews shall be performed at such frequency and times as NCO shall determine, but shall be performed at least once annually.  Within thirty (30) days of its receipt by NCO, NCO shall provide Special Servicer with a copy of each report and the related working papers submitted by NCO's independent accountants regarding any of the matters set forth in this paragraph.  All such reviews shall comply with

AICPA SAS-70 standards or equivalent thereof, and the reports obtained shall be of the type generally referred to (depending on the publication) as either type "2" or "B", and shall include an unqualified opinion on the operating effectiveness of NCO's controls. All such reviews shall also comply with Security Standards Certification ISO 17799/BS7799 or equivalent thereof. If a SAS 70 or equivalent audit reveals that the services provided by NCO do not cause NCO's operations to meet the auditor's recommendation, then NCO shall promptly provide such further services as are necessary to bring its operations into conformance with the auditor's recommendations to such level and degree, at no cost to Special Servicer.

    6.3    <u>Regulatory Agency Requirements.</u>

    (a)    NCO understands and acknowledges that Special Servicer may be subject to examination by any federal, state or local governmental or quasi-governmental officials with regulatory authority over Special Servicer and its affiliates. NCO agrees to cooperate fully with any examination or inquiry by any such officials or other regulatory body or agency. NCO further acknowledges that Special Servicer, as a regulated financial institution, is required to engage in ongoing oversight of its relationship with NCO, including, but not limited to, reviewing NCO's compliance with privacy laws and regulations, insurance coverage, and performance under this Agreement. NCO agrees to notify Special Servicer promptly in writing in the event it experiences any material adverse change, including but not limited to, material financial difficulty, other catastrophic event, material change in strategic goals, or significant staffing changes relative to its obligations under this Agreement.

    (b)    Within thirty (30) days of its receipt, to the extent NCO is permitted to do so, NCO shall provide Special Servicer with a copy of the results of any audit performed by a federal, state or local regulator, but only to the extent such audit relates to compliance by NCO with applicable law and to the Services performed by NCO for Special Servicer hereunder. If such audit reveals that the Services provided by NCO do not cause NCO's operations to meet the auditor's recommendation, then NCO shall provide such further Services as are necessary to bring its operations into conformance with the auditor's recommendations to such level and degree, at no cost to Special Servicer.

## ARTICLE VII - CONFIDENTIALITY

    7.1    <u>Confidentiality.</u> NCO acknowledges and agrees that all information provided to NCO by Special Servicer is considered confidential or proprietary and is provided to NCO solely to enable NCO to perform the Services and related functions set forth in Article II of this Agreement. For purposes of this Agreement, "Confidential Information" of Special Servicer means all confidential or proprietary information and documentation and data (whether technical, commercial or other in nature) of such party, whether or not marked as such and/or whether now in existence or hereafter created including, without limitation all Borrower Data and any other Trust data. For purposes of this Agreement, "Borrower Data" means any and all data and information of any kind or nature provided to NCO by or on behalf of Special Servicer or arising out of or in connection with this Agreement with respect or relating in any way to borrowers individually or in the aggregate. NCO shall hold the Confidential Information of Special Servicer in confidence and shall not disclose nor use such Confidential Information other than for the purposes contemplated by this Agreement without prior written consent of Special Servicer. Notwithstanding any provision in this Agreement to the contrary, NCO shall limit the use and circulation of such information, even within its own organization, solely to the extent

necessary to perform its obligations under this Agreement. Confidential Information shall not include information that: (i) has been disclosed in the public domain prior to the date hereof; (ii) becomes, through no fault nor action of either party, hereafter disclosed in the public domain; (iii) is now or comes into the possession of NCO without any obligation of confidentiality. Special Servicer acknowledges that NCO and/or its affiliates may have legitimately obtained Borrower Data through prior relationships and that such data is held under restrictions arising out of such relationships and not under this Agreement. In addition, the substance of the negotiations of this Agreement and the terms of this Agreement are Confidential Information subject to the restrictions contained in this Agreement. NCO shall not be considered to have breached its obligation by disclosing Confidential Information of the Special Servicer in response to the order of any competent court or governmental agency; provided, however, that upon receipt of such order, NCO shall promptly provide to the Special Servicer notice of such request to enable the Special Servicer to seek an appropriate protection order or take other action to assure the confidential handling of the Confidential Information. All such Confidential Information shall remain the exclusive property of Special Servicer.

      7.2    <u>Restricted Use</u>. NCO agrees not to utilize any Confidential Information, unless it is necessary to do so in order to fulfill an obligation under this Agreement. NCO also agrees that it will not sell, disclose, transfer, or rent any Confidential Information to any third party nor will it use any Confidential Information on behalf of any third party, without the express written permission of Special Servicer. NCO shall provide all notices and perform all other activities required of it to comply with the Gramm-Leach-Bliley Act and regulations promulgated thereunder and any other applicable federal, state and local privacy laws in connection with the Confidential Information received in connection with this Agreement.

      7.3    <u>Injunctive Relief</u>. NCO acknowledges that money damages may be both incalculable and an insufficient remedy for any breach of this provision by NCO and that any such breach may cause Special Servicer, the Trusts and others irreparable harm. Accordingly, NCO agrees that in the event of any breach of this Article VII, Special Servicer or any Trust, in addition to any other remedies at law or in equity that it may have, shall be entitled without requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance without proof of actual damages.

      7.4    <u>Information Protection and Security</u>.

      (a)    NCO may receive or otherwise have access to Borrower Data in connection with providing Services to Special Servicer pursuant to the terms of the Agreement. NCO shall implement and maintain an appropriate security program for Borrower Data designed to meet the following Objectives (defined below) of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information pursuant to the authority of Section 501(b) of the Gramm-Leach-Bliley Act of 1999. "Objectives" means a program designed to (i) ensure the security and confidentiality of Borrower Data; (ii) protect against any anticipated threats or hazards to the security or integrity to Borrower Data, and (iii) protect against unauthorized access to or use of Borrower Data that could result in substantial harm or inconvenience to any Special Servicer or any borrower. NCO shall provide Special Servicer on or prior to the Effective Date and thereafter, upon request, with a copy of its Information Security and Assurance Policy and any updates or amendments thereto. NCO agrees that upon reasonable notice and at NCO's convenience, Special Servicer or any agent or representative thereof may come to NCO's place of business and review the specifics of NCO's security plan with NCO. It is understood and

agreed that NCO shall not be required to have a security program in place that implements every security measure listed in each paragraph of Section III C of Appendix A to 12 CFR § 30 provided that NCO's security program is appropriate to address the level of risk and otherwise meets the Objectives. Special Servicer, its internal and external auditors and regulatory agencies ("Auditors") shall be permitted, during normal business hours, to audit NCO's security program upon provision of reasonable prior notice and provision of an agenda for the audit requirements. NCO shall be subject to said audits as long as NCO continues to maintain, store or have access to Borrower Data.

      (b)    NCO presently maintains and agrees it will continue to maintain appropriate physical, electronic, procedural and technical safeguards to protect all Borrower Data from unauthorized disclosure, misuse, alteration, destruction or other compromise that are consistent with appropriate industry practices and no less stringent than those used to protect the Confidential Information of NCO.

      (c)    As part of its information security program, NCO shall take appropriate measures to properly dispose of Borrower Data. These measures will include, at a minimum:

      i.    Burning, pulverizing or shredding of papers containing Borrower Data so that the Borrower Data cannot practicably be read or reconstructed;

      ii.    Ensuring the destruction or erasure of electronic media containing Borrower Data so that the Borrower Data cannot practicably be read or reconstructed; and/or

      iii.    Ensuring that any third party who performs the activities described in (i) and (ii) on behalf of NCO above does so in a manner consistent with this Section.

      (d)    NCO shall ensure that it does not retain Confidential Information of Special Servicer for longer than it needs such information to perform its obligations hereunder. NCO's disposal policy shall require that such information is reviewed and destroyed on a routine basis consistent with NCO's disposal policy. NCO shall, upon the reasonable request of Special Servicer, provide to Special Servicer the certificate of destruction as prescribed by Special Servicer. It is understood that information sent in an intangible or electronic format cannot be removed, erased or otherwise deleted from archival systems (also known as "computer or system back-ups") but that such information will continue to be protected under the confidentiality requirements contained in this Agreement for as long as such information remains accessible and/or vulnerable to unauthorized access use or disclosure. Notwithstanding anything to the contrary contained herein, NCO may retain an archival copy of any document for its permanent records to the extent required by applicable law or regulation of NCO's document retention policy. The rights and obligations of the parties under this Agreement will survive any return or destruction of Confidential Information.

      (e)    NCO shall have in place and follow a routine destruction policy for all Confidential Information of Special Servicer (whether in electronic, paper or other form) related to NCO's performance under this Agreement. No such materials will be retained longer than such period as is set forth in NCO's policy period for retention unless mandated under this Agreement or by applicable law.

7.5    Security Breach.  In the event NCO knows or reasonably believes that there has been any unauthorized acquisition of or access to data that compromises the security, confidentiality, or integrity of Borrower Data maintained by or for NCO (a "Breach"), NCO shall take the following actions:

(a)    Notify Special Servicer of such breach as soon as practicable;

(b)    Identify to Special Servicer, at no cost to Special Servicer, what specific Borrower Data, by borrower and/or account number has or may have been breached;

(c)    Monitor, or cause to be monitored at NCO's sole expense, any affected accounts for any unusual activity for a period of 12 months from the discovery of the breach;

(d)    Take such commercially reasonable measures, at the sole cost of NCO, as may be requested by the Special Servicer to contain and control the incident to prevent further unauthorized access;

(e)    Remedy the circumstances that permitted such breach to occur; and

(f)    Cooperate with Special Servicer as necessary to facilitate Special Servicer's compliance with any applicable Federal or state law regarding unauthorized access of Borrower Data.

In addition to and not by way of limitation of any and all damages for which NCO is or may become obligated under this Agreement to pay to owner (i.e., the applicable Trust), NCO shall fully reimburse Special Servicer for the actual costs of mailing notices to individuals whose data has or may have been breached, to the extent such breach is the result of NCO's breach of this Agreement, NCO's failure to conform to applicable law, or NCO's negligence.

The obligations contained in this Section 7.5 shall survive the termination of this Agreement.

## ARTICLE VIII - INDEMNIFICATION AND EXCLUSION

8.1    Indemnity.

(a)    NCO shall defend, indemnify and hold harmless Special Servicer and the applicable Trust, or any affiliate or subsidiary of Special Servicer or any Trust (each an "Special Servicer Indemnified Party") from and against any and all damages arising out of or resulting from third party claims relating to (i) the breach of any representation or warranty, covenant or agreement of NCO contained in this Agreement; (ii) any inaccurate information or inaccurate materials provided by NCO to Special Servicer in connection with providing the Services.  In addition, NCO shall reimburse Special Servicer for all costs incurred by Special Servicer resulting from third party investigation of the acts and practices of NCO, including expenses related to compliance with any third party subpoena or with any other discovery proceeding, if such investigation is due to the negligent act of NCO or breach of this Agreement by NCO.

(b)    NCO shall defend, indemnify and hold harmless each Special Servicer Indemnified Party from and against all damages arising out of or resulting from any action by a third party against such Special Servicer Indemnified Party that is based on any claim that any

intellectual property used in the performance of this Agreement infringes a patent, copyright, or trademark or violates a trade secret or other proprietary right of any person or entity.

(c)     Special Servicer shall defend, indemnify and hold harmless NCO or any affiliate or subsidiary of NCO (each a "NCO Indemnified Party") from and against all damages arising out of or resulting from any action by a third party against such NCO Indemnified Party that is based on any claim resulting from (i) the breach of any representation or warranty, covenant or agreement of Special Servicer contained in this Agreement; (ii) any information or materials provided by Special Servicer to NCO for use in providing the Services; or (iii) the nature or use of Special Servicer's products or services. In addition, Special Servicer shall reimburse NCO for all costs incurred by NCO resulting from third party investigation of the acts and practices of Special Servicer, its subsidiaries and affiliates, including expenses related to compliance with any third party subpoena or with any other discovery proceeding.

(d)     An indemnified party which intends to claim indemnification under Section 8.1 shall promptly notify the indemnitor in writing of any action, claim or liability with respect to which the indemnified party intends to claim such indemnification. The indemnified party shall permit the indemnitor, at its discretion, to settle any such action, claim or liability and agrees to the control of such defense or settlement by the indemnitor; provided, however, such settlement does not adversely affect the indemnified party's rights hereunder or impose any obligations on the indemnified party in addition to those set forth herein in order for it to exercise such rights. No such action, claim or liability shall be settled without the prior written consent of the indemnitor and the indemnitor shall not be responsible for any attorneys' fees or other costs incurred other than as provided herein. The indemnified party shall cooperate fully with the indemnitor and its legal representatives in the investigation and defense of any action, claim or liability covered by this indemnification. The indemnified party shall have the right, but not the obligation, to be represented by counsel of its selection and expense

(e)     This provision shall not be construed to limit the rights, obligations, liabilities, claims or defenses of either party or any indemnified party which arise as a matter of law or pursuant to any other provision of this Agreement.

8.2     Exclusions from Liability.

(a)     Except as provided in this Article VIII, in no event shall NCO or Special Servicer be liable for consequential, incidental, punitive, special, or indirect damages.

(b)     Except as otherwise provided herein, neither party's liability hereunder shall exceed an amount equal to the service fees payable by Special Servicer to NCO in the month immediately preceding the claim to which such liability relates, multiplied by twelve (12).

(c)     The limitation of liability provisions of subsections 8.2(a) and 8.2(b) do not apply to liability that is the result of either party's breach of (i) the confidentiality, privacy, or security obligations or provisions contained in this Agreement or (ii) such party's indemnification obligations.

(d)     The limitation of liability provisions of subsections 8.2(a) and 8.2(b) also do not apply to any third party claim against an indemnified party arising out of the indemnifying party's failure to comply with the terms and conditions of this Agreement, if such claim results in such indemnified party being liable for consequential, incidental, special or indirect damages

to such third party. Such damages will be considered to be direct damages incurred by the indemnified party.

The obligations set forth in this Article VIII shall survive termination or expiration of this Agreement.

## ARTICLE IX - TERM AND TERMINATION

9.1  Term of Agreement.

(a)  The initial term of this Agreement shall commence as of the Effective Date and shall continue in effect for a period of three (3) years, unless sooner terminated pursuant to Section 9.2 (the "Initial Term").

(b)  Upon conclusion of the Initial Term or any succeeding term, this Agreement shall automatically renew for an additional, successive one (1) year term, unless either party shall give a written notice of non-renewal to the other party not less than ninety (90) days prior to the conclusion of such term.

9.2  Termination for Cause. Either party may terminate this Agreement upon the occurrence of any of the following events, by delivery of a written notice of termination to the other party:

(a)  NCO shall file, or after the Effective Date, Special Servicer shall file, a petition to take advantage of any applicable insolvency or reorganization statute; or shall file a petition or answer seeking or shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to such party or relating to all or substantially all of its property; or a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or the winding-up or liquidation of its affairs, shall have been entered against such party, which decree or order entered against such party shall have remained in force undischarged or unstayed for a period of sixty (60) days; or such party shall be insolvent, admit in writing its inability to pay its debts generally as they become due, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations; or

(b)  Any other party shall fail to perform any of its obligations or shall breach any of its representations, warranties or covenants in this Agreement, including without limitation representations and warranties set forth in Article IV (Representations and Warranties), covenants set forth in Article V (General Covenants), or Article VII (Confidentiality), in any material respect and such failure or breach continues unremedied after the expiration of thirty (30) days (or such shorter period that is reasonable depending on the materiality of the failure or breach or the potential significance of its impact on the other party) following written notice to such party specifying the nature of such failure or breach and stating the intention of the terminating party to terminate this Agreement absent a cure of such failure or breach within such thirty (30) day (or shorter) period.

9.3  Termination of Specific Accounts.

(a)    Special Servicer may terminate this Agreement with regards to individual accounts at any time, and NCO shall close and return such accounts to Special Servicer immediately.

(b)    If a borrower should enter into bankruptcy voluntarily or involuntarily at any time after his or her account is referred to NCO, NCO will immediately notify Special Servicer and this Agreement will be deemed terminated as to such account unless Special Servicer otherwise directs in writing

(c)    With respect to default Collection Services, this Agreement shall terminate automatically as to any account at six (6) months from the date the account was referred to NCO, or from date of last payment, whichever is later, or nine (9) months on Third Placements, unless at such time the account has been referred to an attorney for litigation and litigation is pending. NCO will upon termination as to an account forthwith send to Special Servicer, at Special Servicer's request and at NCO's expense all documentation on the account, including a full record of all collection activities.

9.4    Rights and Obligations Upon Notice of Termination.

(a)    Requirements Upon Termination. Upon the termination or expiration of this Agreement, NCO shall cease all Services and subject to the data security provisions in section 7.4 herein, return to Special Servicer or destroy all Confidential Information within thirty (30) days from the date of termination or as otherwise mutually agreed upon by the parties in writing. Notwithstanding the foregoing, NCO shall be permitted to retain certain files pursuant to Section 6.1. If applicable, NCO shall also provide to Special Servicer a final reconciliation of all amounts collected by Subservicers, collect all original files from Subservicers, and transmit all such files to Special Servicer. NCO shall report to Special Servicer its record of all account balances of all ASLs that were the subject of Default Collection Services at the time of termination.

(b)    Survival. The provisions of Sections 5.2, 9.4, Article VII, and Article VIII shall survive the termination or expiration of this entire Agreement.

(c)    Final Invoice. NCO shall send to Special Servicer a final invoice for Services performed within thirty (30) days of termination of this Agreement.

## ARTICLE X - DISASTER RECOVERY AND BUSINESS CONTINTUITY

10.1    NCO shall maintain and shall test at least once annually plans to continue business in the event of an interruption to its business or unavailability of any site from which Services are being performed (the "Disaster Recovery/Business Continuity Plans"). NCO agrees to maintain viable Disaster Recovery/Business Continuity Plans for the Services which includes, among other things, provision for the remote storage of computer software and data, the availability of a location for off-site computer services and procedures covering all of NCO's facilities used in connection with the Services in order to insure continuance of Services in the event of a disaster affecting any such NCO facility and storage of a complete system image tape of both object code and source code for software at an off-site storage location designated by NCO and disclosed to Special Servicer. In the event of a natural or other disaster beyond NCO's control that interrupts NCO's performance of any such Services for any period, NCO shall promptly respond to such disaster in accordance with the procedures contained in the Disaster Recovery/Business Continuity Plans in order to resume performance of such Services.

10.2    NCO shall annually test its Disaster Recovery/Business Continuity Plans and shall update in a timely manner such Disaster Recovery/Business Continuity Plans. NCO shall provide Special Servicer with a summary report of the results of such testing annually. If Special Servicer requests, it shall be permitted to participate in NCO's testing of its Disaster Recovery/Business Continuity Plans to the extent such test relates to Services provided to Special Servicer.

10.3    Prior to execution of this Agreement, NCO shall provide a copy of its Disaster Recovery/Business Continuity Plans to Special Servicer (including in electronic form). Any material changes to NCO's Disaster Recovery/Business Continuity Plans will be subject to Special Servicer's prior written consent which shall not be unreasonably withheld and will conform to reasonable commercial and industry standards for such plans. Special Servicer, or its designated representative, shall be entitled to review such Disaster Recovery/Business Continuity Plans annually during the term of this Agreement at NCO's corporate headquarters.

10.4    Notwithstanding any provision in this Agreement to the contrary, NCO's Disaster Recovery/Business Continuity Plans required under this Agreement must meet Special Servicer's Recovery Time Objective ("RTO") and Recovery Point Objective ("RPO") for the business function being serviced, as defined below, <u>unless</u> events or circumstances beyond NCO's control prevent NCO from implementing its Disaster Recovery/Business Continuity Plans:

> Services will be available within a forty-eight (48) hour period following any outage/incident (RTO = 48 hours), with at least 99.99% preservation of data (RPO = 99.99) through the close of business on the day preceding the outage/incident.

10.5    NCO shall, as soon as practicable, notify Special Servicer of any interruption to NCO's business or unavailability of any site from which Services are being performed. As soon as possible (and in no event more than twenty-four (24) hours) following any such interruption or unavailability, NCO shall provide detailed information to Special Servicer concerning NCO's implementation of its Disaster Recovery/Business Continuity Plans, the effectiveness of such implementation, and the impact of the interruption or unavailability on the RTO, the RPO and the performance standards set forth in Exhibits B, D and H.

## ARTICLE XI - MISCELLANEOUS

11.1    <u>Notice Procedure: Addresses</u>. All notices, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given and received at the time delivered by hand, if personally delivered; when receipt is acknowledged, if mailed by certified mail, postage prepaid, return receipt requested; the next business day after timely delivery to the courier, if sent by overnight air courier guaranteeing next-day delivery; and when received, if sent by any other means, as follows:

<u>If to initial Special Servicer</u>:

First Marblehead Education Resources, Inc.

Attn: General Counsel, Corporate Law Department

800 Boylston St., 34th Floor

Boston, Massachusetts 02199

If to NCO:

NCO Financial Systems, Inc.

Attn: Joshua Gindin, Esq.

Executive Vice President and General Counsel

507 Prudential Road

Horsham, Pennsylvania 19044

The persons or addresses to which mailings or deliveries shall be made may be changed from time to time by notice given pursuant to the provisions of this Section 11.1.

11.2   Mediation; Arbitration.   Except in the case of a third party action, the parties agree that any controversy or claim arising out of or related to this Agreement, including an alleged breach hereof, shall first be settled through negotiation, if possible.  If negotiation is not successful, the parties agree to then try in good faith to settle such dispute by non-binding mediation under the then current Commercial Mediation Rules of the American Arbitration Association.  In the event that such mediation does not resolve the dispute to the mutual satisfaction of the parties, then the parties agree to settle such dispute by binding arbitration to be held in Cincinnati, Ohio, in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

11.3   Press Releases.   No party shall issue any press release or other announcement regarding the subject matter of this Agreement without the consent of the other party, which consents shall not be unreasonably withheld, unless a party refuses to consent and the party desiring to issue the release or other announcement is advised by its legal counsel that the press release or other announcement is required in order to comply with Requirements of Law. Notwithstanding the foregoing, the parties contemplate that a press release regarding the execution of this Agreement may be executed, and the parties shall cooperate with respect to the drafting of mutually acceptable language.

11.4   Relationship of the Parties.   The parties agree that in carrying out their responsibilities pursuant to this Agreement they are in the position of independent contractors. This Agreement is not intended to create, nor does it create and shall not be construed to create, a relationship of partners or joint venturers, fiduciaries or any association for profit between and among the parties or any of their respective affiliates.

NCO acknowledges that it may not be the exclusive collector for Special Servicer and that Special Servicer, in the exercise of its sole discretion, may submit the accounts to more than one collector (but not the same account to different collectors) in a specific geographic location. Special Servicer, in the exercise of its sole discretion, likewise may by oral or written notice,

require NCO to cease its collection efforts and return to Special Servicer any or all of the accounts.

11.5   Expenses.  Except as is otherwise specifically provided in this Agreement, each party shall pay its own costs and expenses in connection with this Agreement and the transactions contemplated hereby, including but not by way of limitation, all regulatory fees, attorneys' fees, accounting fees and other expenses.

11.6   Successors and Assigns.  All terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of Special Servicer and NCO, and each of their respective permitted transferees, successors and assigns.  Except as set forth in this Agreement, no party may assign any of its rights or obligations under this Agreement (whether by operation of law or otherwise) without the prior written consent of the other party; *provided, however*, that no prior written consent of the other party is required in the event that (a) Special Servicer experiences a merger or consolidation with or into or a reorganization between and among the wholly-owned subsidiaries of its ultimate parent company, or (b) Special Servicer seeks to assign this contract to any operating subsidiary.  Nothing in this Agreement is intended to create or grant any right, privilege or other benefit to or for any person or entity, other than the parties hereto and their permitted transferees, successors or assigns.

Notwithstanding the foregoing, the parties hereto acknowledge that U.S. Bank as the Back-Up Special Servicer under the Special Servicing Agreement is an express third-party beneficiary of this Agreement and that upon the Effective Date, the Back-Up Special Servicer as successor Special Servicer under the Special Servicing Agreement shall become the "Special Servicer" under this Agreement.  It is further acknowledged and agreed that fees, expenses and other amounts payable to NCO under this Agreement, including without limitation, indemnity payments, shall be payable by the Trusts as provided in the Special Servicing Agreement.  U.S. Bank as Special Servicer shall not be personally liable for payment of any such indemnity, indebtedness, fees or expenses (except to the extent it is reimbursed for same by each Trust).

11.7   Multiple Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which shall be deemed, collectively, one agreement, but in making proof hereof it shall not be necessary to exhibit more than one such counterpart.

11.8   Drafting.  Each party acknowledges that its legal counsel participated in the drafting of this Agreement.  The parties hereby agree that the rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement to favor one party over any other.

11.9   Captions.  The captions, headings and arrangements used in this Agreement are for convenience only and do not in any way affect, limit or amplify the terms and provisions hereof.

11.10   Entire Agreement; Amendments.  The making, execution and delivery of this Agreement by the parties have been induced by no representations, warranties, statements or agreements other than those herein expressed.  This Agreement embodies the entire understanding of the parties, and there are no further or other agreements or understandings, written or oral, in effect among the parties relating to the subject matter hereof.  This Agreement may be amended or modified only by a written instrument signed by each of the parties and,

prior to the Effective Date, with the consent of the Back-Up Special Servicer. None of the parties shall be deemed to have waived any of its rights, powers or remedies under this Agreement unless such waiver is approved in writing by an authorized representative of the waiving party.

11.11   Waivers. The waiver of any term hereof shall be binding only when committed to writing and signed by the parties hereof. Failure by either party of this Agreement to insist upon the strict performance of any term or condition hereunder or to exercise any right, power or remedy available on a breach thereof, shall not constitute a waiver of any breach of such term, covenant or condition. No waiver, whether express or implied, shall be construed as a waiver of the same or any other term, condition or right or any other occasion.

11.12   Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Requirements of Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Requirements of Law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

11.13   GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF OHIO, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN TO THOSE OF THE STATE OF OHIO. EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

11.14   Force Majeure. In the event that either party shall be prevented from performing any of its obligations due under the terms of this Agreement by an act of God, acts of war, civil riot, an act of State, strikes, or occurrence of any other event beyond the control of the parties hereto, that party shall be excused from any further performance of the obligations and undertakings set forth under the terms of this agreement with the exception of those obligations described in Articles III, VII, VIII, X, and Sections 5.2, 11.2, and 9.4(b), and provided, further, that NCO could not reasonably circumvent the failure orderly through the use of commercially reasonable alternate services, unrevoked plans or other means. Notwithstanding any provision is this Agreement to the contrary, a force majeure event shall obligate and require NCO to commence its Disaster Recovery/Business Continuity Plan as set forth in Article X.

11.15   Cooperation/Consents. The parties agree to cooperate with each other for the purposes contemplated by this Agreement. NCO shall execute and deliver to Special Servicer at any time such further documents, instruments and/or consents which Special Servicer may require in such form as Special Servicer may reasonably request to effectuate the performance of the Services contemplated by this Agreement.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement, as of the day and year first above written, to be effective as of the Effective Date.

FIRST MARBLEHEAD EDUCATION RESOURCES, INC.

By: _Kenneth Klipper_

Its: _TREASURER_

NCO FINANCIAL SYSTEMS, INC.

By: _____

Its: _____

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement, as of the day and year first above written, to be effective as of the Effective Date.

FIRST MARBLEHEAD EDUCATION RESOURCES, INC.

By: _____

Its: _____

NCO FINANCIAL SYSTEMS, INC.

By: _____

Its: Executive Vice President _____

Date: 3-10-09 _____

{J0023915 1 }

27

<u>Table of Exhibits</u>

Exhibit A – Servicer File Data – Default Prevention

Exhibit B – Default Prevention Services

Exhibit C – Default Prevention Reports

Exhibit D – Default Collection Services

Exhibit E – Default Collection Reports

Exhibit F – Settlement Authority

Exhibit G – Early Awareness Services

Exhibit H – Fees to NCO

Exhibit A to Default Prevention and Collection Services Agreement

Servicer Data File

**Servicer Data to be Delivered to NCO**

**Data Frequency**

The following data shall be delivered monthly, as of the end of each calendar month.

**Data Format**

The file layouts provide for "fixed-width" fields using the ASCII character set. Delimited data is also acceptable, though we would need to agree to the delimiter.

If comma-delimited fields are being submitted, then all text fields must be enclosed in double quotes.

**Data Transmission**

Both files will need to be encrypted (PGP preferred) and delivered via FTP.

The filenames must include unique identifiers for servicer name, snapshot or transaction file category, and contain a date-time-stamp.

Example filename for raw data file: XXXXSD00.CSV_mmddyy_hhmmss

(XXXX = Client Abbreviation, SD = Snapshot Detail (Monthly Loan Snapshot), 00 = Tiebreaker,

.csv (filetype), _datestamp)

Example filename for PGP-encrypted data file: XXXXTD00.CSV>PGP_ mmddyy_hhmmss

(XXXX = Client Abbreviation, TD = Transaction Detail (Monthly Loan Transaction), 00 = Tiebreaker,

.csv (filetype), pgp (encryption extension), _datestamp)


Snapshot Detail File Data

| Field Name | Field Description |
|---|---|
| CLUID | Commonline Unique Identifier( or other unique loan Identifier) |
| CUROWN | Current Owner code |
| DEFDTBEG | Date deferment begins |
| DEFDTEND | Date deferment ends |
| DEFTYPCD | Deferment type code |
| DISB1AMT | Amount of first disbursement |
| DISB1DT | Date of the first disbursement for the loan |
| ENROLLDTBEG | Begin of enrollment period date |

| Field Name | Field Description |
|---|---|
| ENROLLDTEND | Last day of enrollment |
| EXPPAYOFFDT | Expected payoff date |
| FIRSTPAYDUEDT | When the borrower's first payment is due |
| FORBDTBEG | Date current forbearance began |
| FORBDTEND | Date current forbearance ends |
| FORBTYPCD | Forbearance type code |
| FULLDISB | Fully disbursed loan indicator |
| GRCDTBEG | Grace period begin date |
| GRCDTEND | Grace period end date |
| INIREPTERM | Initial loan repayment term |
| INSTL1AMT | Installment amount of loan repayment schedule 1 |
| INSTL2AMT | Installment amount of loan repayment schedule 2 |
| INSTL3AMT | Installment amount of loan repayment schedule 3 |
| INSTL4AMT | Installment amount of loan repayment schedule 4 |
| INT1DTAPP | Application date for interest type code 1 |
| INT1DTBEG | Effective begin date for interest type 1 |
| INT1DTEND | Effective end date for interest type code 1 |
| INT1RATE | Interest rate for interest type code 1 |
| INT1TYPCD | Interest type code 1 |
| INT2DTAPP | Application date for interest type code 2 |
| INT2DTBEG | Effective begin date for interest type 2 |
| INT2DTEND | Effective end date for interest type code 2 |
| INT2RATE | Interest rate for interest type code 2 |
| INT2TYPCD | Interest type code 2 |
| INT3DTAPP | Application date for interest type code 3 |
| INT3DTBEG | Effective begin date for interest type 3 |
| INT3DTEND | Effective end date for interest type code 3 |
| INT3RATE | Interest rate for interest type code 3 |
| INT3TYPCD | Interest type code 3 |
| INT4DTAPP | Application date for interest type code 4 |
| INT4DTBEG | Effective begin date for interest type 4 |
| INT4DTEND | Effective end date for interest type code 4 |
| INT4RATE | Interest rate for interest type code 4 |
| INT4TYPCD | Interest type code 4 |
| INTCAPFREQ | Interest capitalization frequency (in number of months) |
| LASTDISBAMT | Amount of last disbursement |
| LASTDISBDT | Last Disbursement date |
| LOANSEQID | Loan sequence number |
| ORIGPRINAMT | Original amount of principal |
| PGM | Type of Loan |
| TIERSCEN | Program tier |
| PGMYR | Program Year |
| PNTSIGDT | Date Prom Note Signed |
| PNTYR | Prom Note Year |
| REPDTBEG | Repayment begin date |
| REPDTEND | Repayment end date |
| REPTERM1 | Loan repayment term 1 |

| Field Name | Field Description |
| --- | --- |
| REPTERM2 | Loan repayment term 2 |
| REPTERM3 | Loan repayment term 3 |
| REPTERM4 | Loan repayment term 4 |
| REPTYPCD | Type of repayment schedule disclosed |
| TERMDTBEG | Loan term begin date |
| TERMDTEND | Loan term end date |
| TIERPRICE | Tier price |
| TOTDISBAMT | Total amount disbursed for loan |
| TOTOTHRFEEAMT | Total amount of other fees for loan |
| DEFEROPTION | Current Loan Deferment option (IO/DF/DP/IM) |
| COMMONSEQ | Sequence for a Commonline application |
| GUARAMT | Amount guaranteed |
| INT1SPECCD | Special interest indicator for interest type code 1 |
| INT1SUBSCD | Subsidized interest eligibility code for interest type code 1 |
| INT2SPECCD | Special interest indicator for interest type code 2 |
| INT2SUBSCD | Subsidized interest eligibility code for interest type code 2 |
| INT3SPECCD | Special interest indicator for interest type code 3 |
| INT3SUBSCD | Subsidized interest eligibility code for interest type code 3 |
| INT4SPECCD | Special interest indicator for interest type code 4 |
| INT4SUBSCD | Subsidized interest eligibility code for interest type code 4 |
| LOANDTADD | Effective loan add date |
| LOANDTSLD | Date the Loan was sold |
| LOANOWNACCNR | The loan owners account number corresponding to the loan |
| MLN | Master Loan Note |
| MLNSEQID | Master Loan Note Sequence Number |
| MPNAPPTYPCD | Code for master prom note application type |
| MPNDTEXP | Date master prom note expires |
| MPNTYPCD | Code for type of master prom note |
| REGCATCD | Regulatory category code for Interest Rate |
| REPDISCDT | Date repayment disclosure sent |
| TOTINSAMT | Total amount of loan insurance premiums |
| TOTORGFEEAMT | Total amount of loan origination fees |
| BADDR1 | Borrower's street address line 1 |
| BADDR2 | Borrower's street address line 2 |
| BADDR3 | Borrower's street address line 3 |
| BBIRTH | Borrower's birth date |
| BCITY | Borrower's city (post office) address |
| BCRDSRE | Borrower Credit rating score |
| BFIRST | Borrower's first name |
| BFOREIGNCT | Borrower's Foreign country address |
| BFOREIGNST | Borrower's Foreign state address |
| BLAST | Borrower's last name |
| BMID | Borrower's middle initial |
| BSSN | Borrower Social Security Number |
| BSTATE | Borrower's state code |
| BSUFFIX | Borrower's last name suffix |
| BZIP | Borrower's zip code |

| Field Name | Field Description |
|---|---|
| CADDR1 | Cosigner's street address line 1 |
| CADDR2 | Cosigner's street address line 2 |
| CADDR3 | Cosigner's street address line 3 |
| CBIRTH | Cosigner's birth date |
| CCITY | Cosigner's city (post office) address |
| CCRDSRE | Cosigner Credit rating score |
| CFIRST | Cosigner's first name |
| CFOREIGNCT | Cosigner's Foreign country address |
| CFOREIGNST | Cosigner's Foreign state address |
| CLAST | Cosigner's last name |
| CMID | Cosigner's middle name |
| COBORRIND | Coborrower indicator |
| COMAKEIND | Comaker indicator |
| COSIGNIND | Cosigner indicator |
| CSSN | Cosigner Social Security Number |
| CSTATE | Cosigner's state code |
| CSUFFIX | Cosigner's last name suffix |
| CZIP | Cosigner's zip code |
| ENDORSIND | Endorser indicator |
| BACCID | Borrower Account ID |
| BADDIND | Borrower's address indicator |
| BADDRDTCHG | Date of last change to borrower's address information |
| CADDRDTCHG | Date of last change to cosigner's address information |
| CADDRIND | Cosigner's address indicator |
| SACCID | Student Account ID |
| ACADGRDLVL | Academic Grade Level |
| SFIRST | Student's first name |
| SLAST | Student's last name |
| SMID | Student's middle name |
| SSSN | Student's social security number |
| SSUFFIX | Student's last name suffix |
| GUARCD | Guarantor code |
| GUARREFID | Guarantor reference identification number (ALE ID number) |
| LENDERID | Lender Department of Education code |
| OWNERBOND | Owner bond issue identifier |
| OWNERCD | Owner code |
| OWNSHONM | Institution short name |
| GUARSCLCD | Guarantor reporting code for school |
| CURSCLID | Identifier of the school currently enrolled in |
| CURSCLNM | Name of the current school |
| CURSCLPROPIND | Current school proprietary school indicator |
| CURSCLST | Current school state mail code |
| CURSCLTYPCD | Current school type code |
| ORIGSCLID | Original school identifier |
| ORIGSCLNM | Name of the originating school |
| ORIGSCLPROPIND | Original school proprietary school indicator |
| ORIGSCLST | Original school state mail code |

| Field Name | Field Description |
|---|---|
| ORIGSCLTYPCD | Original school type code |
| CAPDTAPLD | Date the last capitalization was applied |
| CURINSTAMT | Current installment amount |
| CURINTAMT | Current end of month borrower interest amount |
| CUROTHRAMT | Current end of month "other charges" amount |
| CURPRINAMT | Current end of month principal amount |
| CYCLESTATCD | Loan life cycle status code |
| CYCLESUBCD | Loan life cycle sub status code |
| DELQDTBEG | Date condition occurred - delinquency for installment |
| DELQDTEND | End of delinquency for installment date |
| DELQINTDTBEG | Date condition occurred - delinquency for interest |
| DELQINTDTEND | End of delinquency for interest date |
| INICLMDTPD | Date initial claim paid |
| INICLMDTREJ | Claim rejection/return actual posted date |
| INICLMDTRESUB | Date initial claim resubmitted |
| INICLMDTSUB | Date initial claim submitted |
| INICLMREASCD | Reason code for the claim/preclaim |
| LOANSUBSTATCD | Loan Sub-status used for reporting |
| NXTINSTDTDUE | Date the next installment bill is due |
| PRECLMDTSUB | Date preclaim submitted |
| TOTCAPINTAMT | Total amount of interest capped |
| ZEROBALCD | An attribute to report zero balance reason code |
| ZEROBALDTAPLD | A attribute for date zero balance applied |
| ZEROBALDTEFF | A attribute for date zero balance effective |
| ZEROBALSUBCD | An attribute to report zero balance sub-reason code |
| AVGDAYBALAMT | Average daily balance amount |
| LASTPMTDT | Date of the last borrower payment |
| PREVINTAMT | Amount of previous month borrower interest |
| PREVPRINAMT | Amount of previous month principal |
| SUPCLMDTPD | Date supplemental claim paid |
| SUPCLMDTRESUB | Date supplemental claim submitted |
| CREATEDATE | Creation date for this record |

Transaction Detail File

| Field Name | Old Field Name | Field Description |
|---|---|---|
| TRANID | TRANID | Unique Transaction ID |
| RPTMTHBEG | RPTMTHBG | First day of reporting period |
| RPTMTHEND | RPTMTHED | Last day of reporting period |
| FINATYRPCD | FINATYRP | Financial activity transaction report line code |
| CLUID | LOANID | Unique Loan Identifier |
| BSSN | BSSN | Borrower Social Security Number |
| LOANSEQID | SEQ | Loan sequence number |
| OWNERCD | OWNER | Owner code |
| OWNERBOND | BONDISS | Owner bond issue identifier |

| Field Name | Old Field Name | Field Description |
|---|---|---|
| PGM | PROGRAM | Current loan program being displayed |
| GUARREFID | GUARREF | Guarantor reference ID number |
| FATDTAPL | FATAPL | Date financial activity transaction applied |
| FATDTEFF | FATEFF | Date financial activity transaction effect |
| CSHADVCD | CSHADV | Financial Activity transaction cash/adv code |
| FATPRECLMFEEAMT | FTPCLFEE | Amount of preclaim fee financial activity transaction |
| FATNSIAMT | FTNSI | Amount non-subsidized borrower interest financial activity transaction |
| FATLTEFEEAMT | FTLTEFEE | Amount of late fee financial activity transaction |
| FATCURPRIAMT | FTCURPRI | Amount of current principal financial activity transaction |
| FATTYPCD | FATTYP | Financial activity transaction type code |
| FATSUBTYPCD | FATSUBTYP | Financial activity transaction subtype code |
| FATRAPIND | FATRAP | Indicates this is the reapplied financial activity of a prior, now inactive financial activity transaction |

For purposes of early awareness services, the Servicer shall also send a monthly file of borrowers who will enter repayment within the upcoming 60 days.

Exhibit B to Default Prevention and Collection Services Agreement
Default Prevention Services

**Work Description**

NCO shall provide Dedicated Staff to make outbound calls related to accounts 30 days or greater past due referred by Special Servicer and receive inbound calls resulting from NCO's efforts. NCO will also draft and mail letters and conduct other activities reasonably calculated to perform the Services.

**Hours of Operation/Staffing**

1.  NCO agrees to maintain the following hours of operation for this engagement:

    Monday – Thursday: 8:00 AM – 10:00 PM EST

    Friday: 8:00 AM – 5:00 PM EST

    Saturday / Sunday: Four hour shift between 9:00 AM – 9:00 PM EST

2.  Holidays -  NCO and Special Servicer mutually recognize the following holidays:

    a.  New Years Day

    b.  Easter Sunday

    c.  Labor Day

    d.  4th of July

    e.  Memorial Day

    f.  Thanksgiving Day

    g.  Christmas Day

**Telephone Attempts/Account Intensity**

1.  NCO will Attempt to Contact the customer through a combination of automated and manual calls to resolve the delinquency on the assigned account, in compliance with state and federal law.

2.  NCO will Attempt to Contact each account by making day, evening and weekend Attempts at both home and business numbers provided for both the primary debtor and cosigner if applicable.

3.  NCO agrees to schedule associates assigned to Special Servicer's portfolio such that a minimum of 65% of all Attempts are made during prime time hours, which for this engagement will be defined as:

    8:00AM -11:00AM M-F local to the debtor

    5:00PM – 9:00PM M-Th local to the debtor

    Saturday and Sunday

4.  NCO will Attempt to Contact both the borrower and cosigner (if applicable) on each account provided to NCO for collections a minimum of five (5) times on a monthly basis.

   5.   550 accounts per seat target

**Key Performance Indicators**

1.   NCO and Special Servicer mutually agree that the following KPI metrics will be used as a means of measuring Agent/Departmental productivity:

   a.   Portfolio value

   b.   Average # borrowers per FTE

   c.   Total Peak Hours to Total Hours worked (%)

   d.   Total Right Party Contacts to Total Borrowers (%)

   e.   Total Promises to Pay to Total Right Party Contacts (%)

   f.   Total Promises to Pay to Total Borrowers (%)

   g.   Total Cured ($)

   h.   Total Borrowers Cured (#)

**Performance Scorecard and Reviews**

There will be a periodic scorecard produced to review NCO's performance.  In addition, there will be at a minimum a quarterly review that will take place at either the place of business of NCO, place of business of Special Servicer or via telephone conference as agreed by the parties. The quarterly review will be focused on the performance of NCO in the previous quarter and discuss how performance can be improved and important updates as it relates to Special Servicer's business and portfolios.

*Execution Version*

Exhibit C to Default Prevention and Collection Services Agreement

Default Prevention Reports

Monthly Flow Report showing trend analysis and roll rate showing accounts in deferment, grace, and repayment by 30-day increments from current through 120 days past due.

*Execution Version*

Exhibit D to Default Prevention and Collection Services Agreement
Default Collection Services

## DEFINITIONS

Post-Default Accounts:

> First Placement Accounts: Accounts that have not been subject to previous collection efforts on Special Servicer's behalf by any other entity other than Special Servicer's staff.

> Second Placement Accounts: Accounts that, prior to transfer to NCO, have been worked by one other collection agency.

> Third Placement Accounts: Accounts that, prior to transfer to NCO, have been worked by two other collection agencies.

Litigation Accounts: Accounts that have been authorized by Special Servicer for Litigation as provided in Section 1 of the Agreement.

## POST DEFAULT MINIMUM WORK STANDARDS

•      Within Twenty-Four (24) hours of placement, NCO shall scrub file against bankruptcy notification data base, either on-line or batch process, before collection effort is pursued. The account should be immediately closed and returned with no collection effort if a bankruptcy "hit" is returned, UNLESS the bankruptcy discharge was issued prior to loan origination or the bankruptcy was dismissed.

•      Credit Bureau reports or credit headers shall be pulled on all accounts within two (2) business days of placement.

•      A validation notice as outlined in the Fair Debt Collection Practices Act (FDCPA) shall be sent within twenty-four (24) hours of placement.

•      Within five (5) business days the first phone Attempts shall be made by NCO to both the borrower and co-borrower.

•      In the event Contact is made within the first five (5) business days of placement, a promise to pay or a commitment should be made to pay the balance in full, settle the balance in full within the guidelines provided by Special Servicer or payment sufficient for the account to be considered for eligibility in a repurchase program as determined by Special Servicer (the "Repurchase Program")

•      Within the first thirty (30) days of placement, if NCO determines it has a valid phone number, four (4) Attempts per week shall be made during strategic hours of the work day. A message should not be left if another Contact will be completed on the same day.

•      Within the first thirty (30) days of placement, if NCO determines it does not have a valid phone number, the account shall be statused as a skip account and skip tracing efforts are to commence no later than forty-eight (48) hours after determining the number is invalid.

•      Continued Attempts after the first thirty (30) days shall continue at the rate of one (1) time per week.

•      Skip Tracing Activities after thirty (30) days or until Contact or closure:

{P0023945.1 }

Minimally, all available skip tracing tools shall be utilized and efforts Attempted three (3) times per month or until borrower is located or the account(s) is closed.  Skip tracing tools may include but are not limited to:

*Nearby and same last name

*Credit Bureau

*Property Verification

*University and/or College directory/registration

*Internet on-line services

*Voter Registration data bases

*Directory Assistance

All possible telephone numbers found should be Attempted within 24 hours, if legal to do so, to determine validity.

•       Borrowers who do not qualify or who cannot reasonably afford amortized payments under the Repurchase Program guidelines should be placed in a temporary reasonable and affordable partial payment arrangement.  The payment arrangement should be reviewed every four (4) months to determine if the borrower can afford a higher payment, can pay the loan balance or can settle the loan under the Special Servicer settlement guidelines.

•       In addition to account closure in accordance with the terms of the attached Agreement, accounts shall also be closed if there is a thirty (30) day work gap.  Work is defined as an Attempt to Contact, a skip Attempt or some form of activity in an attempt to resolve the account.

## LITIGATION MINIMUM WORK STANDARDS

•       Within Twenty-Four (24) hours of placement or authorization to litigate, NCO shall scrub the file against bankruptcy notification data base, either on-line or batch process, before collection effort is pursued.  The account should be immediately closed and returned with no collection effort if a bankruptcy "hit" is returned, UNLESS the bankruptcy discharge was issued prior to loan origination or the bankruptcy was dismissed.

•       Credit Bureau reports or credit headers shall be pulled by NCO on all accounts within five (5) business days of placement or authorization.

•       A validation notice as outlined in the Fair Debt Collection Practices Act (FDCPA) shall be sent by NCO within two (2) business days of placement or authorization.  Upon outsourcing to local counsel, Attorney may also send an additional validation notice if appropriate.

•       Within five (5) business days the first phone Attempts shall be made by NCO to both the borrower and co-borrower.

•       In the event Contact is made, a promise to pay or a commitment should be made to pay the balance in full, settle the balance in full within the guidelines provided by Special Servicer or payment sufficient for the account to be considered for eligibility in the Repurchase Program.

•       From the date of placement or authorization until the account is either outsourced to local counsel or has satisfactory payment arrangements made as described above, if NCO determines it has a valid phone number, NCO shall make phone Attempts at the rate of four (4) times per

week at different times of the day, including at least two evening (e.g., after 5 p.m. debtor's time) or weekend Attempts. Attempts will be made on both the borrower and co-borrower.

• Within the first thirty (30) days of placement or authorization, if NCO determines it does not have a valid phone number, the account shall be statused as a skip and skip tracing efforts are to commence no later than forty-eight (48) hours after determining the number is invalid.

• Skip Tracing Activities after thirty (30) days or until Contact or closure:

Minimally, all available skip tracing tools shall be utilized and efforts Attempted three (3) times per month or until borrower is located or the account(s) is closed. Skip tracing tools may include but are not limited to:

*Nearby and same last name

*Credit Bureau

*Property Verification

*University and/or College directory/registration

*Internet on-line services

*Voter Registration data bases

*Directory Assistance

* Local professional licensing authority

• Borrowers who do not qualify or who cannot reasonably afford amortized payments under the Repurchase Program guidelines should be placed in a temporary reasonable and affordable partial payment arrangement. The payment arrangement should be reviewed every four (4) months to determine if the borrower can afford a higher payment, can pay the loan balance or can settle the loan under the Special Servicer settlement guidelines.

• Any Broken Commitment:

Litigation should be pursued immediately if there is a broken commitment.

• Broken Payment Commitment:

Litigation should be pursued immediately if there is a broken commitment.

• Returned (NSF) Item:

All efforts should be made to resolve the issue and reinstate payments. If unable to resolve within reasonable period of time, litigation should be pursued.

• Once the account(s) is outsourced to local counsel, Attorney (and NCO if appropriate) will continue diligent collection efforts in concert with the legal proceedings.

• Attorney and NCO must track the progress of the suit and assure all service is made in accordance with applicable laws, all deadlines are met and seek default judgments whenever appropriate.

• Attorney must make NCO immediately aware, and NCO will make Special Servicer immediately aware, of any and all counterclaims or defenses filed by borrowers in response to the Complaint.

- If available, Attorney (and NCO if appropriate) shall make the borrower aware of his/her options under the Repurchase Program. Only after it is determined that the borrower cannot or will not make the payments needed to become eligible for consideration in the Repurchase Program, should payment arrangements be established after the suit has been filed and the Attorney shall pursue a stipulated judgment when appropriate to protect Special Servicer's interests in the event the arrangement is not paid as agreed.

- If a witness is needed to provide testimony or other evidence at a trial or other hearing, whether live or telephonic, the Attorney shall submit a "Witness Request Form" provided by Special Servicer to NCO and NCO shall in turn submit said "Witness Request Form" to Special Servicer no later than fifteen (15) days prior to the scheduled hearing.

- Attorney shall submit any judgment received, and complete the "Judgment Form" provided by Special Servicer within five (5) days of receipt to NCO. NCO will in turn provide both the judgment and the "Judgment Form" to Special Servicer within five (5) days of receipt. All fields on the "Judgment Form" must be completed in their entirety by Attorney.

- Attorney (and NCO if appropriate) must pursue collection efforts through appropriate legal means available (e.g., wage garnishments, liens, etc.) once judgment is entered. At least one (1) Attempt to secure post-judgment collection shall be made by Attorney (or NCO if appropriate) per month. These efforts may include, but are not limited to, phone contact, attempts to locate attachable assets such as bank accounts, property searches and employment searches.

- Special Servicer may, at its sole discretion, close any account and have it returned at any time. For each account closed, NCO shall submit a closing statement which shall include borrower name, social security number, Special Servicer account number, amount of funds expended, any funds remaining, closing balance, payments received and any judgment information entered. Any funds remaining shall be forwarded to Special Servicer within thirty (30) business days of closure. The litigation closing statement requirements are separate and distinct from the systemic "closed report" filed each month by NCO.

- Special Servicer will not pay a non-contingent suit fee or any other up-front fee to NCO or Attorney unless Special Servicer has provided its prior express written agreement to pay such fees.

- NCO agrees to provide regular case status reports to Special Servicer at no greater than quarterly intervals as directed by Special Servicer.

- NCO agrees to immediately provide copies of all correspondence and pleadings generated in connection with a contested matter (contested matter being defined as any civil action where the defendant has filed an answer or other pleading or motion).

- Attorney agrees to file a Motion for Summary Judgment in all cases unless prohibited from doing so by local rules of court or Special Servicer and Attorney otherwise mutually agree that Attorney should not file such a Motion.

## REMITTANCE PROCESS

The following work standards related to remittance processes are applicable to all types of placements.

•      Remittances shall be processed on a weekly basis, whether by electronic wire or by check and have a remittance statement submitted.  All remittance statements are to contain: borrower name, Special Servicer account number(s), placement type (e.g., first, second, third or litigation), commission rate, payment amount, commission amount, payment date, application of funds (i.e., costs, principal, interest, etc.), and balance after payment applied.

•      Any payment that does not result in good funds is to be posted immediately and included in the most current weekly remittance report as with any other payment information.

•      NCO shall submit net remittances of all monies collected.  NCO shall maintain copies of each invoice paid on each account.

•      NCO shall maintain copies of all payment documents for a minimum of three years.

## SETTLEMENT PROCESS

Subject to any contrary account-specific instructions from Special Servicer, the following work standards related to settlement processes are applicable to all types of placements.

•      NCO shall have blanket authority to settle any account for 90% or greater of the outstanding principal and interest balance at the time of settlement, provided there is no judgment entered on the account.

•      NCO shall have blanket authority to settle any account for 80% or greater on any account whose "default date" or "charge-off date" is greater than twelve (12) months but less than thirty-six (36) months from settlement date, provided there is no judgment entered on the account.

•      NCO shall have blanket authority to settle any account for 70% or greater on any account whose "default date" or "charge-off date" is greater than thirty-six (36) months but less than sixty (60) months from settlement date, provided there is no judgment entered on the account.

•      NCO shall have blanket authority to settle any account for 60% or greater on any account whose "default date" or "charge-off date" is equal to or greater than five (5) years from settlement date, provided there is no judgment entered on the account.

•      Settlement offers which do not meet any of the above guidelines must be submitted in writing to Special Servicer for review.  Settlements not meeting the above guidelines must have Special Servicer written authorization to be accepted.

•      The authorization must be maintained by NCO for a minimum of three years.

•      Accounts with judgments entered on them DO NOT qualify for the above guidelines and all settlement offers on judgment accounts must be submitted to Special Servicer in writing. Such offers may not be accepted without Special Servicer's written authorization.

Exhibit E to Default Prevention and Collection Services Agreement

Default Collection Reports

NCO shall produce status and reconciliation reports to Special Servicer as follows.

      a.      NCO will report the status of all accounts on a monthly basis, itemized by borrower Social Security number and additional identifying data, including but not limited to placement type (as defined in Exhibit D).

      b.      NCO will report to Special Servicer, on a monthly basis, in a format acceptable to Special Servicer, the recovery percentage for all loans by each placement segment. A "placement segment" is defined as the number of loans placed with NCO in a given month, day, and year. Accounts shall be identified in this report by placement type.

      c.      Within twenty-four (24) hours of each placement of accounts by Special Servicer to NCO, NCO will submit to Special Servicer, for reconciliation purposes, a written report outlining each account and the dollar value thereof, as well as the total number of accounts and the aggregate dollar amount for each placement of accounts made by Special Servicer to NCO. NCO shall, on the same day of each placement, acknowledge both the total number of accounts placed and the aggregate balance thereof in writing. Accounts shall be identified in this report by placement type.

      d.      NCO will report to Special Servicer for reconciliation purposes the aggregate number and aggregate current balance of all accounts, whenever placed, which are active with NCO. Accounts shall be identified in this report by placement type. This report will be submitted annually within thirty (30) days following the end of Special Servicer's fiscal year.

      e.      NCO will report to Special Servicer, on a weekly basis (or an alternative periodic interval chosen by Special Servicer), the payments received by NCO for reconciliation by Special Servicer of the remittance outlined in Section 2.6. Such report shall include, but not be limited to, borrower name, account number(s), placement type, corresponding commission rate, payment amount and commission amount.

The foregoing reports are not exclusive of any other reasonable requests for information that Special Servicer may have from time to time.

*Execution Version*

Exhibit F to Default Prevention and Collection Services Agreement

Settlement Authority

None at time of execution

*Execution Version*

Exhibit G to Default Prevention and Collection Services Agreement

Early Awareness Services

1.     NCO shall develop and carry out a "Borrower Repayment Education And Counseling" program for borrowers about to enter repayment. NCO shall use its "propensity to pay" model that for prioritizing and segmenting accounts and will perform early awareness service for accounts within the bottom 50% of propensity to pay scores. The specific objective of this program is to educate borrowers of upcoming payment requirements and advise borrowers, if authorized under the circumstances, of the existence of deferment, forbearance and modified graduated repayments ("MGRS") alternatives under applicable Program Guidelines, to reduce the number and percentage of borrowers becoming subsequently delinquent in the repayment process.

2.     At the beginning of the program, NCO shall receive from Special Servicer an estimated monthly volume of 5,000 to 7,000 borrower accounts (approximately 40% of borrowers entering repayment) that are 30-45 days prior to entering repayment. Variances of plus/minus 10 percent of the estimated monthly volume will be considered as within the target range of accounts to be placed. If mutually agreed by Special Servicer and NCO, Special Servicer may elect to send additional monthly placement volume to be worked by NCO.

3.     It is estimated that 70% of the borrower accounts will have cosigners.

4.     The "work period" shall be 30 days from date of placement.

5.     NCO and Special Servicer will work cooperatively with the Trusts' primary servicer, American Education Services ("AES"), to establish whether NCO will contact borrowers "as NCO," "on behalf of the owner of your loan" or "on behalf of AES," or such other designation as the parties may agree the distinction being a function of the nature of the relationship established, which is not under the control of either Special Servicer or NCO. NCO will not hold itself out "as" AES.

6.     On accounts with cosigners, NCO will Attempt to contact both the primary borrower and cosigner.

7.     NCO shall initially conduct this program in its NCO facility, which offers low domestic U.S. labor costs, and thus advantages this project.

8.     NCO may at its sole discretion decide to expand or move this program to another NCO facility. Such a move shall not have an impact on the fees paid to NCO by or the service hereunder provided to or on behalf of Special Servicer pursuant to this Agreement.

9.     Upon receiving and loading each monthly placement from Special Servicer, NCO shall use the following contact methodology ("waterfall approach") in an effort to maximize the contact rate of the Trusts' borrowers:

{F0023945.1 }

     a.     Send an email to all borrowers and cosigners for whom NCO has received an email address on the placement file. The content of the email, to be jointly developed by Special Servicer and NCO, will be approximately as follows:

     i.     Congratulate borrowers (or cosigners on behalf of the borrowers) on graduating and presumed entrance / re-entrance into working world.

     ii.     Alert borrowers that they will be contacted shortly to discuss the upcoming repayment status.

     iii.     Encourage borrower in the meanwhile to call in to NCO's inbound 800 number set up specifically for this program to speak with a loan counselor standing by with important information.

     b.     Immediately begin calling campaigns:

     i.     NCO loan counselors will Attempt to contact all borrowers on the Special Servicer data file for whom NCO has received "good" contact information. NCO loan counselors will skip-trace all "bad" numbers. Where good number(s) are subsequently obtained, NCO will update Special Servicer (and/or AES) records.

     ii.     NCO shall make several Attempts to contact each borrower using the telephone numbers provided by Special Servicer over the first ten business days at different times of day (if directed by Special Servicer). Periodically, depending on the number of borrowers remaining to be contacted, NCO may conduct outbound calling efforts on Saturdays, as appropriate.

     iii.     If a borrower is contacted and a counseling session is conducted there may be no need to send a letter (see "Letter Campaigns"), although a follow-up email with appropriate Special Servicer collateral material may be desirable.

     iv.     If a borrower is not contacted, then NCO may send a letter (see "Letter Campaigns") with similar information to the email.

     v.     NCO loan counselors will continue attempting to contact the borrower throughout the work period (using best contact methodology—i.e. varying times, days of week—including, as noted above, Saturdays—etc.)

     c.     Letter campaigns

     i.     In an effort to measure the effectiveness of various letter campaigns, at Special Servicer's direction NCO will split the monthly account placements into two groups and apply a different letter strategy to each. At any time Special Servicer can direct NCO to change the percentage of accounts going to either group or to stop the multiple strategy approach entirely and apply only one strategy to all accounts.

1.     Group 1: NCO will mail letters to all borrowers in Group 1 immediately upon receipt of the account placement.

2.     Group 2: NCO will mail letters to all borrowers in Group 2 who have not yet been contacted after an initial attempt period of 10 business days.

All mailings will have an address correction request included and, where change of address is noted, Special Servicer files will be updated.

10.   NCO Hours of Operation

a.     NCO will set hours of operation to give the best opportunity to optimize contact rate of the Trusts' borrowers and to be consistent with and fully compliant with all requirements of law and regulation.

11.   Prior to initiating any contact with borrowers, NCO will work in conjunction with Special Servicer to develop appropriate scripting for phone contacts, with such scripting reflecting the brand look and feel that Special Servicer wishes to convey. This scripting will be articulated in the Statement of Work Amendment, separate from this Agreement and will incorporate among other aspects, the circumstances under which NCO shall be authorized to advise borrowers of the existence of deferment, forbearance and MGRS alternatives under applicable Program Guidelines.

NCO anticipates that the call will be conducted in approximately the following manner:

a.     Validate that we are speaking with the right party.

b.     Introduce ourselves as a loan counselor calling from NCO (or on behalf of) AES in reference to their private student loans held by the Trusts. Special Servicer will provide the loan holder information to NCO so NCO can use this information in the scripting.

c.     Explain the purpose of the call is to remind borrower of upcoming repayment requirements and to gauge borrower's preparedness and intent to meet upcoming requirements.

d.     Receive payment commitment from borrowers.

e.     Attempt to set borrower up on automatic debit program.

i.     If allowed by AES, NCO will use web-based technology to enable the borrower complete and electronically sign an automatic debit form.

ii.     If a web-enabled process is not allowed by AES, NCO will either email the borrower the appropriate form or direct the borrower to AES's web site www.asessuccess.org where the form is available online. The borrower will then be required to print, sign and return the form either to NCO to be forwarded on to AES or to AES directly.

f.      Ask several brief probing questions that will capture important borrower information to be used when constructing the post-pilot full-scale implementation program.

12.    The following steps will be included in the Borrower Repayment Education And Counseling Program:

NCO will document "results codes" to track key data. In addition to tracking contacts, commitments and other operational metrics, NCO will be able to quantify (and subsequently analyze) responses to key qualitative questions.

Sample of potential questions:

- Is borrower prepared to meet repayment requirements?
- Is borrower already employed?
- What is starting income?
- Does borrower have concerns over upcoming repayment requirements?
- What are concerns? (no job, not enough income, percent of disposable income going to debt service, etc.)
- Does borrower have other private loans? (dollar ranges, lenders) Probe for future private loan consolidation opportunities. (In the aggregate, NCO will be able to perform analysis for Special Servicer showing borrowers according to balances held by a listing of other lenders—this is important information for assessing potential risk of prepayment through third-party consolidation of Trust loans).
- Status of FFELP loans and repayment plans

13.    NCO shall develop and submit to Special Servicer, frequency to be determined in consultation with Special Servicer, management reports with key program performance indicators.

14.    NCO and Special Servicer will conduct meetings every, frequency to be determined in consultation with Special Servicer, to review the management reports and have a qualitative discussion about the program.

15.    NCO will supply its proprietary contact system and all necessary supporting inbound and outbound telephony, data networking, email, and secure web-based applications required to support the program, activities, and reporting described herein. All NCO technology used in the program shall be provided at no additional cost. All technology and related systems and applications may be audited by Special Servicer at any time during regular business hours.

{F0023945.1}

*Execution Version*

Exhibit H to Default Prevention and Collection Services Agreement

Fees

**Early Awareness:**

For loans that are referred to the Early Awareness vendor for pre-call and letters and ACH enrollment 60 days prior to 1st payment due date:

**$20 per borrower Contact and $0.51 (fifty-one cents) per letter sent, which may be adjusted for increases implemented by the United States Postal Service, cent for cent.**

**Default Prevention:**

For loans that roll at 31 days from servicer to NCO Default Prevention Collectors and to be managed up until 180 days past due or lender mandated charge off date, including loans in Claims Review:

**$4600 per seat ($4600 per seat fee shall be increased by 3% each year on the anniversary of the Effective Date without further action by the parties) and $0.51 (fifty-one cents) per letter sent, which may be adjusted for increases implemented by the United States Postal Service, cent for cent.**

**The per seat default prevention fee above shall be subject to an annual incentive payment, calculated as follows:**

**For each 30-day delinquency period (i.e., 31-60, 61-90, etc.), the percentage of loans that were in one delinquency period and progressed from that period to the next delinquency period (the "flow rate") shall be calculated for each of the three prior 12-month intervals. The baseline flow rate for each delinquency period for each 12-month interval shall be: (0.70 x the flow rate for the immediately preceding 12 months) + (0.15 x the flow rate for each of the prior two 12-month intervals).**

**For each delinquency period in the 12 months under consideration for incentive payment: (a) if the flow rate is more than 2.0% less than the baseline flow rate (e.g., less than 18% on a baseline flow rate of 20%), then an incentive of 12% shall be paid for each seat dedicated to default prevention in that delinquency period; (b) if the flow rate is equal to or less than the baseline flow rate, but more than 2.0% less than the baseline flow rate (e.g., equal to or more than 18% and less than 20% on a baseline flow rate of 20%), then an incentive of 6% shall be paid for each seat dedicated to default prevention in that delinquency period; and (c) if the flow rate is greater than the baseline flow rate, no incentive shall be paid.**

For purposes of the above incentive calculations, flow rates shall be rounded to the nearest whole number (i.e., rounded down for 0-4 tenths of a percentage and rounded up for 5-9 tenths of a percentage).

<u>Post Default Collections (including probate recoveries)</u>:

NCO to utilize Default Collectors for all of post default collections prior to litigation

**25% (30% for recalled defaulted accounts recalled from other agencies following the Effective Date)**

<u>Litigation</u>:

NCO to manage Default Collectors' attorney network for accounts referred to litigation:

**35%**

# FIRST AMENDMENT TO DEFAULT PREVENTION AND COLLECTION SERVICES AGREEMENT

This First Amendment to Default Prevention and Collection Services Agreement (hereinafter "Amendment") is entered into by and between First Marblehead Education Resources, Inc. ("FMER"), a Delaware corporation with a principal place of business at 800 Boylston St., 34th Floor, Boston, MA 02199 (together with its successors and assigns, the "Special Servicer") and NCO Financial Systems, Inc., a corporation organized under the laws of the Commonwealth of Pennsylvania having a place of business at 507 Prudential Road, Horsham, PA 19044 (together with its successors and assigns, "NCO"), and amends that certain Default Prevention and Collection Services Agreement entered into by and between FMER and NCO and dated as of March 1, 2009 (the "Agreement").  This Amendment is executed as of May 1, 2009.

**NOW THEREFORE**, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, it is hereby agreed as follows:

1.    <u>Restatement of Recitals</u>. Special Servicer and NCO hereby amend and restate the recitals to the Agreement by deleting them in their entirety and replacing them with the following:

"**WHEREAS**, FMER as the initial Special Servicer currently provides administration services to certain Delaware statutory trusts (the "Non-Ambac Trusts") consisting of alternative student loans ("ASLs"), including the provision of default prevention and collection management services pursuant to that certain Special Servicing Agreement entered into by and among FMER as Special Servicer, U.S. Bank National Association ("U.S. Bank"), (in such capacity, the "Back-Up Special Servicer") and the Non-Ambac Trusts party thereto and dated as of March 1, 2009 (the "Non-Ambac Special Servicing Agreement"); and

**WHEREAS**, FMER entered into an additional agreement to serve as the initial Special Servicer to provide administration services to certain additional Delaware statutory trusts consisting of alternative student loans ("ASLs") (the "Ambac Trusts", together with the Non-Ambac Trusts, referred to in this Agreement as the "Trusts") in which Ambac Assurance Corporation ("Ambac") is a credit facility provider, including the provision of default prevention and collection management services pursuant to that certain Special Servicing Agreement entered into by and among FMER as Special Servicer, U.S. Bank National Association ("U.S. Bank") (in such capacity, the "Back-Up Special Servicer"), Ambac, and the Ambac Trusts party thereto and dated as of May 1, 2009, and any successor agreement thereto entered into by and among FMER, U.S. Bank, Ambac, and the Ambac Trusts (the "Ambac Trusts Special Servicing Agreement") (together with the Non-Ambac Special Servicing Agreement, the "Special Servicing Agreements"); and

**WHEREAS**, NCO provides default prevention and collections services (the "Services") to financial institutions; and

**WHEREAS**, the initial Special Servicer and NCO desire to arrange for the outsourcing of certain default prevention and collections activities to NCO for the Trusts in the event that the Back-Up Special Servicer becomes the Special Servicer under either or both of the Special Servicing Agreements pursuant to Section 8 of either or both of the Special Servicing Agreements; and

**WHEREAS**, NCO is willing to provide certain default prevention and collection activities as herein provided in the event that the Back-Up Special Servicer becomes the Special Servicer."

2.    <u>Restatement of Services Generally</u>. Section 2.1 of the Agreement is hereby amended and restated to read as follows:

{F0024989.1 }

"Special Servicer hereby retains NCO to perform the Services set forth herein in the event that, and only in the event that, Special Servicer (including for the avoidance of doubt, U.S. Bank in its capacity as successor Special Servicer) notifies NCO in writing that the Back-Up Special Servicer has assumed the duties of the Special Servicer pursuant to Section 8 of either or both of the Special Servicing Agreements.  The parties acknowledge and agree that the foregoing reference to the Special Servicing Agreements is intended only as a reference to the conditions under which performance of the Services under this Agreement will begin; it is does not and shall not create duties or obligations for NCO under either of the Special Servicing Agreements. The parties further agree that upon U.S. Bank assuming the duties of Special Servicer under the Servicing Agreement, all references to "Special Servicer" in this Agreement shall, unless otherwise provided or the context otherwise requires, be deemed to refer to U.S. Bank acting in such capacity.  The date of the beginning of the performance of services by NCO referenced in the foregoing sentence shall be the "Effective Date" for purposes of this Agreement (it being acknowledged that NCO shall commence performance of the Services set forth herein immediately upon being notified of the assumption by the Back-Up Special Servicer of the duties of the Special Servicer under either or both of the Special Servicing Agreements or such later date (if any) as shall be specified in such written notice). In order for NCO to carry out its duties under this Agreement with respect to the Services, as of the Effective Date, the initial Special Servicer shall cause the Servicers to provide to NCO (a) consumer file data in the manner and form described in Exhibit A (as amended from time to time by Special Servicer), and (b) view-only access to borrower ASL accounts on the Servicers' systems. NCO shall use such data for the purposes of performing the Services, risk modeling, providing reports as set forth in this Agreement, forecasting and billing."

3.  <u>Successors and Assigns</u>. Special Servicer and NCO hereby amend the references to the "Special Servicing Agreement" in Section 11.6 of the Agreement to instead be references to the "Special Servicing Agreements".

4.  <u>Full Force and Effect</u>.  This Amendment amends the Agreement only as expressly set forth in this Amendment. As amended herein, the Agreement remains in full force and effect according to its terms.

5.  <u>Counterparts</u>.  This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement, as of the day and year first above written, to be effective as of May 1, 2009.

**FIRST MARBLEHEAD EDUCATION RESOURCES, INC.**

By: _____

Its: TREASURER

**NCO FINANCIAL SYSTEMS, INC.**

By: _____

Its: EXECUTIVE VICE PRESIDENT

USB 0055

## SECOND AMENDMENT TO
## DEFAULT PREVENTION AND COLLECTION SERVICES AGREEMENT

This Second Amendment to Default Prevention and Collection Services Agreement (this "Amendment") is entered into by and between First Marblehead Education Resources, Inc. ("FMER"), a Delaware corporation with a principal place of business at 800 Boylston St., 34th Floor, Boston, MA 02199 (together with its successors and assigns, the "Special Servicer") and NCO Financial Systems, Inc., a corporation organized under the laws of the Commonwealth of Pennsylvania having a place of business at 507 Prudential Road, Horsham, PA 19044 (together with its successors and assigns, "NCO"), and amends that certain Default Prevention and Collection Services Agreement entered into by and between FMER and NCO and dated as of March 1, 2009, as amended by that certain First Amendment to Default Prevention and Collection Services Agreement entered into by and between FMER and NCO and dated as of May 1, 2009 (as amended, restated, supplemented or otherwise modified through the date hereof, the "Agreement"). This Amendment is executed as of June 15, 2012.

NOW, THEREFORE, in consideration of the premises set forth above, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Defined Terms. All capitalized terms in this Amendment shall have the same meanings given to them in the Agreement, unless otherwise expressly stated herein.

2.    Amendments of the Agreement. The Agreement is hereby amended in the following respects:

2.1    The Agreement is amended by deleting each and every reference therein to "Early Awareness Services."

2.2    Section 1.1 of the Agreement is amended by deleting the definition of "Early Awareness Services." Section 1.1 of the Agreement is further amended by inserting the following definitions:

"'Claims Package' means a credit agreement or promissory note."

2.3    The third sentence of Section 2.1 of the Agreement is amended by deleting the phrase "Servicing Agreement" and inserting "Special Servicing Agreements" in lieu thereof.

2.4    Section 2.3 of the Agreement is amended by deleting the third sentence in its entirety and the following shall be inserted in lieu thereof:

"Special Servicer shall cause the Servicers to provide to NCO all documents and information specified in the Servicing Agreements and/or Servicing Guidelines."

2.5    Section 2.3(a)(i) of the Agreement is hereby deleted in its entirety and the following shall be inserted in lieu thereof:

"[Reserved]"

2.6    The first sentence of Section 2.3(a)(i)(iii) of the Agreement is amended by deleting the phrase "with a Claims Package" so that the first sentence of Section 2.3(a)(iii) of the Agreement reads, in its entirety, as follows:

USB 0056

"From time to time Special Servicer may instruct NCO with respect to collection costs, default interest rates and other adjustments to be made to account balances submitted pursuant to Special Servicer's direction by Servicers to NCO ("Default Charges")."

2.7     Section 2.4 of the Agreement is amended by deleting the third sentence in the second paragraph in its entirety.

2.8     Section 2.4(e) of the Agreement is hereby deleted in its entirety and the following shall be inserted in lieu thereof:

"Settlement authority given to NCO is described in Exhibit D attached hereto. Special Servicer agrees to designate a business contact with authority to review and approve collection settlement proposals with NCO."

2.9     Section 2.8 of the Agreement is hereby deleted in its entirety and the following shall be inserted in lieu thereof:

"[Reserved]"

2.10    Article II of the Agreement is amended by inserting a new Section 2.9 in between Section 2.8 and Section 2.10 as follows:

"2.9     [Reserved]"

2.11    Section 4.1(a) of the Agreement is amended by deleting the phrase "a national banking association organized, validly existing and in good standing under the laws of the United States" and inserting "a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware" in lieu thereof.

2.12    Section 5.2(b)(vii) is amended by deleting the phrase "Paragraph 23(a)" and inserting "Section 5.2(b)" in lieu thereof.

2.13    Section 9.1 of the Agreement is hereby deleted in its entirety and the following shall be inserted in lieu thereof:

"(a)     The initial term of this Agreement shall commence as of the Effective Date and shall continue in effect for a period of one (1) year, unless sooner terminated pursuant to Section 9.2 (the "Initial Term").

(b)     Upon conclusion of the Initial Term or any succeeding term, this Agreement shall automatically renew for an additional, successive one (1) year term, unless (i) either party shall give written notice of non-renewal to the other party not less than ninety (90) days prior to the conclusion of such term or (ii) sooner terminated pursuant to Section 9.2.

(c)     Upon conclusion of the Initial Term, Special Servicer may terminate this Agreement at any time by providing thirty (30) days prior written notice to NCO.

2.14    Section 11.6 of the Agreement is amended by deleting the first paragraph in its entirety and the following shall be inserted in lieu thereof:

"All terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of Special Servicer and NCO, and each of their respective permitted transferees, successors and assigns. NCO may not assign any of its rights or obligations under this

Agreement (whether by operation of law or otherwise) without the prior written consent of Special Servicer. Special Servicer may assign any of its rights or obligations under this Agreement (whether by operation of law or otherwise) without the prior written consent of NCO. Nothing in this Agreement is intended to create or grant any right, privilege or other benefit to or for any person or entity, other than the parties hereto and their permitted transferees, successors or assigns."

2.15    The Table of Exhibits to the Agreement is amended by deleting such table in its entirety and the following shall be inserted in lieu thereof:

"Exhibit A – Servicer File Data – Default Prevention
Exhibit B – Default Prevention Services
Exhibit C – Default Prevention Reports
Exhibit D – Default Collection Services
Exhibit E – Default Collection Reports
Exhibit F – Bankruptcy Services
Exhibit G – [Reserved]
Exhibit H – Fees to NCO
Exhibit I – Trusts"

2.16    Exhibit A to the Agreement is amended by deleting the last sentence on Exhibit A in its entirety.

2.17    Exhibit B to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit B attached to this Amendment.

2.18    Exhibit C to the Agreement is amended by deleting "120" and inserting "180" in lieu thereof.

2.19    Exhibit D to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit D attached to this Amendment.

2.20    Exhibit F to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit F attached to this Amendment.

2.21    Exhibit G to the Agreement is hereby deleted in its entirety and the following shall be inserted in lieu thereof:

"[Reserved]"

2.22    Exhibit H to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit H attached to this Amendment.

2.23    The Agreement is hereby amended by inserting a new Exhibit I in the form of Exhibit I attached to this Amendment.

3.    <u>Effect of Amendment</u>.  This Amendment shall be effective as of the date first set forth above.  Except as expressly amended in this Amendment, all terms and provisions contained in the Agreement shall continue in full force and effect, without modification.

4.    <u>Multiple Counterparts</u>.  This Amendment may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which shall be deemed, collectively, one agreement, but in making proof hereof it shall not be necessary to exhibit more than one such counterpart.

Delivery of an executed counterpart of this Amendment by facsimile or pdf electronic transmission shall be deemed as effective as delivery of an originally executed counterpart.

    5.    <u>GOVERNING LAW</u>.  THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF OHIO, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN TO THOSE OF THE STATE OF OHIO.  EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to the Default Prevention and Collection Services Agreement to be executed as of the date first written above.

FIRST MARBLEHEAD EDUCATION RESOURCES, INC.

By: _____
Name: Seth Gelber
Title: President


NCO FINANCIAL SYSTEMS, INC.


By: _____
Name: John R. Schwab
Title: Executive Vice President

{F0038953.7}

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to the Default Prevention and Collection Services Agreement to be executed as of the date first written above.

FIRST MARBLEHEAD EDUCATION RESOURCES, INC.

By:_____
Name: Seth Gelber
Title: President


NCO FINANCIAL SYSTEMS, INC.

By:_____
Name: John R. Schwab
Title: Executive Vice President

{F0038953.7 }

<u>Exhibit B to Default Prevention and Collection Services Agreement</u>
<u>Default Prevention Services</u>

<u>Work Description</u>

NCO shall provide Dedicated Staff to make outbound calls related to accounts 31-180 days past due referred by Special Servicer and receive inbound calls resulting from NCO's efforts. NCO will also draft and mail letters and conduct other activities reasonably calculated to perform the Services. Refer also to Exhibit D for standards shared between Default Prevention ("Pre-Default Accounts") and Post-Default Accounts (as defined in Exhibit D).

<u>Hours of Operation/Staffing</u>

1.  NCO agrees to maintain the following hours of operation for this engagement:

    > Monday – Thursday: 8:00 AM – 10:00 PM EST
    > Friday: 8:00 AM – 5:00 PM EST
    > Saturday / Sunday: Four hour shift between 9:00 AM – 9:00 PM EST

2.  Holidays - NCO and Special Servicer mutually recognize the following holidays:

    - New Years Day
    - Easter Sunday
    - Memorial Day
    - 4th of July
    - Labor Day
    - Thanksgiving Day
    - Christmas Day

3.  NCO agrees to maintain the following staffing ratios as they relate to management and support personnel for the FMER engagement.

    - 1 Client Manager to 60 FTE
    - 1 Supervisor to 15 FTE
    - 1 Trainer to 60 FTE
    - 1 Quality Monitor to 50 FTE
    - 1 Administrative support to 50 FTE

4.  Initially the Account to Collector Ratio (ACR) will be established from 250:1 – 500:1. This ratio may be modified from time to time based on business needs and mutually agreement between the parties.

<u>Telephone Attempts/Account Intensity</u>

1.  NCO will attempt to contact the borrower through a combination of automated and manual calls to resolve the delinquency on the assigned account, in compliance with state and federal law.

2.  NCO will attempt to contact each account by making day, evening and weekend attempts at primary contact numbers provided for both the primary debtor and cosigner if applicable, unless NCO knows or should know that such contact would at any unusual place or time that is inconvenient for the Borrower.

{F0033953.7 }

3. NCO agrees to schedule associates assigned to this program such that adequate attempts are made during "prime time hours," which for this engagement will be defined as:

   - 8:00AM - 11:00AM M-F local to the debtor as based upon primary contract numbers provided by borrower unless NCO has a reasonable belief that borrower is located in a different time zone.
   - 5:00PM - 9:00PM M-Th local to the debtor as based upon primary contract numbers provided by borrower unless NCO has a reasonable belief that borrower is located in a different time zone.
   - Saturday and Sunday, unless it is known that Sunday is an inconvenient time for borrower.
   - Holidays are presumed inconvenient.

4. NCO will attempt to contact each account provided to NCO for collections a minimum of five times on a monthly basis, including prime time hours.

5. NCO will refrain from unreasonable use of an autodialer, which shall include calling a borrower's known wireless phone unless it is an emergency or borrower has consented to such contact.

6. NCO will undertake efforts to prevent unauthorized third party disclosure, specifically in the event borrower is contacted at a place of employment via phone, email or fax, and if NCO utilizes text messages with borrower as a means of communication.

Call Recording

NCO will provide call recording for quality assurance purposes. NCO agrees to record a sample size of at least 50 Right Party Contact calls per month and deliver said samples in a format and at time intervals agreeable to Special Servicer.

Key Performance Indicators

NCO agrees that the following KPI metrics will be used as a means of measuring productivity:

- Intensity – Number of attempts/number of accounts
- Connect Rate- Connects/number of accounts
- Contact Rate to Connect rate – RPC's /Connects
- Contact Rate to Inventory – RPC's/number of accounts
- Percent Promise to Pay (Promise Conversion – Promises/RPC's)
- Urgency Conversion - Urgency Payments/RPC's
- Total Prime Time Hours to Total Hours worked (%)
- Total Right Party Contacts to Total Borrowers (%)
- Total Promises to Pay to Total Right Party contacts (%)
- Total Promises to Pay to Total Borrowers (%)
- Total Cured ($)
- Total Borrowers Cured (#)

Performance Scorecard and Reviews

There will be a monthly scorecard produced to review NCO's performance. In addition, there will be at a minimum a quarterly review that will take place in person at either NCO's premises or other location. The quarterly review will be focused on the performance of NCO in the previous quarter and discuss how performance can be improved and important updates as it relates to business and portfolios.

{F0038953.7 }

<u>Exhibit D to Default Prevention and Collection Services Agreement</u>
<u>Default Collection Services</u>

<u>Definitions</u>

Post-Default Accounts:

> First Placement Accounts: Accounts that have not been subject to previous collection efforts on Special Servicer's behalf by any other entity other than Special Servicer's staff.

> Second Placement Accounts: Accounts that, prior to transfer to NCO, have been worked by one other collection agency.

> Third Placement Accounts: Accounts that, prior to transfer to NCO, have been worked by two other collection agencies.

Litigation Accounts: Accounts that have been authorized by Special Servicer for Litigation as provided in Section 1 of the Agreement; also considered to be Post-Default Accounts.

Pre-Default Accounts: those Default Prevention Accounts identified in Exhibit B.

<u>Work Description</u>

> NCO shall provide dedicated staff to make recovery efforts related to Post-Default Accounts placed as described in further detail above. NCO will skip-trace, draft and mail letters, make outbound phone calls and field inbound calls, and conduct other activities reasonably calculated to lead to recovery of the accounts placed, in compliance with state and federal law.

> NCO may also oversee a network of attorneys for Litigation Accounts as discussed herein. NCO will manage its attorney network by assuring the attorneys satisfy pre-determined quality assurance criteria, and in carrying out recovery efforts, including but not limited to: forwarding media to attorneys for suit, ensuring attorneys mail final demand letters, properly filing suit and managing filing costs and fees, affidavit management, managing litigation status, properly receiving and remitting funds, judgment execution or placement, bankruptcy litigation placement, record creation and keeping, and conducting other activities reasonably calculated to lead to litigation and recovery of the accounts placed for litigation.

<u>Hours of Operation/Staffing</u>

1. NCO agrees to maintain the following hours of operation for this engagement:

> > Monday – Thursday: 8:00 AM – 10:00 PM EST
> > Friday: 8:00 AM – 5:00 PM EST
> > Saturday / Sunday: Four hour shift between 9:00 AM – 9:00 PM EST

2. Holidays - NCO and Special Servicer mutually recognize the following holidays:

   - New Years Day
   - Easter Sunday
   - Memorial Day
   - 4th of July
   - Labor Day

{P0038953.7 }

- Thanksgiving Day
- Christmas Day

3.  NCO agrees to maintain the following staffing ratios as they relate to management and support personnel for the FMER engagement.

- 1 Client Manager to 60 FTE
- 1 Supervisor to 15 FTE
- 1 Trainer to 60 FTE
- 1 Quality Monitor to 50 FTE
- 1 Administrative support to 50 FTE

<u>Post-Default Minimum Work Standards</u>

- Within twenty-four (24) hours of placement, NCO shall scrub the placement file against bankruptcy notification data base, either on-line or batch process, before collection effort is pursued. The account should be immediately closed and returned with no collection effort if a bankruptcy "hit" is returned, UNLESS the bankruptcy discharge was issued prior to loan origination or the bankruptcy was dismissed.
- Credit Bureau reports or credit headers shall be pulled on all accounts within two (2) business days of placement.
- A validation notice as outlined in the Fair Debt Collection Practices Act ("FDCPA") shall be sent within twenty-four (24) hours of placement.
- Within five (5) business days the first phone Attempts shall be made by NCO to both the borrower and co-borrower.
    - o   In the event Contact is made within the first five (5) business days of placement, a promise to pay or a commitment should be made to pay the balance in full, settle the balance in full within the guidelines provided by Special Servicer.
- Within the first thirty (30) days of placement:
    - o   If NCO determines it has a valid phone number, four (4) Attempts per week shall be made during strategic hours of the work day.  A message should not be left if another Contact will be completed on the same day.
    - o   If NCO determines it does not have a valid phone number, the account shall be statused as a skip account and skip tracing efforts are to commence no later than forty-eight (48) hours after determining the number is invalid.
    - o   Continued Attempts after the first thirty (30) days shall continue at the rate of one (1) time per week.
- Skip Tracing Activities after thirty (30) days or until Contact or closure:
    - o   Minimally, all available skip tracing tools shall be utilized and efforts Attempted three (3) times per month or until borrower is located or the account(s) is closed.  Skip tracing tools may include but are not limited to:
        - Nearby and same last name
        - Credit Bureau
        - Property Verification
        - University and/or College Directory/Registration
        - Internet Services
        - Voter Registration Databases
        - Directory Assistance
        - Local Professional Licensing Authority
    - o   All possible telephone numbers found should be Attempted within 24 hours, if legal to do so, to determine validity.

{R0038953.7 }

- Other than for Litigation Accounts described below, if the accounts are subserviced from NCO, accounts shall also be closed with the subservicer if there is a thirty (30) day period of time elapsed in which the subservicer fails to perform work on the account. "Work" is defined as an Attempt to Contact, a skip Attempt or some form of activity in an attempt to resolve the account.

Litigation Account Minimum Work Standards

- Within twenty-four (24) hours of placement or authorization to litigate, NCO shall scrub the file against bankruptcy notification data base, either on-line or batch process, before collection effort is pursued. The account should be immediately closed and returned with no collection effort if a bankruptcy "hit" is returned, UNLESS the bankruptcy discharge was issued prior to loan origination or the bankruptcy was dismissed.
- Credit Bureau reports or credit headers shall be pulled by NCO on all accounts within five (5) business days of placement or authorization.
- A validation notice as outlined in the FDCPA shall be sent by NCO within two (2) business days of placement or authorization. Upon outsourcing to local counsel, Attorney (as defined below) may also send an additional validation notice if appropriate.
- Within five (5) business days the first phone Attempts shall be made by NCO to both the borrower and co-borrower.
- In the event Contact is made, a promise to pay or a commitment should be made to pay the balance in full, or settle the balance in full within the settlement guidelines provided by Special Servicer under Settlement Process below.
- From the date of placement or authorization until the account is either outsourced to local counsel or has satisfactory payment arrangements made as described above, if NCO determines it has a valid phone number, NCO shall make phone Attempts at the rate of four (4) times per week at different times of the day, including at least two evening (e.g., after 5 p.m. debtor's time) or weekend Attempts. Attempts will be made on both the borrower and co-borrower.
- Within the first thirty (30) days of placement or authorization, if NCO determines it does not have a valid phone number, the account shall be statused as a skip and skip tracing efforts are to commence no later than forty-eight (48) hours after determining the number is invalid.
- Skip Tracing Activities after thirty (30) days or until Contact or closure:
  - o Minimally, all available skip tracing tools shall be utilized and efforts Attempted three (3) times per month or until borrower is located or the account(s) is closed. Skip tracing tools may include but are not limited to:
    - Nearby and same last name
    - Credit Bureau
    - Property Verification
    - University and/or College Directory/Registration
    - Internet Services
    - Voter Registration Databases
    - Directory Assistance
    - Local Professional Licensing Authority
  - o All possible telephone numbers found should be attempted within 24 hours, if legal to do so, to determine validity.
- Specific Direction for Litigation Accounts. In instances of repayment on Litigation Accounts, the following scenarios may occur, in which case NCO shall act as follows:
  - o Any Broken Commitment: Pursue litigation immediately
  - o Broken Payment Commitment: Pursue litigation immediately

{F0038953.7}

- o Returned (NSF) Payment Item: All efforts should be made to resolve the issue and reinstate payments. If unable to resolve within reasonable period of time, litigation should be pursued.
- • Subservicing to Litigation Network.
  - o "Attorney" as used herein shall mean each attorney or law firm, individually and collectively, utilized by NCO in the course of its Litigation Account subservicing.
    - ▪ NCO shall provide Special Servicer with a complete list of its Attorneys utilized within the several jurisdictions for which it has oversight, minimally, the fifty (50) United States and the respective counties and districts therein.
    - ▪ NCO shall ensure Attorney satisfies pre-determined quality assurance criteria, including but not limited to, review of:
      - ◦ Applicable Licensing Statuses
      - ◦ Separate Client Trust Account
      - ◦ Bonding
      - ◦ Audited Accounting
      - ◦ Criminal Background Checks of Firm Employees
      - ◦ State Licensing Board and Other Regulatory Complaints
      - ◦ Financial Stability and Solvency
      - • Reputation in the Community
      - • OFAC Scrub
    - ▪ This criteria shall be reviewed periodically, not less once per year, to ensure continuing quality.
    - ▪ Attorneys shall agree to be bound by the applicable commission and hourly defense fee rates pre-determined by NCO and Special Servicer and shall agree to timely remit any collection.
  - o Once the account(s) is outsourced to local counsel, Attorney (and NCO if appropriate) will continue diligent collection efforts in concert with the legal proceedings.
  - o Attorney and NCO must track the progress of the suit and assure all service is made in accordance with applicable laws, all deadlines are met and seek default judgments whenever appropriate.
  - o Attorney must make NCO immediately aware, and NCO will make Special Servicer immediately aware, of any and all answers or defenses filed by borrowers in response to a Complaint.
  - o If available, Attorney (and NCO if appropriate) shall make the borrower aware of his/her options under the settlement guidelines provided by Special Servicer under Settlement Process below.
  - o NCO shall maintain a process for forwarding Litigation Account media to Attorney.
  - o NCO shall review all complaints and affidavits utilized by Attorney. NCO shall maintain a process for pre-populating and executing Litigation Account affidavits as necessary to assist litigation by Attorney.
  - o If a witness is needed to provide testimony or other evidence at a trial or other hearing, whether live or telephonic, the Attorney shall submit information in a pre-approved form provided by Special Servicer to NCO and NCO shall in turn submit said form to Special Servicer no later than fifteen (15) days prior to the scheduled hearing. NCO shall not unreasonably incur expense in producing a witness for an appearance, expenses shall be minimized to the extent practicable.
  - o Attorney shall submit any judgment received, and complete a pre-approved form provided by Special Servicer within five (5) days of receipt to NCO. NCO will in turn provide both the judgment and the form to Special Servicer within five (5) days of

{F0038953.7 }

receipt. All fields on the form must be completed in their entirety by Attorney, and should include:

- Principal amount of judgment
- Pre-judgment interest amount awarded in judgment
- Post-judgment interest amount awarded in judgment
- Applicable interest rate
- Fees and costs
- To which amounts the applicable interest rate applies, whether principal, pre and/or post judgment interest, and/or fees and costs

- Attorney (and NCO if appropriate) must pursue collection efforts through appropriate legal means available (e.g., wage garnishments, liens, etc.) once judgment is entered. At least one (1) Attempt to secure post-judgment collection shall be made by Attorney (or NCO if appropriate) per month. These efforts may include, but are not limited to, phone contact, attempts to locate attachable assets such as bank accounts, property searches and employment searches.
- Special Servicer may, at its sole discretion, close any account and have it returned at any time. For each account closed, NCO shall submit a closing statement which shall include borrower name, social security number, Special Servicer account number, amount of funds expended, any funds remaining, closing balance, payments received and any judgment information entered. Any funds remaining shall be forwarded to Special Servicer within thirty (30) business days of closure. The litigation closing statement requirements are separate and distinct from the systemic "closed report" filed each month by NCO.
- Special Servicer will not pay a non-contingent suit fee or any other up-front fee to NCO or Attorney unless Special Servicer has provided its prior express written agreement to pay such fees.
- NCO agrees to provide regular case status reports to Special Servicer at no greater than quarterly intervals as directed by Special Servicer.
- NCO agrees to immediately provide copies of all correspondence and pleadings generated in connection with a contested matter (contested matter being defined as any civil action where the defendant has filed an answer or other pleading or motion).
- NCO agrees to escalate to Special Servicer any notices of counterclaim, cross-claim or other claim exposing the Trusts or Special Servicer to risk of loss, or reputational harm.
- NCO shall seek authority from Special Servicer for all expenses in excess of one hundred dollars ($100.00) to be incurred by the Attorney.
- Attorney agrees to file a Motion for Summary Judgment in all cases unless prohibited from doing so by local rules of court or Special Servicer and Attorney otherwise mutually agree that Attorney should not file such a Motion for Summary Judgment.

Pre- and Post-Default Account Shared Standards

Regulatory Agency Response Systems

For all Pre- and Post-Default Accounts, NCO shall maintain a process for accepting, reviewing and responding to complaints, inquires, notices, demands, subpoenas and alike from State and Federal administrative and regulatory agencies, such as Attorney General inquires, Consumer Federal Protection Bureau inquiries, Better Business Bureau Complaints, and alike. Notice of such inquires shall be provided to Special Servicer and such responses shall be forwarded to Special Servicer upon completion. Special Servicer shall be notified immediately of any penalty or sanction threatened or assessed by such agencies.

[F0038953.7]

Fraud Process

For all Pre- and Post-Default Accounts, NCO shall maintain a process for accepting, reviewing and administratively adjudicating claims of fraud by borrowers, which process shall utilize minimally a pre-approved form to be completed by claimants.

Credit Reporting Disputes

For all Pre- and Post-Default Accounts, NCO shall maintain a process for accepting, reviewing and timely responding to formal E-Oscar disputes generated through the major credit reporting agencies to which NCO reports.

Death, Disability Discharge and Hardship Claims

For all Pre- and Post-Default Accounts, NCO shall maintain a process for accepting, reviewing and timely responding to requests loan forgiveness arising from death, disability discharge or hardship. This may include subservicing of estate and probate claims services.

Military Scrubs and Servicemembers Civil Relief Act Compliance

For all Pre- and Post-Default Accounts, NCO shall maintain a process for accepting, reviewing and timely responding to active duty notices for United States service personnel.

Remittance Process

The following work standards related to remittance processes are applicable to all types of placements.

- Remittances shall be processed on a weekly basis, whether by electronic wire or by check and have a remittance statement submitted. All remittance statements are to contain: borrower name, Special Servicer account number(s), placement type (e.g., first, second, third or litigation), commission rate, payment amount, commission amount, payment date, application of funds (i.e., costs, principal, interest, etc.), and balance after payment applied.

- Any payment that does not result in good funds is to be posted immediately and included in the most current weekly remittance report as with any other payment information.

- NCO shall submit net remittances of all monies collected. NCO shall maintain copies of each invoice paid on each account.

- NCO shall maintain copies of all payment documents for a minimum of three years.

Key Performance Indicators ("KPI")

NCO agrees that the following KPI metrics will be used as a means of measuring productivity, in the form of reports containing:

- Suit rates
- Judgment rates
- Liquidation rates
- Collection costs

{F0038953.7 }

Settlement Process

Other than as set forth in Section 2.4(e) in the Agreement, and subject to any contrary account-specific instructions from Special Servicer, the following work standards related to settlement processes are applicable to all types of placements.

**Cash Settlement:**

- For loans within one year of charge-off, NCO shall manage to an aggregate monthly settlement total of 80% or greater of the outstanding principal and interest balance at the time of settlement. The minimum individual settlement shall be no less than 65%.

- For loans between one and two years post-charge-off, NCO shall manage to an aggregate monthly settlement total of 65% or greater of the outstanding principal and interest balance at the time of settlement. The minimum individual settlement shall be no less than 50%.

- For loans greater than two years post-charge-off, NCO shall manage to an aggregate monthly settlement total of 55% or greater of the outstanding principal and interest balance at the time of settlement. The minimum individual settlement shall be no less than 40%.

- Settlement offers which do not meet any of the above guidelines must be submitted in writing to Special Servicer for review. Settlements not meeting the above guidelines must have Special Servicer written authorization to be accepted.

- The authorization must be maintained by the NCO for a minimum of three years.

**12-Month Repayment Plan Settlement:**

- For loans within one year of charge-off, NCO shall manage to an aggregate settlement of 90% or greater of the outstanding principal and interest balance at the time of settlement. The minimum individual settlement shall be no less than 80%.

- For loans between one and two years post-charge-off, NCO shall manage to an aggregate settlement of 80% or greater of the outstanding principal and interest balance at the time of settlement. The minimum individual settlement shall be no less than 65%.

- For loans greater than two years post-charge-off, NCO shall manage to an aggregate settlement of 65% or greater of the outstanding principal and interest balance at the time of settlement. The minimum individual settlement shall be no less than 45%.

**24-Month Repayment Plan Settlement:**

- For loans within one year of charge-off, NCO shall manage to an aggregate settlement of 95% or greater of the outstanding principal and interest balance at the time of settlement. The minimum individual settlement shall be no less than 85%.

- For loans between one and two years post-charge-off, NCO shall manage to an aggregate settlement of 90% or greater of the outstanding principal and interest balance at the time of settlement. The minimum individual settlement shall be no less than 70%.

- For loans greater than two years post-charge-off, NCO shall manage to an aggregate settlement of 70% or greater of the outstanding principal and interest balance at the time of settlement. The minimum individual settlement shall be no less than 50%.

{P0038955.7}

Exceptional Authority

Except in the case where there is no media availability, any decision not outlined immediately above regarding settlement, dismissal of the action, or the removal of an attorney will require Special Servicer's written consent after reasonable opportunity to review. The authorization must be maintained by NCO for a minimum of three years.

Judgment Account Authority

Accounts with judgments entered on them DO NOT qualify for the above guidelines and all settlement offers on judgment accounts must be submitted to Special Servicer in writing.  Such offers may not be accepted without Special Servicer's written authorization.

{F0038953.7 }

Exhibit F to Default Prevention and Collection Services Agreement
Bankruptcy Services

Certain bankruptcy matters may be forwarded to NCO for handling. These matters may include, but are not limited to, adversary proceedings. These matters will be handled as follows:

a.   On all matters that are resolved without the need of proceeding with legal action, other than the entry of consent judgment of notice of non-dischargeability of debt, will be handled on a flat fee basis of $150.00 plus a contingency fee of 14% of all payments received connected to a given account.

b.   On all matters where legal action is taken, other than those matters referenced in paragraph (a) will be handled at an hourly rate of $265.00 for partners, $225.00 for Associates and $105.00 for Legal Assistants. These rates will apply to attorneys to whom matters are referred for defense. No contingency fees shall be taken on these accounts.

c.   Should it be determined that a file should be referred for collection litigation after a finding or agreement of full or partial non-dischargeability in the bankruptcy court, then the contingency rate for such action will be the same as outlined in Exhibit H to the Agreement.

To the extent reasonably practicable with respect to Bankruptcy Litigation Services, NCO shall be subject to the Litigation Account Minimum Work Standards as set forth in Exhibit D as if incorporated herein.

{F0038953.7}

Exhibit H to Default Prevention and Collection Services Agreement
Fees

**Default Prevention:**

For loans that roll at 31+ days from servicer to NCO Default Prevention Collectors and to be managed up until 180 days past due or lender mandated charge off date, including loans in Claims Review:

Pricing

$5,000.00 per month for each pre-approved NCO FTE. An "FTE" is the equivalent of 147 production hours in a month.

Initial Staffing Ratios

- The number of FTEs dedicated by NCO for this engagement shall be as mutually agreed.

- Any increase or decrease to staffing levels will be communicated in writing at least fifteen days (15) prior to the month in which the change shall be effective.

Performance Incentive

NCO will be further compensated based on reaching and/or exceeding agreed upon "Cure Rate" goals outlined below. The incentive compensation will be a % of the base rate billed in the same month for each stage.

Below numbers are a weighted average for a given month:

| Bonus based on billed amount for number of reps in each stage | Early<br><br>30 Day Evaluation<br>(31-60 DPD) | Primary<br><br>60 Day Evaluation<br>(61-120 DPD) | Secondary<br><br>60 Day Replacement<br>Evaluation<br>(121-180 DPD) |
|---|---|---|---|
| **All\***<br><br>Tier 1 = 3% | 52.00% | 56.00% | 16.00% |
| Tier 2 = 7% | 54.00% | 58.00% | 18.00% |
| Tier 3 = 13% | 56.00% | 61.00% | 20.00% |
| Bonus structure | $12,000 for top agency*<br>(details below) | $12,000 for top agency*<br>(details below) | $6,000 for top agency*<br>(details below) |

Cash Cure Percentages

NCO is expected to maintain the below percentage of cures attributable to cash resolution (as opposed to MGRS, Forbearance, and the Reduced Payment Program). Falling below this ratio will cause NCO to be ineligible for the "top agency bonus" for the period as well as ineligible for volume increases, both described more fully below.

{F0038953.7}

| Early | Primary | Secondary |
|---|---|---|
| **30 Day Evaluation (31-60 DPD)** | **60 Day Evaluation (61-120 DPD)** | **60 Day Replacement Evaluation (121-180 DPD)** |
| 72% | 70% | 60% |

- NCO will compete for a "top agency bonus" each month. A weighted average will be compared on the initial 30 day evaluation (31-60 DPD), the 60 day evaluation (61-120 DPD) and the Replacement 60 day evaluation (121-180 DPD). The agency with the best cure rate for each of these evaluations will earn a $12,000, $12,000 and $6,000 "top agency bonus," respectively.

- NCO cure rates will be measured to two decimal points, and in the event of a tie will revert to the agency with the highest Cash Cure Percentage.

- NCO must achieve a minimum of a Tier 1 performance level to be eligible for the "top agency bonus."

- NCO must not fall below the targeted Cash Cure Percentage to be eligible for the "top agency bonus."

- If the top agency falls below the Cash Cure Percentage goal, the next best agency will inherit the "top agency bonus" provided they have not fallen below their Cash Cure Percentage target and have achieved at least Tier 1 performance.

Volume Increase Opportunity

Monthly, 31+ DPD volume may be reallocated as follows:

- NCO will be ranked based on 31+ day evaluations within a given month, and may be given an increase of volume placed at 31+ DPD for the following month based on that rank. Conversely, poorer performing agencies may realize a decrease in volume for the following month based on their rank.

- NCO may not fall below Cash Cure Percentage targets listed above to qualify for any volume increases.

- NCO will be notified of monthly results and how they will impact the FTE counts outlined above.

**Post Default Collections (including probate recoveries):**

NCO to utilize Default Collectors for all of post default collections prior to litigation.

a.      Payments on First Placements

NCO shall receive a fee equal to eighteen percent (18%) of all amounts collected directly from the Borrower(s) on each account.

{F0038953.7}

b.    Payments on Second Placements

NCO shall receive a fee equal to twenty-five percent (25%) of all amounts collected directly from the Borrower(s) on each account.

c.    Payments on Third Placements

NCO shall receive a fee equal to twenty-eight (28%) of all amounts collected directly from the Borrower(s) on each account.

d.    Accounts in Litigation

Amounts collected on accounts referred by NCO to an attorney for formal legal proceedings will be deposited into the account, and NCO will be entitled to a fee on any such amount equal to thirty percent (30%) of all amounts collected by the attorney from the borrower, of which twenty-five percent (25%) shall be remitted to the attorney.

{F0038953.7 }

Exhibit I to Default Prevention and Collection Services Agreement
Trusts

The National Collegiate Master Student Loan Trust
The National Collegiate Student Loan Trust 2003-1
The National Collegiate Student Loan Trust 2004-1
The National Collegiate Student Loan Trust 2004-2
The National Collegiate Student Loan Trust 2005-1
The National Collegiate Student Loan Trust 2005-2
The National Collegiate Student Loan Trust 2005-3
The National Collegiate Student Loan Trust 2006-1
The National Collegiate Student Loan Trust 2006-2
The National Collegiate Student Loan Trust 2006-3
The National Collegiate Student Loan Trust 2006-4
The National Collegiate Student Loan Trust 2007-1
The National Collegiate Student Loan Trust 2007-2
The National Collegiate Student Loan Trust 2007-3
The National Collegiate Student Loan Trust 2007-4

{80038953.7}

USB 0077

*EXECUTION VERSION*

## THIRD AMENDMENT TO
## DEFAULT PREVENTION AND COLLECTION SERVICES AGREEMENT

This Third Amendment to Default Prevention and Collection Services Agreement (this "Amendment") is entered into as of June 21, 2012, by and between U.S. Bank National Association, as successor Special Servicer, a national banking association with a principal place of business at 60 Livingston Avenue, Mailcode: EP-MN-WS3D, St. Paul MN 55107 (together with its successors and assigns, the "Successor Special Servicer") and NCO Financial Systems, Inc., a corporation organized under the laws of the Commonwealth of Pennsylvania having a place of business at 507 Prudential Road, Horsham, PA 19044 (together with its successors and assigns, "NCO"), and amends that certain Default Prevention and Collection Services Agreement entered into by and between First Marblehead Education Resources, Inc. ("FMER"), the initial Special Servicer, and NCO and dated as of March 1, 2009 (the "Original Agreement"), as amended by that certain First Amendment to Default Prevention and Collection Services Agreement entered into by and between FMER and NCO and dated as of May 1, 2009 (the "First Amendment") and by that certain Second Amendment to Default Prevention and Collection Services Agreement entered into by and between FMER and NCO and dated as of June 15, 2012 (the "Second Amendment" and, together with the Original Agreement and the First Amendment, the "NCO Agreement"; and the NCO Agreement, as supplemented and amended by this Amendment and as same may be further amended from time to time pursuant to Section 11.10, the "Agreement").

WHEREAS, pursuant to that certain (i) Special Servicing Agreement dated as of March 1, 2009 (the "March SSA") by and among FMER as special servicer, U.S. Bank National Association as back-up special servicer (in such capacity the "Back-Up Special Servicer") and each of the Trusts listed on Schedule A to the March SSA and (ii) Special Servicing Agreement dated as of May 1, 2009 (together with the March SSA, the "Special Servicing Agreements") by and among FMER as special servicer, U.S. Bank as back-up special servicer, Ambac Assurance Corporation ("Ambac") and each of the Trusts listed on Schedule A to the May SSA, the Trusts appointed FMER as the initial Special Servicer and U.S. Bank as the Back-Up Special Servicer for the purposes of providing default prevention, collection and other special services duties to the Trusts identified in the Special Servicing Agreements (collectively, the "Trusts" and individually, a "Trust") in accordance with the terms of the Special Servicing Agreements.

WHEREAS, pursuant to the Special Servicing Agreements, FMER as initial Special Servicer arranged for the outsourcing to NCO of certain default prevention and collection activities of the Special Servicer under the Special Servicing Agreements in the event that U.S. Bank became the successor Special Servicer under the Special Servicing Agreements;

WHEREAS, as of June 21, 2012, the Successor Special Servicer assumed the duties of the Special Servicer under the Special Servicing Agreements and FMER notified NCO of such assumption;

WHEREAS, pursuant to the NCO Agreement, upon being notified of the assumption by U.S. Bank as Back-up Special Servicer of the duties of the Special Servicer under the Special

Servicing Agreements, NCO shall begin performance of the Services specified in the NCO Agreement;

WHEREAS, June 21, 2012, is the "Effective Date" for purposes of the Agreement;

WHEREAS, the Successor Special Servicer and NCO wish to amend the Agreement to update, expand and confirm the services, including, without limitation, collection and enforcement services, to be provided by NCO thereunder.

WHEREAS, pursuant to that certain Special SubServicing Agreement dated ___ ,2012, between the Successor Special Servicer and Turnstile Capital Management, L.L.C. a wholly owned subsidiary of Goal Structured Solutions, Inc. as the Special SubServicer (the "Special SubServicing Agreement") the Successor Special Servicer has appointed Turnstile as its sub-servicer (in such capacity, the "Special SubServicer") for purposes of performing the Special Services required to be performed under the Special Servicing Agreements (other than the Special Services to be performed by NCO under the  Agreement);

WHEREAS, as part of the Special Services to be performed by it, the Special SubServicer will be responsible for global portfolio strategy and oversight of NCO's performance under the Agreement as more fully set forth in the Agreement;

NOW THEREFORE, in consideration of the premises set forth above, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Defined Terms.  All capitalized terms in this Amendment shall have the same meaning given to them in the Agreement, unless otherwise expressly stated herein.

2.      Amendments of the Agreement.  The Agreement is hereby amended in the following respects:

2.1     The first line of the first paragraph of the Agreement is amended by replacing the parenthetical, "(hereinafter "Agreement")" with "(such agreement, as same may be  amended from time to time in accordance with Section 11.10, the "Agreement")".

2.2     Section 1.1 of the Agreement is amended by deleting and replacing the defined terms "Services" and "Subservicers" with the following as applicable:

        ""Services" means Default Collection Services, Default Prevention Services, Fraud Claims Review, Bankruptcy and Probate Services, and Collection Agency Management Services and the Other Services.

        "Subservicers" means those subservicers (including for the avoidance of doubt, an OCA) retained by NCO in conformity with the requirements of Section 2.12 of this Agreement to perform any of the Services (other than Collection Agency Management Services and Other Services)."

14101092.7                                   2

2.3     The Agreement is further amended by inserting (in alphabetical order, as appropriate) the following defined terms to Section 1.1 thereof:

""Bankruptcy and Probate Services" means those services generally described in Section 2.5 and in Exhibit F attached hereto.

"Collection Agency Management Services" means the management, oversight and monitoring of Subservicers retained by NCO pursuant to Section 2.12 of the Agreement.

"Fraud Claim Review" means those services described generally in Exhibit F hereto.

"OCA" means a collection agency retained by NCO to perform any of the Services (other than Collection Agency Management Services), which, for the avoidance of doubt, may be NCO as a servicer.

"Operating Guidelines" shall have the meaning ascribed to such term in Section 2.1.

"Other Services" means the accounting, reporting and record management services and portfolio strategy services to be performed by NCO as generally described in Sections 2.1B and 2.1C.

"Special Servicer Account" means the Special Servicer designated account or accounts to which NCO will remit weekly (or at different intervals) funds in the Account (defined in Section 2.6) representing payments received by NCO (except fees owed to NCO for Default Collection Services.)"

2.4     Section 2.1 of the Agreement is amended by:

(a)     adding the following sentence to the end of the first paragraph in Section 2.1:

"NCO directly and/or through its Subservicers shall perform the Services in accordance with this Agreement, including, without limitation, the Exhibits attached hereto and incorporated herein by this reference, and in conformity with the terms and conditions set forth in the NCSLT Operating Guidelines attached hereto as Exhibit G (as same may be updated from time to time pursuant to provisions of Section 11.10, the "Operating Guidelines")."

(b)     adding the following new Sections immediately following the end of Section 2.1:

"2.1A  Collection Agency Management and Oversight Services.   (a) For each ASL subject to this Agreement, NCO shall perform or cause its SubServicers to perform, the Services required for such ASL, in each case, in accordance with

the terms of this Agreement and the Exhibits attached hereto (including, without limitation, the Operating Guidelines).  NCO shall supervise, monitor and oversee the obligations of, and performance by, Subservicers retained by it to service and administer the particular ASLs subject to this Agreement with the goal of maximizing the collection of amounts payable on the ASLs.  NCO shall oversee and consult with its Subservicers from time-to-time as necessary or desirable to ensure compliance with the terms of this Agreement (including, without limitation, the Exhibits attached hereto).  Without limiting the generality of the foregoing, NCO shall take such actions as it deems reasonably necessary or appropriate, but in conformity with the Operating Guidelines and this Agreement, to:

(i)     With respect to Delinquent Loans, transfer all collection activities from the applicable Servicer for a Trust to a Subservicer selected by NCO (which may for the avoidance of doubt, include NCO as subservicer) for the enforcement and collection of such ASLs;  provided that NCO shall not be required to transfer such collection activities if GSS Data Services ("GSS") is the Administrator for the Trusts and GSS notifies NCO that it has determined that collections would not be maximized on such Delinquent Loans if the collection activities were transferred to Subservicers;

(ii)    With respect to Defaulted Loans, in its sole discretion, transfer all collection activities to NCO directly or to an OCA, provided that NCO shall not be required to transfer such collection activities if GSS is the Administrator and GSS determines that it is likely that collections would not be maximized on such Defaulted Loans if the collection activities were transferred to NCO or the OCA, as applicable;

(iii)   Replace any Subservicer who is deemed to be deficient or negligent in performing the applicable duties outlined in this Agreement or the related subservicing agreement with NCO;

(iv)    Remit or cause each Subservicer to remit net collections received on Defaulted Loans to the Special Servicer Account;

(v)     With respect to Defaulted Loans that are over 180 days delinquent, cause the Subservicer to (a) roll or reassign accounts from 180 days delinquent into a default recovery queue for collection efforts and (b) remit weekly (or at such other agreed intervals) to the Special Servicer Account for the receipt of collections from a Subservicer for the benefit of the respective Trusts as their interest may appear, cash collected on all Defaulted Loans serviced by such Subservicer for the Trusts; and

(ix)    Review claim packages prepared by a Servicer for a Trust with respect to Defaulted Loans to confirm, on the basis of such review, that (a) Servicer

USB 0081

has complied with applicable servicing guidelines and (b) the loan originator has complied with applicable program guidelines and return the claim packages to the Servicers for further collection efforts and/or cure by the Servicers as provided in the applicable servicing guidelines if it detects Servicer error.

(b)     NCO shall provide the Collection Agency Management Services in substantially the same manner and of the same quality and standards as it generally performs comparable services for itself and others in accordance with all customary and usual servicing practices and procedures with a view to maximize the value of the ASLs subject to this Agreement and without regard to NCO's right to receive compensation for its services hereunder.

2.1B   Record Management, Accounting and Reporting Services. NCO shall perform the following record management and reporting services:

(i)      Establish and maintain a system of record for purposes of monitoring and tracking by Trust any ASL subject to the Agreement and in connection therewith, receive data, reports and other information from the applicable Trust's Servicers and from the Subservicers, including, without limitation, as to payments and other amounts collected with respect to Delinquent Loans and Defaulted Loans and update the system of record to reflect such information and data;

(ii)     Provide monthly reports to the Special SubServicer and the Administrator for each Trust in form and substance reasonably satisfactory to the Special SubServicer and the Administrator (which as of the date hereof shall be in the form of Exhibit A hereto);

(iii)    Perform (a) periodic audits of Subservicers for compliance and performance reviews in accordance with the Operating Guidelines, (b) provide oversight of the activities of a Subservicer with regard to account management, litigation assistance, bankruptcy, probate and/or settlement strategies, (c) report results of audits and oversight to the Special SubServicer and (d) reconcile and/or resolve any discrepancies or issues; and

(iv)    Establish and maintain an account or accounts, which may be the Account, in trust for the benefit of the Indenture Trustee and the Trusts for the deposit by a Subservicer of net collections on all Defaulted Loans serviced by such Subservicer for the respective Trusts and in connection therewith preparing or causing to be prepared such control agreement or agreements as may be necessary or desirable to maintain and preserve the lien and security interest therein of the Indenture Trustee under the respective Indentures.

2.1C    Global Portfolio Strategy Services. NCO agrees to meet from time to time with Special SubServicer and/or Special Servicer, as applicable, to review strategy with respect to the Student Loan Portfolios subject to this Agreement and performance of the Services and related functions, including, without limitation, the performance and market share of the Subservicers (including without limitation the OCAs), across all segments consistent with the Operating Guidelines. NCO shall perform the Services consistent with the terms of the Agreement and the Operating Guidelines. NCO will have no authority to, and agrees that it will not, make any changes to the procedures and operations set forth in this Agreement and/or the Operating Guidelines without the written consent of the Special Servicer and/or the Special SubServicer pursuant to Section 11.10."

2.1D    Outsourcing. For avoidance of doubt, the Services to be provided by NCO in accordance with Section 2.1A, 2.1B, 2.1C and, except as may otherwise be agreed by the Special SubServicer, 2.1D shall be performed directly by NCO.

2.5    The first paragraph of Section 2.3 and Section 2.3(a) of the Agreement are hereby amended and restated as follows:

"2.3    Default Collection Services. NCO shall perform Default Collection Services in conformity with those Default Collection Services set forth herein and in Exhibit D attached hereto and in conformity with the Operating Guidelines. NCO shall use Dedicated Staff to perform Default Collection Services. Special Servicer shall cause the Servicers to provide to NCO all documents and information specified in the Servicing Agreements and/or Servicing Guidelines.

(a)    Generally.

(i)    NCO shall review the Claims Package for conformity to the Servicing Guidelines and Program Guidelines. NCO shall return the Claims Package to the Servicers for further collection efforts and/or cure by the Servicers as provided in the Servicing Guidelines and Special Servicer's servicing agreement if it detects Servicer error as prescribed in the Servicing Guidelines.

(ii)    NCO shall reconcile all cash collections with its reported results of operations and transmit all cash receipts (net of the fees set forth on Exhibit H) weekly (or at such other agreed intervals) to Special Servicer. NCO shall provide the Default Collection Reports set forth in Exhibit E. NCO shall assign defaulted ASLs as needed to optimize collection."

2.6    Section 2.3(b) (iii)of the Agreement is hereby amended and restated as follows:

14101092.7                                        6

"(iii)   Special Servicer reserves the right to restrict or otherwise limit at any time, from time to time, the manner or means to be used by NCO in collecting any account, which restrictions may be communicated to NCO by Special Servicer orally or in writing, at Special Servicer's sole discretion.  However, for so long as NCO's collection practices conform to the terms of this Agreement, the Operating Guidelines and applicable law, Special Servicer shall not exercise such right."

2.7   Section 2.4 of the Agreement is hereby amended by adding the following new clauses (h) and (i) at the end of the second paragraph thereof:

"(h)   Notwithstanding anything herein to the contrary, effective as of the date of the Third Amendment, NCO shall administer, manage and oversee collection litigation consistent with the terms of this Agreement, including without limitation, Exhibit D hereto and the Operating Guidelines and, except as contemplated in the Operating Guidelines, no further approval, consent or direction of the Special Servicer shall be required with respect to management of litigation relating to ASLs.

(i)   The Special Servicer shall execute and deliver to NCO one or more powers of attorney appointing NCO as the attorney-in-fact and a custodian of records for the Special Servicer for the purpose of executing on behalf of the Special Servicer such affidavits, documents and instruments as may be required to be delivered in connection with the performance of the Services.  Notwithstanding anything contained herein to the contrary, neither NCO nor any Subservicer shall, without the  Special Servicer's written consent:  (i) hire or procure counsel to represent the applicable Trust or Special Servicer without indicating its representative capacity or (ii) prepare, execute or deliver any filings, forms, affidavits, pleading or other documents on behalf of aTrust or the Special Servicer without indicating its representative capacity. "

2.8   Section 2.5 of the Agreement is hereby amended and restated in its entirety as follows:

"2.5   Special Accounts.

(a)   Notwithstanding anything to the contrary in the NCO Agreement, NCO shall be responsible for servicing any ASL for which the related borrower or guarantor is subject to bankruptcy proceedings as generally described in Exhibit F, including without limitation, the filing of Proofs of Claim and monitoring of same by NCO's Bankruptcy Division.  NCO shall also be responsible for fraud processes as generally described in Exhibit F.

(b)   In the event any debtor with respect to an ASL that is the subject of Services is deceased, NCO will accept from the Servicers the documentation

14101092.7

7

specified under "Death Claim" under the Servicing Guidelines and will collect the ASL. NCO will otherwise perform in accordance with the terms generally identified under the heading 'Probate Servicing' under Exhibit F."

2.9     The fourth sentence of Section 2.6 of the Agreement is hereby amended and restated to read as follows: "NCO will remit on a daily basis (or at different periodic intervals chosen by Special Servicer), by wire transfer to the respective Trusts' collection accounts (as identified by the Special Servicer to NCO), all funds in the Account representing payments received by NCO for the prior day (or alternative periodic basis chosen by the Special Servicer), except fees owed to NCO for Default Collection Services (which shall be payable to NCO as set forth in Section 2.3(c))."

2.10     Section 2.12 of the Agreement is amended and restated as follows:

'2.12   Subservicers.   NCO may retain Subservicers to provide Services (other than the Other Services) under this Agreement. All Subservicers shall be licensed collection agents and other legally authorized persons who meet the eligibility criteria of an OCA as set forth in Section 6 – OCA Eligibility and Network Design of the Operating Guidelines. NCO shall ensure that each Subservicer maintains adequate records and procedures with respect to the services provided by it and otherwise complies with the applicable terms of this Agreement. NCO shall not permit any Subservicer to have access to Confidential Information, including Borrower Data, without first ensuring that such Subservicer has adequate policies and procedures in place, consistent with this Agreement, to safeguard Confidential Information, including borrower data. The retention of a Subservicer shall not relieve NCO of any of its obligations under this Agreement. NCO shall be responsible for the performance or nonperformance of its Subservicers as if such performance or nonperformance were that of NCO. '

2.11     Section 4.1 of the Agreement is hereby amended as follows:

(a)     Section 4.1(a) of the Agreement is amended by deleting the phrase "a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware" and replacing such phrase with "a national banking association organized, validly existing and in good standing under the laws of the United States".

(b)     Section 4.1(f) of the Agreement is hereby deleted.

2.12     Section 4.2(g) of the Agreement is hereby amended by adding the following to the end thereof:

"(g)     Legal Proceedings.   In the event of any lawsuit in which counterclaims are interposed by a debtor, or where a debtor or other third party shall make any other claim against Special Servicer or any Trusts, the same shall be immediately referred by NCO to Special SubServicer and Special Servicer and

USB 0085

Special Servicer shall have the right to intercede and defend such action. No criminal proceedings, real property executions, bailable attachments, commitment orders or other enforcement proceedings, except for the issuance of a subpoena to examine the debtor and restraining notices, shall be instituted by NCO without prior written approval of Special Subservicer."

2.13   Section 8.1 (a) of the Agreement is hereby amended by adding after the term "Special Servicer" wherever it appears in such clause (a) the following phrase: "and its subservicers (including for avoidance of doubt, the Special SubServicer)".

2.14   Section 9.4 of the Agreement is hereby amended by adding the following new subsection (d) at the end thereof:

"(d)   Servicing Transition. For a period of not less than 120 days following the notice of nonrenewal or notice of termination under Section 9.1 or Section 9.2, as applicable, NCO agrees to cooperate and use its commercially reasonable efforts to facilitate the orderly transfer of its responsibilities and rights under this Agreement to a successor, including without limitation, by providing the Special Servicer, its designee or such successor reasonable access, during normal business hours and upon reasonable prior notice, to all files, systems and employees of NCO then used in the provision of the Services, provided NCO may request any such party to comply with customary procedures designed to protect the confidentiality and security of any borrower information. Without limiting the generality of the foregoing, NCO agrees to notify its Subservicers, its collection agents and other appropriate parties of the transfer of the servicing functions and provide (or cause its Subservicers and agents to provide) to the successor all documents and records in electronic or other form reasonably requested by the Special Servicer or its designee to enable the successor to assume the servicing functions performed by NCO under this Agreement (including, without limitation, information relating to Delinquent Loans and Defaulted Loans) and shall transfer (and cause any collection agent to transfer) to the Indenture Trustee for deposit into the Collection Account for the benefit of each Trust net collections received by it with respect to the Defaulted Loans. NCO shall be entitled to reimbursement for its expenses incurred in performing its obligations hereunder subject to the terms and conditions of the SSAs, including, without limitation, the reimbursement limits set forth therein."

2.15   Section 11.1 of the Agreement is hereby amended and replaced in its entirety as follows:

'11.1   Notice Procedure: Addresses. All notices, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given and received at the time delivered by hand, if personally delivered;

when receipt is acknowledged, if mailed by certified mail, postage prepaid, return receipt requested; the next business day after timely delivery to the courier, if sent by overnight air courier guaranteeing next-day delivery; and when received, if sent by any other means, as follows:

If to Special Servicer:

U.S. Bank National Association
Attn: Brian Tri
60 Livingston Avenue
Mailcode: EP-MN-WS3D
St. Paul MN 55107
with a copy to the Special SubServicer:

If to the Special SubServicer:

Turnstile Capital Management, LLC
401 West A Street, Suite 1300
San Diego, California 92101
Attn: Alan Amico

If to NCO:

NCO Financial Systems, Inc.
Attn: Thomas Arnst.
Executive Vice President and Chief Administrative Officer
507 Prudential Road
Horsham, Pennsylvania 19044

The persons or addresses to which mailings or deliveries shall be made may be changed from time to time by notice given pursuant to the provisions of this Section 11.1.'

2.16   Section 11.10 of the Agreement is hereby amended and replaced as follows:

"11.10   Entire Agreement; Amendments.     The making, execution and delivery of this Agreement by the parties have been induced by no representations, warranties, statements or agreements other than those herein expressed. This Agreement (and the exhibits hereto) and the letter agreement dated as of September 7, 2012, among NCO, the Special Servicer and the Special Subservicer regarding the Fee Agreement with Respect to Special Services embodies the entire understanding of the parties, and there are no further or other agreements or understandings, written or oral, in effect among the parties relating to the subject matter hereof. This Agreement and the exhibits hereto (including, for the avoidance of doubt, the Operating Guidelines) may be amended or modified only by a written instrument signed by NCO, the Special Servicer and

14101092.7                                    10

the Special Subservicer; provided however that the Operating Guidelines may be amended with notice to but without the written consent of the Special Servicer if the purpose of such amendment or modification is to correct any mistake, eliminate any inconsistency, cure any ambiguity or deal with any matter not covered (i.e., to give effect to the intent of the parties). None of the parties shall be deemed to have waived any of its rights, powers or remedies under this Agreement unless such waiver is approved in writing by an authorized representative of the waiving party.

2.16    The Table of Exhibits to the Agreement is amended by deleting such table in its entirety and the following shall be inserted in lieu thereof:

> "Exhibit A – Summary Reports
> Exhibit B - Default Prevention Services
> Exhibit C - Default Prevention Reports
> Exhibit D - Default Collection Services
> Exhibit E - Default Collection Reports
> Exhibit F – Non-Traditional Collection Services
> Exhibit G – Operating Guidelines
> Exhibit H - Fees to NCO
> Exhibit I – Trusts"

2.17    Exhibit A to the Agreement is deleted and replaced in its entirety with the form of Exhibit A attached to this Amendment.

2.18    Exhibit F to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit F attached to this Amendment.

2.19    Exhibit G to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit G attached to this Amendment.

2.20    Exhibit H to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit H attached to this Amendment.

3.    Special SubServicer.  NCO acknowledges that it has been notified that the Successor Special Servicer has appointed the Special SubServicer as its subervicer pursuant to the terms of the Special SubServicing Agreement, with full power and authority to act in its stead, for all purposes of the Agreement (including, for the avoidance of doubt, this Amendment.)

4.    Cooperation.

(a) NCO acknowledges that FMER as the initial Special Servicer has agreed to cooperate with the Successor Special Servicer, its agents and subservicers to facilitate the orderly transfer of duties to the Successor Special Servicer, its subservicers and agents, including, for such purposes, NCO.  As part of such agreement, FMER has agreed that the cooperation period

14101092.7                                    11

contemplated under the Special Servicing Agreements will continue until November 30, 2012. The parties hereto acknowledges that it is a mutual goal to have a smooth transition and to enable the Successor Special Servicer through NCO and the Special Subservicer to perform all of the Special Services required under the Special Servicing Agreements without any assistance from FMER or the Successor Special Servicer as soon as possible.  To this end, NCO agrees to continue to use reasonable efforts to cooperate with FMER, the Special SubServicer and the Successor Special Servicer to effect such transfer as expeditiously as possible. NCO acknowledges that a plan for such transition has been developed, including, without limitation, the Operating Guidelines.

(b) NCO acknowledges that the Successor Special Servicer intends to  assign and subservice it's special servicing duties as successor Special Servicer under the Special Servicing Agreements (collectively, the "SSA Duties") to the Special Subservicer and NCO pursuant to the terms of the Agreement and the Special Subscrvicing Agreement, respectively.  As such, NCO, the Successor Special Servicer and the Special Subservicer shall each  cooperate in good faith with one another to implement the assumption of such SSA Duties as are to be performed by each of NCO and the Special Subservicer, respectively, pursuant to the terms of the NCO Agreement and the Special Subservcing Agreement, as applicable. For avoidance of doubt, the Successor Special Servicer hereby acknowledges and agrees that the Special Servicer's obligations under Section 8.1 of the Agreement are not being assigned to NCO or TCM, it being understood that such obligations remain with the Successor Special Servicer in its capacity as successor Special Servicer under the Agreement, subject to (for the avoidance of doubt) the provisions of Section 11.6 of the Agreement.

5.    Effect of Amendment. This Amendment shall be effective as of the date first set forth above. Except as expressly amended by this Amendment, all terms and provisions contained in the Agreement shall continue in full force and effect, without modification.  All references in the Agreement to the Agreement shall be deemed to mean the Agreement as modified hereby.  This Amendment shall not constitute a novation of the Agreement, but shall constitute an amendment thereof.  The parties hereto agree to be bound by the terms and conditions of the Agreement, as amended by this Amendment, as though such terms and conditions were set forth therein.   This Amendment may not be amended or otherwise modified except as provided in the Agreement.  The failure or unenforceability of any provision hereof shall not affect the other provisions of this Amendment or the Agreement.

6.    Multiple Counterparts. This Amendment may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which shall be deemed, collectively, one agreement, but in making proof hereof it shall not be necessary to exhibit more than one such counterpart.  Delivery of an executed counterpart of this Amendment by facsimile or pdf electronic transmission shall be deemed as effective as delivery of an originally executed counterpart.

7.      GOVERNING LAW, THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF OHIO, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN' TO THOSE OF THE STATE OF OHIO. EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Third Amendment to the Default Prevention and Collection Services Agreement to be executed as of the date first written above.

U.S. BANK NATIONAL ASSOCIATION,
as Successor Special Servicer under the
Special Servicing Agreements

By: _____

Name:        Eva D. Kaplan

Title: Senior Vice President

NCO FINANCIAL SYSTEMS, INC.

By: _____

Name:

Title:

14101092.7

14

IN WITNESS WHEREOF, the parties hereto have caused this Third Amendment to the Default Prevention and Collection Services Agreement to be executed as of the date first written above.

U.S. BANK NATIONAL ASSOCIATION, as Successor Special Servicer under the Special Servicing Agreements

By: _____
Name:
Title:

NCO FINANCIAL SYSTEMS, INC.

By: _____
Name: Alan B. Superfine
Title: Vice President

l4l01092.7                    14

**EXHIBIT A**
**[SEE ATTACHED]**

14101092.7

Exhibit A - Summary Reports

| Defaulted Principal and Interest Roll Forward | | | | | |
|---|---|---|---|---|---|
| | **Principal** | **Interest** | **Total P and I** | **Fees** | **Total Balances** |
| **Beginning Balance** | 1,000,000.00 | 50,000.00 | 1,050,000.00 | | 1,050,000.00 |
| *New Activity Transaction:* | | | | | |
| New Defaults Added to System | 100,000.00 | 5,000.00 | 105,000.00 | | 105,000.00 |
| Default Reversals | (5,000.00) | (1,000.00) | (6,000.00) | | (6,000.00) |
| Transfers In | 12,000.00 | 1,000.00 | 13,000.00 | | 13,000.00 |
| Transfers Out | (12,000.00) | (1,000.00) | (13,000.00) | | (13,000.00) |
| *Cash Transactions:* | | | | | |
| Borrower Payments | (25,000.00) | (2,000.00) | (27,000.00) | 9,000.00 | (18,000.00) |
| Settlements | (3,000.00) | - | (3,000.00) | | (3,000.00) |
| *Non-Cash Transactions:* | | | | | |
| Capitalized Interest | 5,000.00 | (5,000.00) | - | | - |
| Judgements | 2,000.00 | (2,500.00) | (500.00) | | (500.00) |
| Settlements | (5,000.00) | (1,000.00) | (6,000.00) | | (6,000.00) |
| Loans Removed / Closed | (10,000.00) | (1,000.00) | (11,000.00) | | (11,000.00) |
| Adjustments / Other | 500.00 | (500.00) | - | | - |
| Accrued Interest | | 2,000.00 | 2,000.00 | | 2,000.00 |
| **Calculated Ending Balance** | 1,059,500.00 | 44,000.00 | 1,103,500.00 | 9,000.00 | 1,112,500.00 |
| **System Ending Balance** | 1,067,500.00 | 51,000.00 | 1,118,500.00 | 9,000.00 | 1,127,500.00 |
| **Variance** | 8,000.00 | 7,000.00 | 15,000.00 | - | 15,000.00 |
| *Supporting documentation and remediation needed for all variance items* | | | | | |

| New Loans Added to System Reconciliation | |
|---|---|
| New Loans Added to System | 99,000.00 |
| Loans Defaulted at Servicer | 107,000.00 |
| **Variance** | (8,000.00) |
| *Supporting documentation and remediation needed for all variance items* | |

| Cash Receipts Reconciliation | |
|---|---|
| Borrower Payments - Principal | (25,000.00) |
| Borrower Payments - Interest | (2,000.00) |
| Settlements - Principal | (3,000.00) |
| Settlements - Interest | - |
| Commissions | 5,000.00 |
| Recovered Costs | 2,500.00 |
| Litigation | 1,000.00 |
| Other Fees | 500.00 |
| **Total Cash Receipts** | (21,000.00) |
| **Actual Cash Receipts** | (18,000.00) |
| **Variance** | (3,000.00) |
| *Supporting documentation and remediation needed for all variance items* | |

**Exhibit A - Data Elements**

***Transaction Detail File***

| | |
|---|---|
| Transaction ID | Unique transaction identifier |
| LoanID | Unique loan identifier |
| SSN | Borrower SSN |
| Loan Sequence | |
| Entity | Short name of the trust |
| Lender Code | Changed from owner code |
| Transaction Date | |
| Effective Date | Effective date of transaction, could occur in prior periods |
| Transaction code | Transaction code which ties to activity in the above reports |
| Transaction Description | ties to the above descriptions |
| Principal Amount | |
| Interest amount | |
| Fee amount | |
| Report period | |

***Snapshot Data***

| | |
|---|---|
| LoanID | |
| SSN | |
| Loan Sequence | |
| Entity | Short name of the trust |
| Lender Code | Changed from owner code |
| Current principal | |
| Current interest | |
| Current fees | |
| Charge off amount | |
| Charge off interest | |
| Interest Rate | Base + Margin |
| Margin Rate | Spread |
| Base Rate | Benchmark Rate |
| Default date | |
| Current status | skip, litigation, regular collections, dispute, etc. |
| Current OCA | |
| Cum. Gross Collections | |
| Placement date | |
| Report period | |

## EXHIBIT F:
## NON-TRADITIONAL COLLECTION SERVICES

**Bankruptcy Servicing:**

In the event any debtor with respect to any ASL that is the subject of Services becomes a debtor under the U.S. Bankruptcy Code, NCO shall assign the account to its internal Bankruptcy Processing Unit.  NCO will provide the following services;

I.   Timely file proofs of claim ("**Proofs of Claim**") (as required or permitted by the Bankruptcy Code) on behalf of NCT in Chapter 11, 12, 13 and Chapter 7 asset cases, on accounts placed.

II.   Proof of Claims will be monitored and appended when necessary to ensure the proper payment and receipt of notices from the Bankruptcy Court

III.   Shall process all Proceeds which are received from Trustees in all bankruptcy cases in which it has filed Proofs of Claim in compliance with the Agreement.

These services will be provided on accounts that qualify as outlined below

I.   Account balance is  greater than or equal to $175.00

II.   Debt should not be past the Statute of Limitations

III.   Bankruptcy Case is within the Bar Date at the time of placement

**Probate Servicing:**

In the event any debtor with respect to any ASL that is the subject of Services becomes deceased, collection efforts will continue from the non-deceased co-maker. If there is no surviving co-maker, NCO shall assign the account to its internal Deceased and Probate collections Unit. Provided the account balance is at least $175.00, the following services will be provided, as deemed necessary based on NCO's industry experience.

I.   Conduct a search for an open and viable estate

II.   If a viable estate is identified a claim will be filed on behalf of NCT in compliance with NCO's established business model.

III.   Monitor the claim to ensure the proper payments are made

IV.   If no estate is found, NCO will attempt to identify the Personal Representative as defined by law to determine if a repayment option is available

14101092.7

**Fraud Claims Review:**

In the event any debtor with respect to any ASL that is the subject of Services alleges that they are the victim of Fraud or Identity Theft, the claim will be handled as follows;

I.   Either NCO or its Subservicer will forward a copy of a fraud affidavit to the consumer.

II.   Once the Fraud affidavit is completed and returned by the borrower, it will be investigated by an internal team at NCO.

III.   NCO will  either validate the claim as true and close the account appropriately <u>or</u> respond to the consumer with evidence as to why the claim was denied

14101092.7

## EXHIBIT G

## OPERATING GUIDELINES
### NCSLT Operating Guidelines, version 8/31/12

### *Definitions:*

*Base Period:* The historical cohort(s) used to determine baseline performance.

*Cash Cure Rate:* The percentage obtained from the fraction having total Cash Cures as the numerator and total Cures as the denominator.

*Cash Cure:* Any Cure which has occurred through a payment received from the borrower.

*Cure:* An account has been cured if (i) an ASL that is at least thirty (30) days past due but less than one hundred and eighty (180) days past due becomes less than thirty (30) days past due and (ii) an ASL that is at least one hundred and eighty (180) days past due with respect to whom the appropriate Servicer has not yet submitted a Claims Package becomes less than thirty (30) days past due.

*Early Pre- Default:* Loans that are 31-60 days past due

*Goal:* Turnstile Capital Management, LLC, a wholly owned subsidiary of Goal Structured Solutions, Inc.

*Initial Period:* The period of time which begins on the Transition Date and ends 90 days later.

*Indexed Cure Rate:* The percentage obtained from the fraction having Cures during the Base Period as the numerator and Total Delinquent Accounts during the Base Period as the denominator.

*Indexed Cash Cure Rate:* The percentage obtained from the fraction having Cash Cures during the Base Period as the numerator and Total Delinquent Accounts during the Base Period as the denominator.

*Indexed Liquidation Rate:* The percentage obtained from the fraction having gross recoveries during the Base Period as the numerator and total placements during the Base Period as the denominator.

*Liquidation Rate:* The percentage obtained from the fraction having gross recoveries for the Base period as the numerator and total placements for the Base Period as the denominator.

*Litigation Accounts:* Loans that have been identified for litigation according to the Litigation Criteria

14101092.7

*Litigation Criteria*: As of the Transition Date, accounts with a current balance of greater than $1,000, a borrower who does not reside in Puerto Rico or any country outside of the United States, is collectable under the statute of limitations, and been placed in the Primary, Secondary, and Tertiary post-default Segment will be submitted for collections. Litigation Criteria can be changed at NCO's discretion provided, however, that any material changes will be discussed in a Quarterly Business Review prior to being implemented.

*Market Share:* The percentage obtained from the fraction with outstanding principal and interest at a given agency in a given segment as the numerator and total principal and interest within that segment as the denominator.

*NCO Agreement:* The Default Services and Collection Services Agreement dated March 1, 2009 and amended on June 15, 2012 and September 7, 2012 between NCO Financial Systems (NCO), First Marblehead Education Resources and U.S. Bank.

*Performance Progression Plan (PPP)* – A document that is created by NCO and agreed to by an OCA which identifies areas of sub-par performance by an OCA, steps which will be taken to improve performance and address NCO's concerns, and defines how and when performance improvements will be measured.

*Pre-default:* Any account which is less than 180 days delinquent.

*Primary Pre-Default:* Loans that are 61-120 days past due.

*Primary Post-Default:* Loans that have been placed at 1 OCA including the current OCA.

*OCA*: A third party collection agency retained by NCO to perform any of the Services (other than Collection Agency Management Services), and NCO.

*Secondary Pre-Default:* Loans that are 121-180 days past due.

*Secondary Post-Default:* Loans that have been placed at 2 OCAs including the current OCA

*Scorecard Requirements:* An internal scorecard developed by NCO which measures call quality based upon length and disposition of calls, FDCPA compliance, and other factors.

*Settlement Loans*: Loans that are being fully retired at less than face value per a pre-determined agreement with the borrower.

*Settlement Percentage:* The percentage obtained from the fraction with gross dollars collected on Settlement Loans as the numerator and the total principal and interest on same Settlement Loans as the denominator.

*Segment:* A functional area.  Pre-default consists of Early, Primary, and Secondary.  Post-default consists of Primary, Secondary, Tertiary, Warehouse, Litigation and others to be created.

14101092.7

*Services:* The defined services in the NCO Agreement.

*Six Month Batch Rollup:* The sum of the last six monthly vintages which have moved into a post-default status.

*Special Subservicing Agreement:* The agreement dated September 7, 2012 between U.S. Bank National Association (U.S. Bank) and Goal.

*Tertiary:* Loans that have been worked by a total of 3 OCAs including the current OCA

*Total Delinquent Accounts:* The total principal and interest of all accounts which have been placed at an OCA for pre-default collection activity.

*Transition Date:* October 15th 2012 or such other date on which NCO assumes all operational duties previously performed by First Marblehead Education Resources.

*Warehouse:* Loans that have been through Primary Post-Default, Secondary Post-Default and Tertiary Post-Default and do not meet the Litigation Criteria

### *Section1 : Market share limitations:*

    a.  <u>Pre-default</u>: each OCA will have no more than 70% Market Share in a given Segment.   Once total staffing levels for pre-default services are <8 FTE in any Segment, the market share limitation shall no longer apply.

    b.  <u>Post-default</u>: each OCA will have no more than 70% Market Share in a given Segment.  Market share limitations will not apply to loans in the Warehouse Segment or loans in a litigation status.

    c.  <u>Segment Generally</u>: As an account moves to different post-default Segments, the OCA responsible for collecting on the account <u>must</u> change. For example, an account placed at an OCA responsible for primary collections could not be placed at the same OCA for secondary collections. This limitation shall not apply to loans which move into the Warehouse Segment or into a litigation status.

### Section 2: OCA Performance Measurement:

    a.  <u>Pre-default:</u> Each OCA's performance in each Segment will be measured against both the Indexed Cure Rate and Indexed Cash Cure Rate. Should any OCA's cure rate be less than 80% of the Indexed Cure Rate or Indexed Cash Cure Rate for 3 consecutive months, the OCA will be placed on a Performance Progression Plan. If the cure rate does not return to at least 80% of the Indexed Cure Rate within the timeframe established in the Performance Progression Plan, the OCA will be eligible for a market share reduction as described in Section 3 d.

14101092.7

b. <u>Post-default:</u> Each OCA's performance in each Segment will be measured against the Indexed Liquidation Rate. Should any OCA's Liquidation Rate be less than 80% of the Indexed Liquidation Rate for 3 consecutive months, the OCA will be place on a Performance Progression Plan. If the Liquidation Rate does not return to at least 80% of the Indexed Liquidation Rate within the timeframe established in the Performance Progression Plan, the OCA will be eligible for a market share reduction as described in Section 3d.

c. <u>New OCAs:</u> As new OCAs are introduced into a segment there will be insufficient performance data to calculate the metrics used to measure OCA performance. For this reason, OCAs with less than 3 months of pre-default performance history or 6 months of post-default performance history will be excluded from the Indexed Cure Rate. Performance of new OCAs will be included in the Quarterly Business Review.

**Section 3: Market share allocation and adjustments:**

a. <u>Initial Period</u>
   i. All market share allocations, adjustments, and measurements defined herein will not apply to the Initial Period
   ii. During the Initial Period, Market Share allocated to NCO will not exceed the following limitations:
      - Pre-Default – 35%
      - Post-Default Primary Placement –25% of the current month placements and 12.5% in aggregate
      - Post-Default Secondary Placement –40% of the current month placements and 30% in aggregate
      - Post-Default Tertiary Placements –50% of the current month placements and 40% in aggregate
      - Aggregate Post-Default Market Share – 45%

b. <u>Minimum Performance Standards – Pre-Default:</u> In order to be eligible for Market Share increases, an OCA working pre-default accounts must maintain the following requirements:
      - Cash Cure Rate – Early must be at least 72%
      - Cash Cure Rate – Primary must be at least 70%
      - Cash Cure Rate - Secondary must be at least 60%
      - Call quality - Calls must both be made in a timely manner and satisfy the Scorecard Requirements.

Failure to meet all minimum thresholds for 3 consecutive months would make the OCA eligible for a market share reduction. Additionally each OCA must perform to the standards established in their contract. Evaluation of OCAs will incorporate operational

14101092.7

feedback from NCO including the timeliness and accuracy of reporting, placement and recall of accounts, and litigation monitoring.

c. <u>Minimum Performance Standards – Post Defaults:</u> In order to be eligible for market share increases, an OCA working post-default accounts must maintain the following requirements:

- Settlement Percentage, Primary - The average rate must be at least 80% with no individual settlements below 65%
- Settlement Percentage, Secondary – The average rate must be at least 65% with no individual settlements below 50%
- Settlement Percentage, Tertiary – The average rate must be at least 55% with no individual settlements below 40%
- Settlement Percentage – Warehouse must be at least 55% with no individual settlements below 45%
- Call quality- Calls must both be provided in a timely manner and satisfy the Scorecard Requirements. 3 consecutive months would make the OCA eligible for a market share reduction.

Failure to meet all minimum thresholds for 3 consecutive months would make the OCA eligible for a market share reduction. Additionally each OCA must perform to the standards established in their contract. Evaluation of OCAs will incorporate operational feedback from NCO including the timeliness and accuracy of reporting, placement and recall of accounts, and litigation monitoring.

d. <u>Market share adjustments:</u>

  i.   Up to 10% of market share in any segment can be allocated at NCO's discretion to new OCAs and for testing purposes at any time.

  ii.  Any OCA which fails to meet the minimum performance standards defined herein will be eligible for a reduction in Market Share of up to 15%.

  iii. Any OCA which exceeds the performance standards defined herein shall be eligible for an increase in Market Share of up to 15%.

  iv.  Upon the creation of a new Segment, the initial allocation to any OCA will not be subject to the limitations in established in Section d ii and iii, provided that the total market share allocated to any OCA does not exceed [70%]. No new Segment shall be created without the consent of all parties to this agreement.

  v.   Market share adjustments will generally occur in conjunction with a QBR, however NCO has the right to make market share adjustments at any time if circumstances warrant.

14101092.7

**Section 4 - Quarterly Business Review:**

Goal will be responsible for scheduling the Quarterly Business Review (QBR) as provided for in the Special Subservicing Agreement. Each QBR will discuss the following items:

- NCO adherence to the Operating Guidelines
- Staffing levels by segment and corresponding ACRs
- SSA reimbursement limits, projections, and staffing changes
- Prior quarter OCA performance and operational changes
  - Hire / fire of OCAs
  - Market Share adjustments
  - Inventory changes
- Portfolio reporting – actual vs. forecast
  - Delinquency rate
  - Forbearance rate
  - Default rate
- Quality and Compliance Report
- Pending legislation (both debtors and others)
- Review of NCO pre and post-default performance (as performing in the OCA capacity)
- Strategy review
- Such other matters designated by Goal or NCO

**Section 5 - OCA Management:**

a. NCO will perform a QBR with any OCA who receives >$125k in quarterly compensation and provide the associated documentation to Goal. For agencies receiving more than $250k in quarterly revenue, NCO will conduct a site visit at least once per year in conjunction with a regularly scheduled OCA Audit.

b. Goal will be responsible for monitoring and auditing the performance of NCO in its capacity as an OCA in conjunction with the QBR and as specified in the Special Subservicing Agreement.

**Section 6 - OCA Eligibility and Network Design:**

NCO will be responsible for the selection of new OCAs for potential inclusion into the NCSLT network design. NCO will perform all necessary due diligence, including a site visit.

14101092.7

Any new OCA must meet the following criteria prior to being added to the OCA network:

- Performed work in either student loan or consumer bank card asset classes within last year
- Actively licensed in all states where they will be performing collections activities.
- Have a recent SAS 70, Type II or equivalent that can be provided; PCI Certification
- Is in good financial standing and is able to provide two years of audited financials
- Pass a basic background check of their company and principals
- FDCPA training program, as well as a dedicated Quality Assurance team that monitors

Any addition of an OCA is subject to the notice and consent requirements established in Section 2.12 of the NCO agreement, it being understood that no consent will be unreasonably withheld so long as the above criteria have been met.

### Section 7 - Updates and Revisions to the Operating Guidelines

Any proposed changes or revisions to the Operating Guidelines will be discussed during a Quarterly Business Review. Changes to the Operating Guidelines will be effective with the written consent of NCO, Goal, and U.S. Bank.

14101092.7

# EXHIBIT H
## TO DEFAULT PREVENTION AND COLLECTION SERVICES AGREEMENT
### FEES

**Default Prevention:**

For loans that roll at 31+ days from servicer to NCO Default Prevention Collectors and to be managed up until 180 days past due or lender mandated charge off date, including loans in Claims Review:

Pricing

$5,000.00 per month for each pre-approved NCO FTE. An "FTE" is the equivalent of 147 production hours in a month.

Initial Staffing Ratios

- The number of FTEs dedicated by NCO for this engagement shall be as mutually agreed.
- Any increase or decrease to staffing levels will be communicated in writing at least fifteen days (15) prior to the month in which the change shall be effective.

Performance Incentive

NCO will be further compensated based on reaching and/or exceeding agreed upon "Cure Rate" goals outlined below. The incentive compensation will be a % of the base rate billed in the same month for each stage.

Below numbers are a weighted average for a given month:

| Bonus based on billed amount for number of reps in each stage | Early 30 Day Evaluation (31-60 DPD) | Primary 60 Day Evaluation (61-120 DPD) | Secondary 60 Day Replacement Evaluation (121-180 DPD) |
|---|---|---|---|
| **All\*** **Tier 1 = 3%** | 52.00% | 56.00% | 16.00% |
| **Tier 2 = 7%** | 54.00% | 58.00% | 18.00% |
| **Tier 3 = 13%** | 56.00% | 61.00% | 20.00% |
| Bonus structure | $12,000 for top agency\* (details below) | $12,000 for top agency\* (details below) | $6,000 for top agency\* (details below) |

Cash Cure Percentages

NCO is expected to maintain the below percentage of cures attributable to cash resolution (as opposed to MGRS, Forbearance, and the Reduced Payment Program). Falling below this ratio will cause NCO to be ineligible for the "top agency bonus" for the period as well as ineligible for volume increases, both described more fully below.

| Early 30 Day Evaluation (31-60 DPD) | Primary 60 Day Evaluation (61-120 DPD) | Secondary 60 Day Replacement Evaluation (121-180 DPD) |
|---|---|---|
| 72% | 70% | 60% |

- NCO will compete for a "top agency bonus" each month. A weighted average will be compared on the initial 30 day evaluation (31-60 DPD), the 60 day evaluation (61-120 DPD) and the Replacement 60 day evaluation (121-180 DPD). The agency with the best cure rate for each of these evaluations will earn a $12,000, $12,000 and $6,000 "top agency bonus," respectively.
- NCO cure rates will be measured to two decimal points, and in the event of a tie will revert to the agency with the highest Cash Cure Percentage.
- NCO must achieve a minimum of a Tier 1 performance level to be eligible for the "top agency bonus."
- NCO must not fall below the targeted Cash Cure Percentage to be eligible for the "top agency bonus."
- If the top agency falls below the Cash Cure Percentage goal, the next best agency will inherit the "top agency bonus" provided they have not fallen below their Cash Cure Percentage target and have achieved at least Tier 1 performance.

Volume Increase Opportunity

Monthly, 31+ DPD volume may be reallocated as follows:

- NCO will be ranked based on 31+ day evaluations within a given month, and may be given an increase of volume placed at 31+ DPD for the following month based on that rank. Conversely, poorer performing agencies may realize a decrease in volume for the following month based on their rank.
- NCO may not fall below Cash Cure Percentage targets listed above to qualify for any volume increases.
- NCO will be notified of monthly results and how they will impact the FTE counts outlined above.

14101092.7

**<u>Post Default Collections (including probate recoveries)</u>**:

NCO to utilize Default Collectors for all of post default collections prior to litigation.

a.     <u>Payments on First Placements</u>

      NCO shall receive a fee equal to twenty percent (20%) of all amounts collected directly from the Borrower(s) on each account.

b.     <u>Payments on Second Placements</u>

      NCO shall receive a fee equal to twenty-nine percent (29%) of all amounts collected directly from the Borrower(s) on each account.

c.     <u>Payments on Third Placements</u>

      NCO shall receive a fee equal to thirty-three (33%) of all amounts collected directly from the Borrower(s) on each account.

d.     <u>Accounts in Litigation</u>

      Amounts collected on accounts referred by NCO to an attorney for formal legal proceedings will be deposited into the account, and NCO will be entitled to a fee on any such amount equal to thirty percent (30%) of all amounts collected by the attorney from the borrower.

e.     <u>Warehouse Placements.</u>

      NCO shall receive a fee equal to forty percent (40%) of all amounts collected direclty from Borrowers on each account.

14101092.7

FOURTH AMENDMENT TO
DEFAULT PREVENTION AND COLLECTION SERVICES AGREEMENT

This Fourth Amendment to Default Prevention and Collection Services Agreement (this "Amendment") is entered into as of July 1, 2014, by and between U.S. Bank National Association, as successor Special Servicer, a national banking association with a principal place of business at 60 Livingston Avenue, Mailcode: EP-MN-WS3D, St. Paul MN 55107 (together with its successors and assigns, the "Successor Special Servicer") and NCO Financial Systems, Inc., a corporation organized under the laws of the Commonwealth of Pennsylvania having a place of business at 507 Prudential Road, Horsham, PA 19044 (together with its successors and assigns, `NCO"), and amends that certain Default Prevention and Collection Services Agreement entered into by and between First Marblehead Education Resources, Inc. ("FMER"), the initial Special Servicer, and NCO and dated as of March 1, 2009 (the "Original Agreement"), as amended by that certain First Amendment to Default Prevention and Collection Services Agreement entered into by and between FMER and NCO and dated as of May 1, 2009 (the "First Amendment") and by that certain Second Amendment to Default Prevention and Collection Services Agreement entered into by and between FMER and NCO and dated as of June 15, 2012 (the "Second Amendment" and, together with the Original Agreement and the First Amendment, the "NCO Agreement"; and the NCO Agreement, as supplemented and amended by this Amendment and as same may be further amended from time to time pursuant to Section 11.10, the "Agreement").

WHEREAS, pursuant to that certain (i) Special Servicing Agreement dated as of March 1, 2009 (the "March SSA") by and among FMER as special servicer, U.S. Bank National Association as back-up special servicer (in such capacity the "Back-Up Special Servicer") and each of the Trusts listed on Schedule A to the March SSA and (ii) Special Servicing Agreement dated as of May 1, 2009 (together with the March SSA, the "Special Servicing Agreements") by and among FMER as special servicer, U.S. Bank as back-up special servicer, Ambac Assurance Corporation ("Ambac") and each of the Trusts listed on Schedule A to the May SSA, the Trusts appointed FMER as the initial Special Servicer and U.S. Bank as the Back-Up Special Servicer for the purposes of providing default prevention, collection and other special services duties to the Trusts identified in the Special Servicing Agreements (collectively, the "Trusts" and individually, a "Trust") in accordance with the terms of the Special Servicing Agreements.

WHEREAS, pursuant to the Special Servicing Agreements, FMER as initial Special Servicer arranged for the outsourcing to NCO of certain default prevention and collection activities of the Special Servicer under the Special Servicing Agreements in the event that U.S. Bank became the successor Special Servicer under the Special Servicing Agreements;

WHEREAS, as of June 21, 2012, the Successor Special Servicer assumed the duties of the Special Servicer under the Special Servicing Agreements and FMER notified NCO of such assumption;

WHEREAS, pursuant to the NCO Agreement, upon being notified of the assumption by U.S. Bank as Back-up Special Servicer of the duties of the Special Servicer under the Special

Servicing Agreements, NCO shall begin performance of the Services specified in the NCO Agreement;

WHEREAS, June 21, 2012, is the "Effective Date" for purposes of the Agreement;

WHEREAS, the Successor Special Servicer and NCO wish to amend the Agreement to update, expand and confirm the services, including, without limitation, collection and enforcement services, to be provided by NCO thereunder.

WHEREAS, pursuant to that certain Special SubServicing Agreement dated ____ ,2012, between the Successor Special Servicer and Turnstile Capital Management, L.L.C. a wholly owned subsidiary of Goal Structured Solutions, Inc. as the Special SubServicer (the "Special SubServicing Agreement") the Successor Special Servicer has appointed Turnstile as its subservicer (in such capacity, the "Special SubServicer") for purposes of performing the Special Services required to be performed under the Special Servicing Agreements (other than the Special Services to be performed by NCO under the Agreement);

WHEREAS, as part of the Special Services to be performed by it, the Special SubServicer will be responsible for global portfolio strategy and oversight of NCO's performance under the Agreement as more fully set forth in the Agreement;

NOW THEREFORE, in consideration of the premises set forth above, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Defined Terms. All capitalized terms in this Amendment shall have the same meaning given to them in the Agreement, unless otherwise expressly stated herein.

2.    Amendments of the Agreement. The Agreement is hereby amended in the following respects:

2.1   The Exhibits to the Agreement are amended as follows:

(a) Exhibit G to the Agreement is deleted and replaced in its entirety with the form of Exhibit G attached to this Amendment, identified as version 7/1/14.

(b) Exhibit H to the Agreement is deleted and replaced in its entirety with the form of Exhibit H attached to this Amendment, identified as version 7/1/14.

3.    Effect of Amendment. This Amendment shall be effective as of the date first set forth above. Except as expressly amended by this Amendment, all terms and provisions contained in the Agreement shall continue in full force and effect, without modification. All references in the Agreement to the Agreement shall be deemed to mean the Agreement as modified hereby. This Amendment shall not constitute a novation of the Agreement, but shall constitute an amendment thereof The parties hereto agree to be bound by the terms and conditions of the Agreement, as amended by this Amendment, as though such terms and

14101092.7                                    2

conditions were set forth therein. This Amendment may not be amended or otherwise modified except as provided in the Agreement. The failure or unenforceability of any provision hereof shall not affect the other provisions of this Amendment or the Agreement.

    4.    <u>Multiple Counterparts.</u> This Amendment may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which shall be deemed, collectively, one agreement, but in making proof hereof it shall not be necessary to exhibit more than one such counterpart. Delivery of an executed counterpart of this Amendment by facsimile or pdf electronic transmission shall be deemed as effective as delivery of an originally executed counterpart.

    5.    GOVERNING LAW, THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF OHIO, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN TO THOSE OF THE STATE OF OHIO. EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Fourth Amendment to the Default Prevention and Collection Services Agreement to be executed as of the date first written above.

U.S. BANK NATIONAL ASSOCIATION, as Successor Special Servicer under the Special Servicing Agreements

By: _____

Name:       Brian C Tri
            Vice President

Title:


NCO FINANCIAL SYSTEMS, INC.

By: _____

Name: Joseph P. Barr

Title: Vice President


Acknowledged and Agreed:

TURNSTILE CAPITAL MANAGEMENT, LLC

By: _____

Name: Kenneth L. Ruggiero

Title:   President and CEO

14101092.6

## EXHIBIT G

## OPERATING GUIDELINES

### NCSLT Operating Guidelines, version 7/1/14

**_Definitions:_**

*Base Period:* The historical cohort(s) used to determine baseline performance.

*Cash Cure Rate:* The percentage obtained from the fraction having total Cash Cures as the numerator and total Cures as the denominator.

*Cash Cure:* Any Cure which has occurred through a payment received from the borrower.

*Cure:* An account has been cured if (i) an ASL that is at least thirty (30) days past due but less than one hundred and eighty (180) days past due becomes less than thirty (30) days past due and (ii) an ASL that is at least one hundred and eighty (180) days past due with respect to whom the appropriate Servicer has not yet submitted a Claims Package becomes less than thirty (30) days past due.

*Early Pre- Default:* Loans that are 31-60 days past due

*Goal:* Turnstile Capital Management, LLC, a wholly owned subsidiary of Goal Structured Solutions, Inc.

*Initial Period:* The period of time which begins on the Transition Date and ends 90 days later.

*Indexed Cure Rate:* The percentage obtained from the fraction having Cures during the Base Period as the numerator and Total Delinquent Accounts during the Base Period as the denominator.

*Indexed Cash Cure Rate:* The percentage obtained from the fraction having Cash Cures during the Base Period as the numerator and Total Delinquent Accounts during the Base Period as the denominator.

*Indexed Liquidation Rate:* The percentage obtained from the fraction having gross recoveries during the Base Period as the numerator and total placements during the Base Period as the denominator.

*Liquidation Rate:* The percentage obtained from the fraction having gross recoveries for the Base period as the numerator and total placements for the Base Period as the denominator.

*Litigation Accounts:* Loans that have been identified for litigation according to the Litigation Criteria

14101092.6

*Litigation Criteria:*

| NCSLT Next Segment Progression | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Primary | | Secondary | | Tertiary | | Quad | |
| | Recovery <= 600 | Recovery Score > 600 | Recovery <= 600 | Recovery Score > 600 | Recovery <= 600 | Recovery Score > 600 | Recovery <= 600 | Recovery Score > 600 |
| Balance < $2k | Secondary | Secondary | Tertiary | Tertiary | Quad | Quad | Warehouse | Warehouse |
| Lower 3 Quartiles Legal Score | Secondary | Secondary | Tertiary | Tertiary | Quad | Quad | Legal | Legal |
| Upper Quartile Legal Score < $40k | Secondary | Secondary | Legal | Tertiary | Legal | Quad | Legal | Legal |
| Upper Quartile Legal Score => $40k | Legal | Secondary | Legal | Tertiary | Legal | Quad | Legal | Legal |
| Cease and Desist | Legal | Legal | Legal | Legal | Legal | Legal | Legal | Legal |

*Market Share:* The percentage obtained from the fraction with outstanding principal and interest at a given agency in a given segment as the numerator and total principal and interest within that segment as the denominator.

*NCO Agreement:* The Default Services and Collection Services Agreement dated March 1, 2009 and amended on June 15, 2012 and September 7, 2012 between NCO Financial Systems (NCO), First Marblehead Education Resources and U.S. Bank.

*Performance Progression Plan (PPP)* – A document that is created by NCO and agreed to by an OCA which identifies areas of sub-par performance by an OCA, steps which will be taken to improve performance and address NCO's concerns, and defines how and when performance improvements will be measured.

*Pre-default:* Any account which is less than 180 days delinquent.

*Primary Pre-Default:* Loans that are 61-120 days past due.

*Primary Post-Default:* Loans that have been placed at 1 OCA including the current OCA.

*OCA:* A third party collection agency retained by NCO to perform any of the Services (other than Collection Agency Management Services), and NCO.

*Secondary Pre-Default:* Loans that are 121-180 days past due.

*Secondary Post-Default:* Loans that have been placed at 2 OCAs including the current OCA

*Scorecard Requirements:* An internal scorecard developed by NCO which measures call quality based upon length and disposition of calls, FDCPA compliance, and other factors.

*Settlement Loans:* Loans that are being fully retired at less than face value per a pre-determined agreement with the borrower.

*Settlement Percentage:* The percentage obtained from the fraction with gross dollars collected on Settlement Loans as the numerator and the total principal and interest on same Settlement Loans as the denominator.

*Segment:* A functional area. Pre-default consists of Early, Primary, and Secondary. Post-default consists of Primary, Secondary, Tertiary, Warehouse, Litigation and others to be created.

*Services:* The defined services in the NCO Agreement.

14101092.6

*Six Month Batch Rollup:* The sum of the last six monthly vintages which have moved into a post-default status.

*Special Subservicing Agreement:* The agreement dated September 7, 2012 between U.S. Bank National Association (U.S. Bank) and Goal.

*Tertiary:* Loans that have been worked by a total of 3 OCAs including the current OCA.

*Total Delinquent Accounts:* The total principal and interest of all accounts which have been placed at an OCA for pre-default collection activity.

*Transition Date:* October 15th 2012 or such other date on which NCO assumes all operational duties previously performed by First Marblehead Education Resources.

*Warehouse:* Loans that have been through Primary Post-Default, Secondary Post-Default and Tertiary Post-Default and do not meet the Litigation Criteria

## Section1 : Market share limitations:

a. Pre-default: each OCA will have no more than 70% Market Share in a given Segment.   Once total staffing levels for pre-default services are <8 FTE in any Segment, the market share limitation shall no longer apply.
b. Post-default: each OCA will have no more than 70% Market Share in a given Segment.   Market share limitations will not apply to loans in the Warehouse Segment or loans in a litigation status.
c. Segment Generally: As an account moves to different post-default Segments, the OCA responsible for collecting on the account must change. For example, an account placed at an OCA responsible for primary collections could not be placed at the same OCA for secondary collections. This limitation shall not apply to loans which move into the Warehouse Segment or into a litigation status.

## Section 2: OCA Performance Measurement:

a. Pre-default: Each OCA's performance in each Segment will be measured against both the Indexed Cure Rate and Indexed Cash Cure Rate. Should any OCA's cure rate be less than 80% of the Indexed Cure Rate or Indexed Cash Cure Rate for 3 consecutive months, the OCA will be placed on a Performance Progression Plan. If the cure rate does not return to at least 80% of the Indexed Cure Rate within the timeframe established in the Performance Progression Plan, the OCA will be eligible for a market share reduction as described in Section 3 d.
b. Post-default: Each OCA's performance in each Segment will be measured against the Indexed Liquidation Rate. Should any OCA's Liquidation Rate be less than 80% of the Indexed Liquidation Rate for 3 consecutive months, the OCA will be place on a Performance Progression Plan. If the Liquidation Rate does not return to at least 80% of the Indexed Liquidation Rate within the timeframe established in the

14101092.6

Performance Progression Plan, the OCA will be eligible for a market share reduction as described in Section 3d.

c.  <u>New OCAs:</u> As new OCAs are introduced into a segment there will be insufficient performance data to calculate the metrics used to measure OCA performance. For this reason, OCAs with less than 3 months of pre-default performance history or 6 months of post-default performance history will be excluded from the Indexed Cure Rate. Performance of new OCAs will be included in the Quarterly Business Review.

## Section 3: Market share allocation and adjustments:

a.  <u>Initial Period</u>
   i.   All market share allocations, adjustments, and measurements defined herein will not apply to the Initial Period
   ii.  During the Initial Period, Market Share allocated to NCO will not exceed the following limitations:
   - Pre-Default – 35%
   - Post-Default Primary Placement –25% of the current month placements and 12.5% in aggregate
   - Post-Default Secondary Placement –40% of the current month placements and 30% in aggregate
   - Post-Default Tertiary Placements –50% of the current month placements and 40% in aggregate
   - Aggregate Post-Default Market Share – 45%

b.  <u>Minimum Performance Standards – Pre-Default:</u> In order to be eligible for Market Share increases, an OCA working pre-default accounts must maintain the following requirements:
   - Cash Cure Rate – Early must be at least 72%
   - Cash Cure Rate – Primary must be at least 70%
   - Cash Cure Rate - Secondary must be at least 60%
   - Call quality - Calls must both be made in a timely manner and satisfy the Scorecard Requirements.

Failure to meet all minimum thresholds for 3 consecutive months would make the OCA eligible for a market share reduction. Additionally each OCA must perform to the standards established in their contract. Evaluation of OCAs will incorporate operational feedback from NCO including the timeliness and accuracy of reporting, placement and recall of accounts, and litigation monitoring.

c.  <u>Minimum Performance Standards – Post Defaults:</u> In order to be eligible for market share increases, an OCA working post-default accounts must maintain the following requirements:

14101092.6

| NCSLT Revised Settlement Parameters | | | | | | | | | | | |
| Primary | | Secondary | | Tertiary | | Quad | | Legal | | Warehouse | |
| Floor | Aggregate | Floor | Aggregate | Floor | Aggregate | Floor | Aggregate | Floor | Aggregate | Floor | Aggregate |
| Stat Date > 6 Months | 65% | 75% | 60% | 70% | 50% | 60% | 45% | 55% | 40% | 50% | 35% | 45% |
| Post-Judgment Difficult (NC, SC, TX, PA, FL) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 35% | None | 35% | None |
| Stat Date < 6 Months, no MS/WI | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 35% | None | 30% | None |
| 3 < Stat Date < 6 Months, MS/WI | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 25% | None | 20% | None |
| Stat Date < 3 Months, MS/WI | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 15% | None | 10% | None |

Failure to meet all minimum thresholds for 3 consecutive months would make the OCA eligible for a market share reduction. Additionally each OCA must perform to the standards established in their contract. Evaluation of OCAs will incorporate operational feedback from NCO including the timeliness and accuracy of reporting, placement and recall of accounts, and litigation monitoring.

d.  Market share adjustments:

  i.   Up to 10% of market share in any segment can be allocated at NCO's discretion to new OCAs and for testing purposes at any time.

  ii.  Any OCA which fails to meet the minimum performance standards defined herein will be eligible for a reduction in Market Share of up to 15%.

  iii.  Any OCA which exceeds the performance standards defined herein shall be eligible for an increase in Market Share of up to 15%.

  iv.  Upon the creation of a new Segment, the initial allocation to any OCA will not be subject to the limitations in established in Section d ii and iii, provided that the total market share allocated to any OCA does not exceed [70%]. No new Segment shall be created without the consent of all parties to this agreement.

  v.   Market share adjustments will generally occur in conjunction with a QBR, however NCO has the right to make market share adjustments at any time if circumstances warrant.

**Section 4 - Quarterly Business Review:**

Goal will be responsible for scheduling the Quarterly Business Review (QBR) as provided for in the Special Subservicing Agreement. Each QBR will discuss the following items:

- NCO adherence to the Operating Guidelines
- Staffing levels by segment and corresponding ACRs
- SSA reimbursement limits, projections, and staffing changes
- Prior quarter OCA performance and operational changes
  o  Hire / fire of OCAs
  o  Market Share adjustments
  o  Inventory changes
- Portfolio reporting – actual vs. forecast
  o  Delinquency rate
  o  Forbearance rate

14101092.6

    o  Default rate
- Quality and Compliance Report
- Pending legislation (both debtors and others)
- Review of NCO pre and post-default performance (as performing in the OCA capacity)
- Strategy review
- Such other matters designated by Goal or NCO

## Section 5 - OCA Management:

a.  NCO will perform a QBR with any OCA who receives >$125k in quarterly compensation and provide the associated documentation to Goal. For agencies receiving more than $250k in quarterly revenue, NCO will conduct a site visit at least once per year in conjunction with a regularly scheduled OCA Audit.

b.  Goal will be responsible for monitoring and auditing the performance of NCO in its capacity as an OCA in conjunction with the QBR and as specified in the Special Subservicing Agreement.

## Section 6 - OCA Eligibility and Network Design:

NCO will be responsible for the selection of new OCAs for potential inclusion into the NCSLT network design. NCO will perform all necessary due diligence, including a site visit.

Any new OCA must meet the following criteria prior to being added to the OCA network:

- Performed work in either student loan or consumer bank card asset classes within last year
- Actively licensed in all states where they will be performing collections activities.
- Have a recent SAS 70, Type II or equivalent that can be provided; PCI Certification
- Is in good financial standing and is able to provide two years of audited financials
- Pass a basic background check of their company and principals
- FDCPA training program, as well as a dedicated Quality Assurance team that monitors

Any addition of an OCA is subject to the notice and consent requirements established in Section 2.12 of the NCO agreement, it being understood that no consent will be unreasonably withheld so long as the above criteria have been met.

## Section 7 - Updates and Revisions to the Operating Guidelines

Any proposed changes or revisions to the Operating Guidelines will be discussed during a Quarterly Business Review. Changes to the Operating Guidelines will be effective with the written consent of NCO, Goal, and U.S. Bank.

141101092.6

## EXHIBIT H
## TO DEFAULT PREVENTION AND COLLECTION SERVICES AGREEMENT
## FEES, VERSION 7/1/14

**Default Prevention:**

For loans that roll at 31+ days from servicer to NCO Default Prevention Collectors and to be managed up until 180 days past due or lender mandated charge off date, including loans in Claims Review:

Pricing

$5,000.00 per month for each pre-approved NCO FTE. An "FTE" is the equivalent of 147 production hours in a month.

Initial Staffing Ratios

- The number of FTEs dedicated by NCO for this engagement shall be as mutually agreed.
- Any increase or decrease to staffing levels will be communicated in writing at least fifteen days (15) prior to the month in which the change shall be effective.

Performance Incentive

NCO will be further compensated based on reaching and/or exceeding agreed upon "Cure Rate" goals outlined below. The incentive compensation will be a % of the base rate billed in the same month for each stage.

Below numbers are a weighted average for a given month:

| Early Tier Bonus | | | | | |
|---|---|---|---|---|---|
| Bonus based on # of reps | Q1 | Q2 | Q3 | Q4 | |
| Early tier 1 | 59% | 56% | 56% | 53% | $150 per seat |
| Early tier 2 | 61% | 58% | 58% | 55% | $350 per seat |
| Early tier 3 | 64% | 61% | 61% | 58% | $650 per seat |

| Primary Tier Bonus | | | | | |
|---|---|---|---|---|---|
| Bonus based on # of reps | Q1 | Q2 | Q3 | Q4 | |
| Primary tier 1 | 59% | 56% | 56% | 54% | $150 per seat |
| Primary tier 2 | 61% | 58% | 58% | 56% | $350 per seat |
| Primary tier 3 | 63% | 61% | 61% | 59% | $650 per seat |

| Secondary Tier Bonus | | | | | |
|---|---|---|---|---|---|
| Bonus based on # of reps | Q1 | Q2 | Q3 | Q4 | |
| Secondary tier 1 | 27% | 24% | 24% | 21% | $150 per seat |
| Secondary tier 2 | 29% | 26% | 26% | 23% | $350 per seat |
| Secondary tier 3 | 32% | 29% | 29% | 26% | $650 per seat |

| Top Agency Bonus | |
|---|---|
| New top agency bonus structure | |
| Early | 15% bonus ($750 per head) |
| Primary | 15% bonus ($750 per head) |
| Secondary | 15% bonus ($750 per head) |

14101092.6

Cash Cure Percentages

NCO is expected to maintain the below percentage of cures attributable to cash resolution (as opposed to MGRS, Forbearance, and the Reduced Payment Program). Falling below this ratio will cause NCO to be ineligible for the "top agency bonus" for the period as well as ineligible for volume increases, both described more fully below.

| Early 30 Day Evaluation (31-60 DPD) | Primary 60 Day Evaluation (61-120 DPD) | Secondary 60 Day Replacement Evaluation (121-180 DPD) |
|---|---|---|
| 72% | 70% | 60% |

- NCO will compete for a "top agency bonus" each month. A weighted average will be compared on the initial 30 day evaluation (31-60 DPD), the 60 day evaluation (61-120 DPD) and the Replacement 60 day evaluation (121-180 DPD). The agency with the best cure rate for each of these evaluations will earn a $12,000, $12,000 and $6,000 "top agency bonus," respectively.
- NCO cure rates will be measured to two decimal points, and in the event of a tie will revert to the agency with the highest Cash Cure Percentage.
- NCO must achieve a minimum of a Tier 1 performance level to be eligible for the "top agency bonus."
- NCO must not fall below the targeted Cash Cure Percentage to be eligible for the "top agency bonus."
- If the top agency falls below the Cash Cure Percentage goal, the next best agency will inherit the "top agency bonus" provided they have not fallen below their Cash Cure Percentage target and have achieved at least Tier 1 performance.

Volume Increase Opportunity

Monthly, 31+ DPD volume may be reallocated as follows:

- NCO will be ranked based on 31+ day evaluations within a given month, and may be given an increase of volume placed at 31+ DPD for the following month based on that rank. Conversely, poorer performing agencies may realize a decrease in volume for the following month based on their rank.
- NCO may not fall below Cash Cure Percentage targets listed above to qualify for any volume increases.
- NCO will be notified of monthly results and how they will impact the FTE counts outlined above.

14101092.6

**Post Default Collections (including probate recoveries):**
NCO to utilize Default Collectors for all of post default collections prior to litigation.

a.  Payments on First Placements
   NCO shall receive a fee equal to twenty percent (20%) of all amounts collected directly from the Borrower(s) on each account.

b.  Payments on Second Placements
   NCO shall receive a fee equal to twenty-nine percent (29%) of all amounts collected directly from the Borrower(s) on each account.

c.  Payments on Third Placements
   NCO shall receive a fee equal to thirty-three (33%) of all amounts collected directly from the Borrower(s) on each account.

d.  Accounts in Litigation
   Amounts collected on accounts referred by NCO to an attorney for formal legal proceedings will be deposited into the account, and NCO will be entitled to a fee on any such amount equal to thirty percent (32%) of all amounts collected by the attorney from the borrower.

e.  Warehouse Placements.
   NCO shall receive a fee equal to forty percent (40%) of all amounts collected directly from Borrowers on each account.

14101092.6